SEALED

FILED

AO91 (Rev. 12/03) Criminal Complaint

## UNITED STATES DISTRICT COURT

OCT 0 4 2011

_____ Eastern _____  DISTRICT OF  _____

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY ____
DEPUTY CLERK

UNITED STATES OF AMERICA
V.

Nathan V. HOFFMAN
Hung Cao NGUYEN, aka John NGUYEN

### CRIMINAL COMPLAINT

Case Number: 2·11 MJ 0312 KJN

(Name and Address of Defendant)

I, the undersigned complainant state that the following is true and correct to the best of my

knowledge and belief. On or about _____ in ____ see below ____ County, in

(Date)

the ____ Eastern ____ District of ____ Calfiornia ____ defendant(s) did,

*(Track Statutory Language of Offense)*

Beginning in or about the end of 2010, and continuing to the present, in Sutter County, and elsewhere, did knowingly and intentionally conspire with each other and others to manufacture at least 1,000 marijuana plants, a Schedule I Controlled Substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and
Beginning in or about the end of 2010, and continuing to the present, did knowingly and intentionally manufacture at least 1,000 marijuana plants, a Schedule I Controlled Substance, all

in violation of Title ____ 21 ____ United States Code, Section(s) ____ 841(a)(1) ____ .

I further state that I am a(n) ____ IRS Special Agent ____ and that this complaint is based on the

Official Title

following facts:

PLEASE SEE ATTACHED AFFIDAVIT.

Continued on the attached sheet and made a part of this complaint: ☑ Yes  ☐ No

_____
Signature of Complainant

Lisa Ulrikson
Printed Name of Complainant

Sworn to before me and signed in my presence,

10/4/2011 ____ 10:35 Am. ____ at ____ Sacramento ____ California

Date                                                    City                              State

Kendall J. Newman ____ Magistrate Judge ____ _____
Name of Judge                Title of Judge                        Signature of Judge

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Lisa Ulrikson, being duly sworn, declare and state:

1.   I am an investigative and law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516.

## SCOPE OF REQUESTED CRIMINAL COMPLAINT

2.   I make this Affidavit in support of the issuance of a Criminal Complaint against Nathan V. HOFFMAN and Hung Cao NGUYEN, also known as John NGUYEN for: Count One: conspiracy to manufacture at least 1,000 marijuana plants in Sutter County, California, and elsewhere, during the time period beginning in or about the end of 2010, and continuing to on or about June 21, 2011, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and Count Two: manufacture of at least 1,000 marijuana plants in Sutter County, California, during the time period beginning in or about the end of 2010, and continuing to the present, in violation of 21 U.S.C. § 841(a)(1).   These charges are collectively referred to in this Affidavit as the "Subject Offenses."

## AGENT'S TRAINING AND EXPERIENCE

3.   I am employed as a Special Agent ("SA") by the Internal Revenue Service ("IRS") Criminal Investigations and have been so employed for over 11 years.   I am presently assigned to the Sacramento, California office.   In the course of my employment, I have conducted or been involved in over 50 investigations of alleged criminal violations, which have included: income tax evasion (Title 26, U.S.C. Section 7201); subscribing to false

1

income tax returns (Title 26 U.S.C. Section 7206(1)); money
laundering (Title 18 U.S.C. Sections 1956 and 1957); structuring
cash transactions (Title 31 U.S.C. Section 5324(3)); mail fraud
(Title 18 U.S.C. Section 1341); distribution of controlled
substances and conspiracy (Title 21 U.S.C. Sections 841(a)(1) and
846); continuing criminal enterprise (Title 21 U.S.C. Section
848); and forfeiture (Title 18 U.S.C. Section 981). Most of
these investigations focused on individuals deriving income from
illegal sources (narcotics or fraud). I also have a Bachelor's
of Science Degree in Accounting from Arizona State University.

4.   I have worked with Organized Crime Drug Enforcement
Task Force (OCDETF) operations in the Eastern District of
California. This task force concentrates on the investigation
and prosecution of large-scale narcotics trafficking
organizations.

5.   I have attended over 1,000 hours of training in various
aspects of criminal investigation as well as attending and
instructing classes and seminars dealing specifically with money
laundering, international tax and money laundering, seizure,
forfeiture, various financial investigative techniques, advanced
interviewing and related financial and narcotic investigations.

6.   I have participated in the execution of at least 25
Federal and state search warrants involving the seizure of
contraband and records relating to the concealment of assets and
proceeds from fraud and/or the distribution and sales of
controlled substances; records including, but not limited to,
telephone bills, personal telephone books, photographs and
letters that have identified co-conspirators and others involved

2

1  in the fraud, records pertaining to the purchase of real and
2  personal property, bank records, escrow records, credit card
3  records, tax returns, business books and records and computer
4  hardware and software.

5      7.   Based upon my training and experience I am familiar
6  with 21 U.S.C. §§ 802 and 812, which establish criteria for
7  scheduling specific types of drugs.  A drug falling under a
8  Schedule I classification is found to have a high potential for
9  abuse, has no currently acceptable medicinal use in treatment in
10 the United States, and lacks accepted safety for use under
11 medical supervision.  "Marihuana" (the spelling used by Congress
12 in § 812(c), Schedule I(c)(10)) and those substances found to
13 contain tetra-hydro-cannabinols (THC) (<u>see</u> § 812(c), Schedule
14 I(c)(17)), the primary drug in marijuana, are considered Schedule
15 I drugs.[1]

16     8.   Additional training and experience that I have with
17 respect to the methods and practices of marijuana cultivators and
18 distributors, and with respect to digital devices, is set forth
19 below at the end of the probable cause section of this Affidavit.

20

21 [1]   I have confirmed with Assistant United States Attorney Jason
22 Hitt, one of the prosecutors with whom I have consulted regarding
   this Affidavit and the Criminal Complaint requested, my
23 understanding that any distribution of marijuana is a violation
24 of federal law, regardless whether it is exempted from
   prosecution under California or other state laws.  <u>See Gonzales</u>
25 <u>v. Raich</u>, 545 U.S. 1 (2006) (holding that Controlled Substances
   Act, even as applied to intrastate possession of marijuana,
26 is within Commerce Clause powers); <u>United States v. Oakland Cannabis</u>
27 <u>Buyers' Co-op.</u>, 532 U.S. 483 (2001) (holding that no medical
   necessity defense exists to prohibitions on manufacture and
28 distribution of marijuana under the Controlled Substances Act).



1    9.    Additional training and experience that I have with
2  respect to the methods and practices of marijuana cultivators and
3  distributors, and with respect to digital devices, is set forth
4  below at the end of the probable cause section of this Affidavit.

5                        **OVERVIEW OF AFFIDAVIT**

6    10.    I am one of the case agents investigating Hung Cao
7  NGUYEN, also known as John NGUYEN ("NGUYEN"), his primary partner
8  and co-conspirator, Nathan V. HOFFMAN ("HOFFMAN"), and others for
9  violations of numerous federal criminal statutes relating to
10 money laundering and the manufacture and distribution of
11 marijuana.  As described in the Probable Cause section of the
12 Affidavit, NGUYEN, HOFFMAN, and others formed, supported, and
13 developed two large-scale commercial marijuana cultivation sites
14 in the Eastern District of California, one large-scale commercial
15 marijuana cultivation site in the Northern District of
16 California, and he is currently linked to a recently-moved
17 commercial marijuana cultivation site in the Northern District of
18 California.  NGUYEN used two currently-operating marijuana stores
19 or "dispensaries" located in the Central District of California
20 to distribute the marijuana manufactured from these commercial
21 cultivation sites.  I believe NGUYEN continues to engage in the
22 large-scale distribution of marijuana from his dispensaries in
23 Southern California using marijuana obtained from Northern
24 California and elsewhere.  Financial records and other
25 documentation seized in this investigation demonstrate that
26 NGUYEN's co-conspirator, HOFFMAN, conducted numerous financial
27 transactions to support and obtain money from these activities.
28 ///

1    11.   This Affidavit is submitted solely to establish
2  probable cause for the requested Criminal Complaint and does not
3  purport to set forth all of my investigation or knowledge of this
4  matter.   The facts and information contained in this Affidavit
5  are based on my personal knowledge, as well as that of other law
6  enforcement officers involved in this investigation.   Unless
7  otherwise indicated, where actions, conversations, and statements
8  of others are related in this Affidavit, they are related in
9  substance and in part, and based on the reasonable
10  interpretations of the officers and agents involved in the
11  investigation when reviewing these matters in light of their
12  substantial experience and training.
13                **FACTS ESTABLISHING PROBABLE CAUSE**
14  **A.    Search Warrant Affidavit for Nathan HOFFMAN's Residence and
        Law Offices**
15
16    12.   On September 21, 2011, I obtained authority from the
17  Honorable Victor B. Kenton, Magistrate Judge, Central District of
18  California, to search the residence and law office of Nathan
19  HOFFMAN.   A copy of that search warrant and the lengthy Affidavit
20  in support of that warrant are attached as **Exhibit A** to this
21  Criminal Complaint and incorporated here by reference.   In this
22  Affidavit, I summarize the significant events establishing
23  probable cause to believe HOFFMAN and NGUYEN have committed the
24  Subject Offenses.
25  ///
26  ///
27  ///
28  ///

1    **B.    April and May of 2011 – Identification of Two Industrial**
        **Marijuana Cultivation Sites in Sutter and Sacramento**
2       **Counties, California**

3        13.    Based on my review of reports from Sutter County

4    Sheriff Deputy Matthew Maples and my discussions with him, I know

5    the following:

6            a.    On April 20, 2011, Deputy Maples contacted Thomas

7    Jopson at the Jopson Family Ranch located near Rio Oso,

8    California.  Rio Oso is located in rural Sutter County, within

9    the Eastern District of California.  During the course of their

10   conversation, Thomas Jopson said that medical marijuana was being

11   grown on his property.  Jopson invited Deputy Maples into the

12   greenhouse containing the marijuana cultivation operation.  At

13   that time, Deputy Maples observed in excess of 3,000 growing

14   marijuana plants.

15           b.    On April 28, 2011, Deputy Maples returned to the

16   Jopson Ranch and had another conversation with Thomas Jopson.

17   During this conversation, Jopson stated that Yan Ebyam was the

18   person leasing the greenhouse to cultivate marijuana and that the

19   lease was signed in January 2011.  Deputy Maples again toured the

20   greenhouse containing the marijuana garden and observed thousands

21   of marijuana plants in various stages of growth.

22           c.    On May 5, 2011, Deputy Maples returned to the

23   Jopson Ranch and spoke to Yan Ebyam.

24                i.    Ebyam told Deputy Maples that:

25                    (1)    Ebyam was in the process of selling his

26   interest in the marijuana cultivation operation to Aimee Sisco

27   and that she was in the process of changing the lease agreement

28   with Jopson.

                                    6

1                    (2)   Ebyam was starting a separate business
2    in a different area.

3                    ii.   Deputy Maples also spoke with Aimee Sisco,
4    who said the following:

5                    (1)   She was in the process of changing the
6    lease because of conflicts with Ebyam, and

7                    (2)   She had invested over $350,000 into the
8    marijuana operation and that it was costing her over $40,000 each
9    month to operate.

10                   (3)   Ebyam had invested about $150,000.

11         d.   On May 26, 2011, Deputy Maples again returned to
12   the Jopson Ranch and made contact with Aimee Sisco.  She took
13   Deputy Maples into the greenhouse containing the marijuana
14   cultivation operation.  Deputy Maples noticed that the vast
15   majority of the marijuana plants he had previously observed, were
16   gone.  During the meeting, Sisco provided the following
17   information to Deputy Maples:

18                   i.    Ebyam moved the missing marijuana plants to a
19   new greenhouse location off Fruitridge called Cal-Nevada
20   Wholesale Florist (later determined to be located at 9445
21   Fruitridge Road in Sacramento, California).

22                   ii.   Ebyam was conducting business under a company
23   called Blue Horizon, and that she (Sisco) had taken over Black
24   [Horizon].

25                   iii. Ebyam has a Blue [Horizon], an Orange
26   [Horizon], Purple [Horizon].

27                   iv.   Ebyam is part of Marjyn.  Sisco described the
28   Marjyn entity as a wholesaler in Oakland, California, located in

                                    7

1  the Northern District of California.

2          v.   Sisco provided Deputy Maples with a copy of a

3  lease with Jopson Ranch, Inc., identifying Ebyam and Black

4  Horizon as the tenant and users of the property.

5          vi.  Sisco said that her dealings with

6  distributors are protected by legal contracts drawn up by

7  HOFFMAN, an attorney and associate of Ebyam's.

8  **C.   June 21, 2011 – Federal Search Warrants Uncover More than**
   **5,000 Marijuana Plants at the Two Marijuana Cultivation**
9  **Sites**

10         14.  From my own participation in the operation and review

11 of reports and conversations with agents involved, I know that on

12 June 21, 2011, federal and state agents executed seven federal

13 search warrants in Sacramento, Sutter, and Tehama Counties within

14 the Eastern District of California.  Two of these warrants were

15 executed on the large, commercial greenhouses located at the

16 Jopson Ranch in Rio Oso and at Cal-Nevada Wholesale Florist site

17 in, Sacramento.  Law enforcement officers seized over 5,000

18 marijuana plants in all stages of growth from these two

19 locations, approximately 2,168 marijuana plants at the Jopson

20 Ranch grow, and approximately 3,305 plants at the Cal-Nevada

21 Wholesale Florist grow.

22         15.  Numerous individuals were arrested at the search

23 warrant locations, including Yan Ebyam and Aimee Sisco.  At the

24 time of their arrests, both Ebyam and Sisco, made post-Miranda

25 statements admitting their involvement in the marijuana

26 cultivation business.  Ebyam and Sisco were both later indicted

27 for crimes relating to their marijuana cultivation in two related

28 cases in the Eastern District of California: <u>United States v.</u>

8

1 | <u>Ebyam</u>, Case No. 2:11-cr-00275 JAM, and <u>United States v. Ebyam, et</u>
2 | <u>al.</u>, Case No. 2:11-cr-00276 JAM.

3 | **D.   Documentary Evidence Seized Reveals Los Angeles-Based**
  | **Attorney Nathan HOFFMAN is Heavily Involved in Both Eastern**
4 | **District Industrial Marijuana Cultivation Sites and John**
  | **NGUYEN was the Primary Distribution Outlet for the Marijuana**
5 | **from the Eastern District of California**

6 |      16.   From my participation in the operations, discussions
7 | with other agents, and my review of the evidenced seized, I know
8 | that during execution of the seven search warrants connected to
9 | the two industrial marijuana cultivation sites at the Jopson
10 | Ranch grow in Rio Oso and the Cal-Navada Florist grow in
11 | Sacramento, agents seized documents revealing ~~showing~~ that Nathan
12 | HOFFMAN helped to form, plan, finance, and operate the two sites
13 | and the marijuana cultivation occurring in each location.   The
14 | documents also demonstrate that John NGUYEN was the primary
15 | distribution outlet for the marijuana cultivated from these grows
16 | and, in fact, during the conspiracy successfully obtained more
17 | than 90 pounds of marijuana from the Rio Oso cultivation site in
18 | approximately late May of 2011.

19 |      <u>Documents Seized from the Cal-Nevada Wholesale Florist Grow</u>

20 |      17.   Specifically, I know the following evidence connected
21 | to HOFFMAN was seized at the Cal-Nevada Wholesale Florist grow at
22 | 9445 Fruitridge Road, Sacramento, California, on June 21, 2011:

23 |           a.   A printed email string between Ken Sutherland and
24 | Nathan HOFFMAN.   That document contained the following excerpt
25 | from HOFFMAN to Sutherland, with a carbon copy ("CC") to Yan
26 | Ebyam and Eli Bilton, dated June 1, 2009:

27 |           *As follow-up to your recent conference with Yan Ebyam,*
   |           *attached herewith is a General Agreement template for the*
28 |           *consideration of your prospective investor(s) desirous of*

9

*opening a hydroponic facility franchise under the management of YANKS/Blue Horizon Cooperative.  A $50,000 investment will secure a 25% interest in an indoor legal medical marijuana franchise cultivating approximately 900 plants. Assumptions regarding PRICE and CAPACITY for 4 harvests per year are delineated in the attached Excel Spreadsheet.  If you have any additional questions, don't hesitate to contact Yan or myself by cell.*

　　　　i.　Based on the totality of my investigation and training and experience, in my opinion, this email from HOFFMAN along with the referenced spreadsheet (not found with the document) was a prospectus sent by HOFFMAN to Ken Sutherland to entice him and/or his investors to invest in indoor (hydroponic) marijuana growing franchises controlled by HOFFMAN's company.  At that time, June of 2009, HOFFMAN was referring to his marijuana company as YANKS/Blue Horizon Cooperative.

　　　　b.　A printed email from HOFFMAN to Sutherland dated June 2, 2009.  The e-mail states in part, in pertinent part:

　　　　i.　"Attached is same spreadsheet data on 'Price & Capacity' on Word format.  The conservative numbers speak for themselves in terms of profitability . . . but there is always risk in quasi-grey area business even in Oakland.  That's why professional and honest management is the critical factor towards achieving success."

　　　　(1)　Based on this email, and my training and experience, and especially the reference to the "quasi-grey area" of business in Oakland, an area known as one of the most permissive localities regarding the distribution of marijuana, I believe that HOFFMAN understands that his involvement in the manufacturing of marijuana is illegal.

///

10

1           (2)   The sender address listed in this email

2   from the address of "visa_atty@yahoo.com."  This is the same

3   email address that HOFFMAN lists on the website used to advertise

4   his legal services for immigration clients as part of the Law

5   Offices of Hoffman & Osorio, LLP, as I later learned from

6   reviewing the website for that firm.  Based on my review of the

7   California Bar website, I know that this email address is also

8   the email address that HOFFMAN lists on his legal profile with

9   the California State Bar.

10          ii.   This June 2, 2009 Hoffman to Sutherland e-

11  mail contains the following closing text:

12          *Nathan V. Hoffman*
            *Attorney at Law*
13          *Law Offices of Hoffman & Osorio, LLP*
            *3350 Wilshire Blvd., Suite 855*
14          *Los Angeles, CA 90010*
            *Tel: (213) 383-5721*
15          *Fax: (213) 383-5722*
            *Cell: (310) 739-0978*
16          *Email: visa_atty@yahoo.com*

17          *Notice: This message is intended only for the use of*
            *the individual(s) to which it is addressed and may*
18          *contain information that is privileged and/or*
            *confidential.  If you are the intended recipient of*
19          *this message, you agree to keep all privileged and/or*
            *confidential information private without written*
20          *consent of the sender, and will use any such*
            *information only within the necessary scope of your*
21          *professional work.  If you are not the intended*
            *recipient of this message, you have received this*
22          *transmission in error, and any review, distribution or*
            *copying of this transmission is prohibited – please*
23          *notify sender immediately and safely dispose of this*
            *message.*

24

25          (1)   This closing text, and its reference to

26  HOFFMAN and the Hoffman Law Office confirms that HOFFMAN used his

27  title as an attorney, the Hoffman Law Office, and associated

28  methods of communication connected to that office such as email,

1  telephone, and address, to facilitate the cultivation and
2  distribution of marijuana.

3              iii.   I have also reviewed a public record from
4  the California Secretary of State that that lists HOFFMAN is the
5  agent for service for Blue Horizon with an address of 3350
6  Wilshire Blvd., Suite 855, Los Angeles, California, the Hoffman
7  Law Office.

8              (1)   This document is notable in connecting
9  HOFFMAN and the Hoffman Law Office to the marijuana grows because
10 during the May 26, 2011 consensual meeting between Aimee Sisco
11 and Deputy Maples, Sisco volunteered that Ebyam does business
12 under the name Blue Horizon and Sisco does business under the
13 name Black Horizon.   Furthermore, the lease for the marijuana
14 greenhouse at Cal-Nevada Wholesale Florist grow was with Blue
15 Horizon, LLC.

16        c.   A document from the Department of Treasury
17 relating to the Electronic Federal Tax Payment system, addressed
18 as "Black Horizon Cooperative Inc. c/o Nathan Hoffman 3350
19 Wilshire Blvd Ste 855 /Los Angeles, CA."

20              i.   This document connects HOFFMAN to the
21 industrial grows in two ways.   First, as set forth above, Black
22 Horizon Cooperative, Inc. is the business used by Sisco to
23 manufacture marijuana at the Jopson Ranch grow.   Second,
24 according to his legal profile with the California State Bar,
25 that I have review, the listed address at 3350 Wilshire Blvd.,
26 Suite 855, Los Angeles, CA, is the location for HOFFMAN's law
27 practice at the Law Offices of Hoffman & Osorio, LLP.
28 ///

18. On June 22, 2011, the day after the execution of the search warrant at the Cal-Nevada Wholesale Florist grow, the operators of Cal-Nevada Wholesale Florist faxed my office a copy of the commercial lease between Blue Horizon, LLC and Cal-Nevada Wholesale Florist. This lease appeared to be a legal document defining the terms of a rental contract between the parties. It appears to be signed by Yan Ebyam as the tenant of the location where the marijuana plants were growing.

<u>Documents Seized from A Residence</u>
<u>Located at The Jopson Ranch Grow</u>

19. On June 21, 2011, during execution of the federal search warrant at the Jopson Ranch, agents also discovered the following documents further tying HOFFMAN and the Hoffman Law Office to this industrial marijuana grow:

a. Copies of Articles of Incorporation and a Statement of Information filed with the California Secretary of State for Black Horizon Cooperative, Inc. These documents listed the agent of service of Black Horizon Cooperative, Inc. as Nathan V. Hoffman, at 3350 Wilshire Boulevard, Suite 855, Los Angeles, California, the Hoffman Law Office. This is the address of The Law Offices of Hoffman and Osorio, LLP. The Articles of Incorporation are dated December 8, 2010, and appear to contain the signature of HOFFMAN as the Incorporator. This document states that its purpose is to engage in any lawful act or activity for which a corporation may be organized under such law. The Statement of Information is signed by Aimee K. Sisco as manager and is dated July 22, 2011. The document lists HOFFMAN as the agent for service and Ebyam as the Chief Financial

13

1  Officer.   As mentioned above, Black Horizon Cooperative, Inc. was
2  the business used by Sisco to manufacture marijuana at the Jopson
3  Ranch in Rio Oso, California.   These documents created a legal
4  entity devoted exclusively to cultivating and distributing
5  marijuana.

6        b.   A multi-page, printed copy of Black Horizon
7  Cooperatives, Inc.'s check register.   This register reflects
8  several deposits categorized as loans from HOFFMAN as detailed
9  below:

| DATE | AMOUNT |
| --- | --- |
| 01/04/2011 | $1,500 |
| 01/10/2011 | $1,000 |
| 01/18/2011 | $2,000 |
| 01/31/2011 | $   100 |
| 01/31/2011 | $   500 |
| 02/04/2011 | $3,200 |
| 02/08/2011 | $2,300 |
| 02/10/2011 | $1,300 |
| 02/11/2011 | $1,400 |
| 03/01/2011 | $   550 |
| 03/07/2011 | $   600 |
| 03/11/2011 | $1,100 |
| 03/14/2011 | $   600 |
| 03/15/2011 | $   600 |
| 03/15/2011 | $   600 |

25        i.   Based upon this check register, all of these
26  loans were repaid and most were repaid within a few days of the
27  date of the loan.   Based on the account balances, the rapid
28  repayment of these loans, and some account notations, I believe

14

1  that these loans from HOFFMAN were short-term loans needed to
2  cover immediate expenses incurred in the marijuana growing
3  operation at the Jopson Ranch greenhouse complex.  HOFFMAN's
4  lending of money to the effort by Ebyam, Sisco, and others to
5  cultivate large quantities of marijuana at the Rio Oso marijuana
6  cultivation site is indicative of HOFFMAN's significant
7  investment in the success of the overall conspiracy.

8          c.   A document entitled Employee List for Black
9  Horizon Cooperative, Inc., with five columns.  The columns
10 include Employee Name, Date of Birth, Hire Date, Hourly Wage, and
11 SSN.  The document lists numerous individuals under Employee Name
12 including: Aimee Sisco, Yan Ebyam and Nathan HOFFMAN.  The
13 document also lists their respective Dates of Birth and social
14 security numbers but is blank for Hire Date and Hourly Wage.

15          <u>Documents Seized from Residence of Thomas Jopson
16          Located on Jopson Ranch</u>

17     20.  On June 21, 2011, during the search of the
18 residence of Thomas Jopson, 1159 Pleasant Grove, Rio Oso, at the
19 Jopson Ranch, agents discovered the following documents pertinent
20 to HOFFMAN:

21          a.   A printed email from Nathan HOFFMAN to Thomas
22 Jopson, Yan Ebyam, and others, dated February 17, 2011.  The
23 following is an excerpt:

24     *While I would love to revisit Rio Oso for the meeting on
       Friday, I have to defer this time around.*
25
       *However, I whole-heartedly agree with the sum and substance*
26     *of your 'proposal', and by this email affirm my vote to: (1)*
       *appoint Tom Jopson as 'Team Leader' and head manager of the*
27     *GH; (2) Vest primary authority with Tom, Brook and David to*
       *work out a tentative crop schedule and rotation; (3) Yan &*
28     *Jesus to handle all Finances and Sales; (4) Aimee and Autumn*

1   *remain in charge of HR and Accounting functions; and (5)*
2   *Nathan remains responsible for Legal and assists with*
    *Southern CA sales.*

3   *Nathan*

4        i.   (Note: This email also closes with the same

5   notice used by HOFFMAN in a previously discussed email relating

6   to attorney-client privileged material. Due to its length, the

7   notice is not reproduced here.)

8        ii.  This email demonstrates that HOFFMAN played

9   an integral role in the formation of the Black Horizon entity and

10  leadership within the Jopson Ranch grow in Rio Oso.

11  Specifically, the email reveals that HOFFMAN had the authority to

12  vote among the members of Black Horizon and took responsibility

13  for legal matters associated with the Black Horizon effort to

14  cultivate and distribute marijuana.  In addition, HOFFMAN admits

15  that he is responsible for distributing marijuana in Southern

16  California that originates from the cultivation site in Rio Oso.

17  HOFFMAN's associate in marijuana distribution is co-conspirator

18  John NGUYEN.

19        b.  A printed email from HOFFMAN to Thomas Jopson,

20  dated February 18, 2011.  The following is an excerpt from that

21  e-mail:

22   *Hi Tom:*

23   *Thank you for sharing your idea.  I'm in Oakland now dealing*
    *with the MarJyn investor/member meeting.  As you can imagine*
24   *a lot of disgruntled investors that the facility is not in*
    *the black yet and struggling with union labor issues.  This*
25   *is not an easy business…and now of course the City licensing*
    *and permitting process is indefinitely suspended as a result*
26   *of the US Attys ominous public pronouncement against the*
    *City plan.  In particular, that any industrial size*
27   *cultivation facility acting under a City Permit would be*
    *immediately targeted by the Feds as crossing the proverbial*
28   *Prop 215 line in the sand.*

16

*Anyway, the idea of making 'Black Horizon' a model facility producing only 'pharmaceutical grade' cannabis has great merit.  Frankly, that was the hope of MarJyn initially, but Yan and I were unable to achieve that type of high quality product indoors...*
*Even with positive publicity about BH quality comes the chance that the feds will target us no matter how much security and confidentiality we achieve on paper…*

   i.   The content of this email demonstrates that HOFFMAN and Jopson were well aware that large-scale marijuana cultivation remains illegal under federal law.  As explained below, HOFFMAN's reference to MarJyn is to a legal entity created by HOFFMAN for marijuana cultivation sites in Oakland, California.  The marijuana sites in Oakland were created earlier than the marijuana cultivation sites in Rio Oso and Sacramento. From the quoted language above, it appears that HOFFMAN and Ebyam viewed the large-scale Oakland marijuana sites as a model to be followed at the Rio Oso and Sacramento marijuana cultivation sites.

   ii.   Based on my training and experience, I know that HOFFMAN's email reference to "the feds and US Attys ominous public pronouncement against the City plan" refers to a letter from the U.S. Attorney for the Northern District of California, the Honorable Melinda Haag, dated February 1, 2011, and addressed to Oakland City Attorney Daniel Russo.  The content of the letter was widely reported in the press.  See, e.g., http://articles.sfgate.com/2011-02-03/bay-area/27098495_1_marijuana-farm-ordinance-dispensaries-pot. According to press accounts (and HOFFMAN's email above), the letter warns the City Attorney for Oakland that permitting licensing of industrial-scale marijuana cultivation sites will

17

1  run afoul of federal law and could lead to criminal or civil

2  actions by the Department of Justice.  A copy of this letter is

3  available online at the following address:

4  http://info.swlaw.com/reaction/2011/MedicalMarijuanaUpdate_May201

5  1_HTML/California%20Med%20Marijuana%20DOJ%20Ltr.PDF

6  **E.  March 2010 to the Present - Documentary Evidence Establishes**
   **HOFFMAN's Earlier Involvement in Oakland-Based Marijuana**
7  **Cultivation Sites and MARJYN Investments, LLC**

8       21.  The investigation of HOFFMAN, Ebyam, and others in this

9  case uncovered earlier efforts by these individuals to establish

10 industrial-scale marijuana cultivation sites in Oakland,

11 California, between approximately March of 2010 and the present.

12 The primary legal entity utilized by HOFFMAN and his co-

13 conspirators to further their illegal marijuana cultivation sites

14 is known as Marjyn Investments, LLC.

15          a.  Secretary of State Records:  As part of this

16 investigation, I obtained a corporate report from the State of

17 California Secretary of State's Office (Secretary of State)

18 relating to Marjyn Investments, LLC (hereafter referred to as

19 "Marjyn").  This online report reveals that Marjyn Investments,

20 LLC was filed as a legal entity on March 23, 2010.  I also

21 obtained a copy of the Statement of Information from the

22 Secretary of State that lists, as of July 22, 2010, Yan Ebyam,

23 James Stretch, and Nathan HOFFMAN are members or managers of

24 Marjyn.  Furthermore, it lists the Chief Executive Officer as Yan

25 Ebyam at 9201 San Leandro Street, Bldg B, Oakland, California.

26 The agent for service is listed as Nathan Hoffman at 3350

27 Wilshire Blvd., Suite 855, Los Angeles, California, which is the

28 address of HOFFMAN's law office

                              18

b.   <u>Police Reports</u>: HOFFMAN's Marjyn Investments, LLC was directly linked to an large-scale indoor urban marijuana cultivation site within the City of Oakland.  Until recently, that marijuana grow site was located at 9201 San Leandro Street in Oakland.  The link between Marjyn and this marijuana garden was discovered because during 2010, the Oakland Police Department was called to respond to theft or attempted thefts of marijuana, described below, at the ongoing marijuana cultivation site at 9201 San Leandro Street in Oakland on multiple occasions.  Furthermore, this is the address used by Ebyam in the above-described Secretary of State filings.  The following summaries of thefts at 9201 San Leandro, Oakland, California, are derived from copies of numerous Oakland Police Department Crime Reports from 2010:

i.   <u>November 25, 2010 – Burglary at Marijuana Cultivation Site in Oakland</u>:  A crime report dated November 25, 2010, details the reported robbery of 471 harvest-ready marijuana plants worth $129,000 from Marjyn Investments located at 9201 San Leandro Street in Oakland.  The reporting officer concluded that the robber(s) were aided by the security guard hired to protect the premises.  The reporting officer does not indicate how he knew this premises was associated with Marjyn.

ii.   <u>December 17, 2010 – Burglary at Marijuana Cultivation Site in Oakland</u>:  A crime report dated December 17, 2010, details the reported burglary of approximately 600 ready-to-harvest marijuana plants.  The report estimated the value of stolen marijuana plants as approximately $165,000.  The reporting officer wrote that 9201 San Leandro Street is a warehouse with

19

approximately 3,000 medical marijuana plants, and that he had been dispatched there several times for crimes associated with the marijuana such as a burglary, robbery, and kidnaping.  The report indicates that the plants were stolen from Marjyn Investments at 9201 San Leandro Street in Oakland.  The reporting officer does not indicate how he knew this premises was associated with Marjyn.

iii. <u>December 25, 2010 – Burglary at Marijuana Cultivation Site in Oakland</u>:  The last crime report dated December 25, 2010, details the investigation of a burglary in progress at Marjyn Investments located at 9201 San Leandro Street, Oakland.  The reporting officer wrote, "This facility grows medical marijuana and houses the plants and product on site."  The witness to this crime listed his occupation as Security Guard and his employer as Marjyn Investments.

c.   <u>Financial Investigation of Marjyn Investments, LLC</u>:  The financial investigation into Marjyn confirms HOFFMAN's direct participation in the running of Marjyn and the underlying business of marijuana cultivation at 9201 San Leandro Street in Oakland.  Based on my participation in this investigation, I know that IRS has conducted an investigation of Marjyn's financial activities throughout 2010 and 2011.  This investigation reveals that HOFFMAN's financial activities demonstrate that he uses his law practice to conduct marijuana cultivation with growers and dispensaries throughout California, including San Jose and Los Angeles.

///

///

20

1          d.   Bank Records:

2               i.   A financial investigation into HOFFMAN

3    revealed a Wells Fargo Bank (WFB) account in the name of Marjyn

4    Investments, LLC, with an address of 3350 Wilshire Blvd, Suite

5    855, Los Angeles, California 90010.   Nathan V. HOFFMAN and James

6    Stretch are the two signers to this account.   The State Bar of

7    California website reflects that Nathan V. HOFFMAN is an active

8    attorney associated with Law Offices of Hoffman & Osorio, LLP

9    located at this same address, 3350 Wilshire Blvd., Suite 855, Los

10   Angeles, California 90010.

11              ii.   The account was opened on March 31, 2010.

12   WFB has produced the monthly statements for this account spanning

13   from March 31, 2011, through May 31, 2011.   A very limited number

14   of cancelled checks and deposited items have also been produced.

15   The vast bulk of the banking transactions associated with this

16   account have not as yet been produced for analysis.   The

17   following analysis is based on the limited records received to

18   date.

19   **F.   Credits to a HOFFMAN-Controlled Wells Fargo Bank Account
        Corroborate HOFFMAN's Involvement in Various Marijuana-**
20   **     Related Transactions**

21   22.   A total of seven deposited items have been obtained for

22   analysis.   From my participation and review in the analysis of

23   this financial data, I know that:

24              a.   Four of these deposited checks were drawn on the

25   account of BB Collective Inc. [dba] The Rainforest at 12515

26   Venice Blvd., Los Angeles, California.

27              b.   Three of the checks are dated in November 2010 and

28   the other one is dated January 2011.   The checks ($6,940, $6,450,

                                  21

1 | $6,450, and $6,600) total $26,450 and are made payable to Marjyn
2 | or Marjyn Investments.

3 |         c.    The memo lines on three of the checks bear the
4 | following handwritten notations: Inv., Inventory, and IC.  Two of
5 | these checks bear the endorsement of Nathan V. HOFFMAN for
6 | deposit into the Marjyn checking account.

7 |         d.    An internet search (Google) conducted on the name
8 | BB Collective Rainforest revealed a Facebook page for The
9 | Rainforest Collective located at 12515 Venice Blvd., Los Angeles,
10 | California.  Their Facebook page states, The RainForest
11 | Collective is a medical marijuana "collective" with quality
12 | strains, clones, concentrates and much more.

13 |         e.    Further internet research revealed a Los Angeles
14 | Times article dated May 3, 2011, entitled "City attorney sues
15 | medical marijuana dispensaries." <u>See</u>
16 | <u>http://latimesblogs.latimes.com/lanow/2011/05/city-attorney-sues-</u>
17 | <u>medical-marijuana-dispensaries.html</u>  According to the article,
18 | the Los Angeles City Attorney sued seven medical marijuana
19 | dispensaries to bar the shops from storing, selling, distributing
20 | or giving away marijuana.  One of the listed dispensaries is the
21 | Rainforest Collective at 12515 Venice Blvd.  I had an IRS
22 | financial investigator call the telephone number listed for the
23 | Rainforest Collective on August 3, 2011. The phone was
24 | disconnected.

25 |         i.    Based on the notations on the memo lines of
26 | the checks and the fact that The RainForest Collective was a
27 | marijuana dispensary, I believe that these checks were issued in
28 | payment for marijuana (or marijuana-related items because

1   inventory for a marijuana dispensary is likely to be marijuana)
2   supplied to the marijuana dispensary by HOFFMAN (or someone on
3   his behalf) doing business as Marjyn.  It is also worth noting
4   that the checks deposited and endorsed by HOFFMAN are not for
5   legal services or legal advice of any type.

6            f.    Another deposited item, dated November 5, 2011, is
7   a $4,100 cashier's check drawn on Chase Bank and purchased by
8   Sanctuary Health Center, Inc. (remitter) and made payable to
9   Marjyn Investments.  An internet search (Google) conducted on the
10  name Sanctuary Health Center Inc. revealed a medical marijuana
11  dispensary located in San Jose, California.  On August 3, 2011,
12  an investigator working with me placed a call to the telephone
13  number listed for Sanctuary Health Center, Inc.  During the call,
14  he was able to confirm that it is a marijuana dispensary.

15           i.    Based on this information about the type of
16  business run by the Sanctuary Health Center, Inc., I believe that
17  this check was for the payment for marijuana (or marijuana-
18  related items) supplied to them by Nathan V. HOFFMAN (or someone
19  on his behalf) doing business as Marjyn.

20           g.    HOFFMAN is linked to another deposited item on
21  this WFB account that I believe is marijuana-related.
22  Specifically, there is a $65 check, dated February 16, 2011,
23  drawn on the account of the Teamsters Local Union No. 70 in
24  Oakland, California, and made payable to MarJYN Investments at
25  9201 San Leandro Blvd., Oakland, CA.

26           i.    An internet search (Google) conducted on the
27  name Marjyn revealed an article in the Washington Times dated
28  September 20, 2010.  This article, entitled "Union Protects

23

1    Growers of Pot," describes how "the Teamsters added nearly 40
2    members this month by organizing the country's first group of
3    unionized marijuana growers."  The article reports, that "[t]he
4    new members work as gardeners, trimmers and cloners for Marjyn
5    Investments, LLC, an Oakland business that contracts with medical
6    marijuana patients to grow their pot for them."  See
7    http://www.washingtontimes.com/news/2010/sep/20/union-protects-
8    growers-of-pot/

9              ii.   Based on the forgoing, I believe this $65
10   check drawn on the Teamster's account is probably some type of
11   reimbursement for overpayment of fees by Marjyn relating to the
12   employment of Teamster Union members tending marijuana grows
13   under their control.

14             h.   The WFB monthly bank statements for Marjyn reflect
15   both the gross deposits and the gross currency deposits for each
16   month.  Over the 15-month period (March 2010 through May 2011)
17   covered by the monthly statements, a total of $2,487,571 in gross
18   deposits were made to the account.  Of this, a total of
19   $1,631,300 was in the form of currency.  This equates to more
20   than 65% of the total deposits to this account being in currency.
21   Due to the paucity of backup records (deposit slips, deposited
22   items, cancelled checks, etc.), I have been unable to determine
23   who made each of the numerous deposits to this bank account.
24   However, as set forth below, an analysis of filed Currency
25   Transaction Reports sheds some light on this matter.
26   ///
27   ///
28   ///

24

G.   **Currency Transaction Reports And Other Financial Analysis Link NGUYEN, HOFFMAN, and the Hoffman Law Office To Large-Scale Marijuana Trafficking**

23.   <u>Currency Transaction Reports</u>:   I have analyzed 50 Currency Transaction Reports (CTR) filed on Marjyn.   These CTR's were triggered whenever someone (or a group of individuals) associated with the HOFFMAN-controlled WFB account conducted a financial transaction with more than $10,000 in currency in a single day.   This analysis disclosed that:

a.   Yan Ebyam (using the Hoffman Law Office at the address of 3350 Wilshire Blvd., Suite 855, Los Angeles, California) made at least four large currency deposits to this account during the month of July 2010.   These four CTR's reflect a total of $180,530 in currency deposited.   All of these deposits took place in Oakland, California.   On one occasion, July 29, 2010, both HOFFMAN and Ebyam made currency deposits on the same day at the same bank deposit location.

b.   Twenty CTR's were filed between August 2010 and March 2011 reflecting Nathan HOFFMAN was the person conducting the deposit.   During this eight-month time period, these 20 CTR's show a total of $549,285 in currency deposited into the Marjyn account.   These deposits occurred in Oakland, Hollywood, Culver City, Alameda, Studio City, Beverly Hills, Torrance, and two locations in Los Angeles.

c.   Fourteen CTR's were filed on James Stretch, the co-signer on the account along with HOFFMAN.   Stretch deposited $438,885 in currency into the Marjyn account.   These deposits occurred in the cities of Oakland, Hayward, and San Mateo.   As developed more in other sections of this Affidavit, I believe

25

1  James Stretch is a Bay Area-based marijuana cultivator and
2  distributor working with HOFFMAN in an ongoing marijuana
3  cultivation business that, until recently, was located within a
4  warehouse located at 9201 San Leandro Street, Oakland,
5  California.

6         d.   Significantly, one CTR was filed on Hung C. NGUYEN
7  for a currency deposit of $13,202 into the Marjyn account on
8  April 8, 2011.  As detailed later in this Affidavit, NGUYEN is
9  the President of New Age Canna, doing business as Canna Clinic of
10 Garden Grove and South Bay Canna Clinic, two separate medical
11 marijuana dispensaries located in the Central District of
12 California.  Evidence in this investigation establishes that
13 NGUYEN is critical to HOFFMAN's success in the marijuana
14 cultivation business because NGUYEN is a distributor for much of
15 the marijuana obtained from HOFFMAN's cultivation sites in
16 Northern California.

17        e.   CTR's also show that currency deposits were made
18 to the Marjyn account by John Joseph Henry, Jarrett Magazine,
19 Randy Stutzriem, Kevin Knox, and Matthew Harris.

20        f.   Based on my experience, I know that the most
21 common method of paying for illicit drugs is with the use of
22 currency because many drug purchasers do not want to leave a
23 paper trail demonstrating that they bought illegal controlled
24 substances.  In addition, many drug addicts must purchase drugs
25 using money obtained from the streets.  This money is frequently
26 broken down into small denominations of currency, such as $5,
27 $10, and $20 bills.  Based on the totality of the facts in this
28 investigation, I believe that the vast majority of currency

                                26

1  deposited to HOFFMAN's WFB Marjyn account came from marijuana
2  sales.

3      24.  Debits (withdrawals) to the Marjyn Account: As
4  mentioned earlier, WFB has supplied the monthly bank statements
5  relating to the Marjyn account for the time period March 31, 2010
6  through May 31, 2011 (approximately 15 months).  During this time
7  period, the monthly statements reveal hundreds of checks written
8  on this account.  To date, I have only received 22 of these
9  checks.  My analysis of these materials shows the following:

10     a.  Seven of the 22 checks are made payable to PG&E.
11  These checks vary from a low of $15,606 to a high of $44,000
12  between November of 2010 and April of 2011.  The memo section on
13  these checks reflects notations such as "Dec. current charge,"
14  "Account - 7264353980-1," and "Payment plan installment."  All of
15  these checks were signed by James Stretch.  One of the checks was
16  co-signed by HOFFMAN.

17          i.  In my training and experience, and the
18  training and experience of marijuana investigators that I have
19  consulted in preparing this Affidavit, I know that energy is a
20  large and necessary expense for any hydroponic/indoor marijuana
21  cultivation site.  Hydroponic/indoor marijuana grows are energy-
22  intensive because they use powerful, high-wattage lights to
23  assist and accelerate the marijuana growth cycle.  The larger the
24  cultivation site, the more lights and energy must be expended.
25  In addition, marijuana cultivators must utilize extensive
26  irrigation mechanisms to feed the plants.  Often, these
27  irrigation mechanisms use electronic pumps to filter and remove
28  the water from the plants on a periodic basis.  The larger the

                                27

1    cultivation site, the more pumps and energy are needed.  For

2    these reasons, large monthly utility expenditures can be an

3    objective indicator of an ongoing marijuana cultivation site.

4    This training and experience is corroborated in this particular

5    case because the marijuana cultivation sites uncovered at the

6    Jopson Ranch and Cal-Nevada Wholesale Florist on June 21, 2011,

7    both required an extensive amount of energy to support the

8    ongoing large-scale marijuana gardens at those two locations.

9           ii.   Pacific Gas and Electric Company (PG&E)

10   supplied records relating to customer account number 7264353980-

11   1.   This is the account number written in the memo section of

12   checks drawn on the Marjyn account at WFB that are detailed

13   above.   The PG&E records establish that Marjyn is the customer

14   associated with this account, the account was established on May

15   27, 2010, and the premise covered is located at 9201 San Leandro

16   Street, Oakland, California.   The customer information includes a

17   cell phone contact for "Nathan" and a business number for "Jim."

18   I believe these first names correspond to Nathan HOFFMAN and

19   James (or Jim) Stretch.   The last payment to PG&E from this

20   account was on June 17, 2011, for $25,580.   The last billing from

21   PG&E on this account was on June 29, 2011, for $58,404.

22           iii. Based on the forgoing, I believe the seven

23   checks drawn on the Marjyn account and payable to PG&E for

24   between $15,606 to $44,000 during March 2010 and May 2011, and

25   the most recent payment of $25,580 on June 17, 2011, and a

26   billing of $58,404 on June 29, 2011, are all indicative of these

27   funds being paid for electricity bills to support an ongoing

28   marijuana cultivation site. Specifically, I believe that HOFFMAN

1  and Stretch are involved in an ongoing effort to cultivate
2  marijuana.  Until recently, their effort centered on a marijuana
3  cultivation site located at 9201 San Leandro Street in Oakland
4  associated with PG&E Account No. 7264353980-1.  Recent events
5  confirm that 9201 San Leandro Street in Oakland did contain a
6  marijuana cultivation site, but James Stretch and his co-
7  conspirators recently moved that marijuana to a new, unknown
8  location.  I believe HOFFMAN and Stretch are likely continuing to
9  cultivate marijuana at a new, unknown location in Northern
10 California.

11         b.   Six of the 22 checks are dated between November
12 2010 and April 2011 and are made payable to "9201 San Leandro
13 Street, LLC."  Five of these checks are for $18,900 and the
14 remaining check is $20,790.  The memo section for each of these
15 checks shows they are for the payment of rent.  All of these
16 checks were signed by James Stretch.

17         i.   I believe these checks are rental payments
18 for an indoor marijuana growing facility recently located at 9201
19 San Leandro Street, Oakland, California.

20         c.   One check for $2,596, dated November 9, 2010, is
21 made payable to "Darkheart Industries."  In the memo section of
22 this check is the handwritten notation "clones."  This check was
23 signed by HOFFMAN.  I believe HOFFMAN's notation of "clones" for
24 this particular check means that HOFFMAN paid $2,596 to purchase
25 marijuana clones for a marijuana cultivation site.

26         i.   Based on my training and experience, I know
27 that clones are important to a marijuana cultivation operation
28 because they guarantee a shorter growing cycle (as compared to

29

1  growing from female marijuana seeds) and high-priced clones

2  deliver high-potency strains of marijuana that command a premium

3  when the marijuana is processed and sold.

4          d.   The remaining eight checks are to businesses or

5  individuals and, based on the notations in the memo sections,

6  appear to be for payroll, expenses, payments toward notes, and

7  unknown purposes.

8      25.  <u>Monthly Bank Account Statements</u>:  The WFB monthly

9  statements also reflect transfers between accounts, point-of-sale

10 transactions, and check card purchases.  An analysis of these

11 transactions reveals the following:

12         a.   An April 5, 2010 online transfer (deposit) of

13 $50,000 with the notation "partial cap contribution Fx Nathan and

14 Yan."  I believe this transfer was a capital contribution by

15 HOFFMAN and Ebyam to cover Marjyn's initial startup costs.

16         b.   An April 7, 2010 online transfer (withdrawal) of

17 $400 with the notation April rent balance for Yan.

18         c.   An April 15, 2010 online transfer (deposit) of

19 $3,000 with the notation from checking Nvh cap loan to cover bal

20 on clones.

21             i.   Based on the abbreviations, I believe this

22 transfer from HOFFMAN's checking account was to cover the cost of

23 marijuana clones.  This is based on Nvh representing the initials

24 of Nathan V. HOFFMAN and cap loan meaning a capital loan to cover

25 the bal (balance) on clones (marijuana clones).  It is worth

26 noting that a capital loan is generally understood in the

27 business world to mean contribution of capital, in the form of

28 money or property, to a business by an owner, partner, or

1   shareholder. The contribution increases the owner's equity
2   interest in the business.  Thus, one interpretation of HOFFMAN's
3   notation is to suggest that each capital contribution he makes
4   toward purchasing marijuana clones increases his equity in the
5   marijuana cultivation operation.
6           d.   An April 30, 2010 online transfer (deposit) of
7   $1,400 with the notation from business checking Nvh cap contrib.
8   for Dan Grace Clones.
9                i.   I believe that this is another transfer from
10  HOFFMAN's checking account to cover a "cap contrib." (capital
11  contribution) to purchase marijuana clones from Dan Grace.
12  According to a July 20, 2010 article appearing in the Los Angeles
13  Times (retrieved at
14  http://articles.latimes.com/2010/jul/20/local/la-me-big-pot-
15  20100720), Dan Grace is the owner of Dark Heart Nursery in
16  Oakland, California.  According to the article, Dark Heart
17  Nursery raises about 10,000 marijuana clones a month in a 3,000-
18  square-foot space located in Oakland.
19          e.   On July 30, 2010, there was an online transfer
20  (withdrawal) of $2,470 with the notation "checking reimb to Nvh
21  for Dark Heart clone buy."
22               i.   Based upon the notation and amount of the
23  transfer, I believe this was another large purchase of marijuana
24  clones by HOFFMAN from the Dark Heart Nursery run by Dan Grace in
25  Oakland.
26               ii.  On November 9, 2010, there is a check from
27  this account for $2,596, made payable to "Darkheart Industries."
28  I believe this may be an operating name for the Dark Heart

1  Nursery run by Dan Grace in Oakland.

2         f.    A June 6, 2010 online transfer (withdrawal) of
3  $4,500 with the notation "Prop 215 stipends Horizon patients."

4              i.    I believe the notation of "Prop 215" is in
5  reference to the California law concerning the use of medical
6  marijuana and that Horizon refers to one of the colored Horizon
7  Cooperative discussed later in this Affidavit.

8              ii.   A July 20, 2010 online transfer (withdrawal)
9  of $2,000 with the notation "transfer to cc marjyn nutrient
10 purchase."

11        g.    Two check card purchases from American
12 Hydroponics.  The first purchase was in August 2010 for $2,949
13 and the second was in March 2011 for $623.

14             i.    Based on my experience and training, I know
15 that growing marijuana hydroponically requires no soil but
16 instead uses an inert growing medium and all of the plants'
17 nutrients are supplied by mixing nutrients with water.  Indoor
18 marijuana cultivators often use hydroponic growing methods (or
19 some hybrid system) since it is cleaner, requires less space, is
20 less labor intensive, allows more control over the environment
21 and can produce higher yields.

22        h.    Three online transfers (withdrawals) for credit
23 card payment to Cropking.  An internet search (Google) conducted
24 on the name "CropKing" revealed a website called "cropking.com."
25 A review of the website by an investigator working with me showed
26 that Cropking is a business located in Lodi, Ohio, and offers a
27 variety of products including hydroponic systems and greenhouses.
28 ///

i.   Twenty-two check card purchases from D & S Garden Supplies in San Leandro, California.  An internet search (Google) conducted on the name D & S Garden Supplies revealed a website called "dshydro.com."  A review of the website by an investigator working with me revealed that D & S Garden Supplies is located in San Leandro, California, and offers a variety of products related to hydroponic growing systems.

**H.   September 8, 2011 – Oakland Police Confirm 9201 San Leandro Marijuana Cultivation Site has Relocated to a New, Unknown Location**

26.   Based on information provided to me by Oakland Police Detective Teddy C. Chu, I know the following:

a.   On September 8, 2011, Oakland Police Detective Teddy C. Chu conducted surveillance of the warehouse located at 9201 San Leandro, Oakland, California.  This location was previously identified as a possible indoor marijuana cultivation facility operated by James Stretch.

b.   When he arrived at the warehouse, Det. Chu observed several individuals in and around 9201 San Leandro and requested that Oakland Police officers investigate.

c.   When uniformed Oakland Police officers arrived, they met with an individual who identified himself as Ron Smith. Smith, who was not under arrest, told the law enforcement officers the following:

i.   He worked for Service West, a property management company.

ii.   The previous tenants had been involved in the growing of marijuana at 9201 San Leandro Street.

///

33

1    iii.  The prior tenants (unnamed) moved out the
2    last week of June (2011) and had chopped all the plants down and
3    removed all their equipment in thirty U-Haul trucks.

4    iv.  The prior tenants had been the victims of
5    multiple robberies, including the loss of 900 marijuana plants on
6    one occasion and the theft of lights and ballasts.

7    v.  One of the original investors in this
8    operation had left and gone somewhere else, where he was arrested
9    by the Feds.

10    vi.  Based on the totality of this investigation,
11    I believe that Smith was referring to Yan Ebyam as an original
12    investor in this marijuana cultivation site, later arrested on
13    June 21, 2011, in this investigation.

14    d.  The was currently no marijuana at 9201 San Leandro
15    Street.

16    27.  Based on the investigation described above, I believe
17    that, as a result of the previously executed search warrants in
18    the Eastern District of California on June 21, 2011, James
19    Stretch became aware of federal law enforcement action against
20    his co-conspirators in the Eastern District and therefore decided
21    to move his marijuana cultivation operation to a new, unknown
22    location.  I believe Stretch did this in an effort to avoid law
23    enforcement detection of his ongoing criminal activity of
24    cultivating marijuana in the Northern District of California.
25    Based upon the documentary evidence detailed above that links
26    HOFFMAN directly to Stretch in ongoing marijuana cultivation
27    efforts and NGUYEN in distributing marijuana from HOFFMAN-
28    directed grows, I believe HOFFMAN and NGUYEN were aware of search

34

1   warrants executed in the Eastern District on June 21, 2011, and
2   they may have informed Stretch of the need to relocate the
3   marijuana cultivation site from 9201 San Leandro Street in
4   Oakland to a new location.

5   I.    Other Marijuana-Related Entities and Individuals Tied to
         NGUYEN and HOFFMAN
6

7       28.   The investigation into HOFFMAN revealed numerous
8   entities, associates, and individuals tied to the production and
9   distribution of marijuana.  The next several sections of this
10  Affidavit detail the facts, testimony, and documents relating to
11  these entities, associates, and individuals and HOFFMAN's
12  involvement with each.  Unless stated otherwise, the information
13  below is based on my personal review of the various documents,
14  web sites, and other referenced materials.

15                     Horizon Cooperatives

16      29.   As noted above, during the 2011 investigation of the
17  marijuana cultivation site at the Jopson Ranch in Rio Oso, Aimee
18  Sisco told Deputy Maples that Yan Ebyam was conducting business
19  under a company called "Blue Horizon," and she had taken over
20  "Black Horizon."  Sisco also said that Ebyam has a Blue
21  [Horizon], an Orange [Horizon], and Purple [Horizon].  Sisco also
22  provided Deputy Maples with a copy of a property lease and a
23  Seller's Permit.  I have reviewed both of these documents and
24  they both demonstrate HOFFMAN's integral role in developing the
25  two large-scale marijuana cultivation sites at Rio Oso and
26  Fruitridge.

27      30.   Black Horizon Documents:  The unsigned lease, dated
28  December 15, 2010, is an agreement between Jopson Ranch, Inc.,

                              35

1   leaser, and Black Horizon Cooperative, LLC (Black Horizon),

2   lessee, for a 28,800 square foot greenhouse located at 1251

3   Pleasant Grove Road, Rio Oso, California.  This is the same

4   greenhouse that was raided on June 21, 2011, and found to contain

5   in excess of 2,000 marijuana plants.  The lease lists a billing

6   address for Black Horizon (c/o Yan Ebyam) of 3350 Wilshire Blvd,

7   Ste. 855, Los Angeles, California 90010.  This is the location of

8   the HOFFMAN's law office.  The Seller's Permit, dated April 11,

9   2011, is in the name of "Black Horizon Cooperative, Inc." with an

10  address of 1252 Pleasant Grove Rd., Rio Oso, California.

11          a.  During the execution of the search warrants at the

12  Jopson Ranch greenhouse and related structures on June 21, 2011,

13  numerous documents were discovered relating to Black Horizon,

14  detailed earlier in this Affidavit, including the Articles of

15  Incorporation and Statement of Information for Black Horizon, a

16  copy of Black Horizon's Profit and Loss Statement and check

17  register, Black Horizon's employee list, and email correspondence

18  between HOFFMAN and co-conspirators.

19      31.  Blue Horizon Documents:  During the June 21, 2011

20  execution of the search warrant at the Cal-Nevada Wholesale

21  Florist greenhouse on Fruitridge Road in Sacramento, several

22  documents were discovered (and some subsequently provided by fax)

23  relating to NGUYEN's connection with Blue and Black Horizon, as

24  detailed earlier in this affidavit, including a commercial lease,

25  correspondence and email correspondence with coconspirators.

26      32.  Colored Horizons:  On July 20, 2011, I obtained from the

27  California Secretary of State the Articles of Incorporation for

28  fourteen separate corporations.  Each corporation uses the name

36

1   "Horizon" coupled with a different color.   Thus, the corporations

2   include: Black Horizon, Blue Horizon, Bronze Horizon, Crimson

3   Horizon, Emerald Horizon, Gold Horizon, Grey Horizon, Olive

4   Horizon, Pink Horizon, Purple Horizon, Rouge Horizon, Silver

5   Horizon, Turquoise Horizon, Violet Horizon, and White Horizon.

6   The Secretary of State documents show that HOFFMAN is listed as

7   the Agent of Service for each of the fourteen corporations.   I

8   believe each one of the colored horizon corporations were

9   organized by HOFFMAN to facilitate a plan to exploit California

10  law by manufacturing and distributing large quantities of

11  marijuana for profit while masquerading as "medicinal" marijuana

12  providers.   In this investigation, evidence demonstrates that

13  NGUYEN provided storefront distribution outlets for the marijuana

14  cultivated under the Black and Blue Horizon corporations in the

15  Eastern District of California.   ~~I suspect further investigation~~

16  ~~will reveal NGUYEN was also a primary conduit for distributing~~   

17  ~~marijuana produced by the other colored Horizon corporations, as~~

18  ~~well as marijuana cultivated by James Stretch under the Marjyn~~

19  ~~entity.~~

20      33.   WFB records also show that HOFFMAN is the signer on

21  accounts in the name of Black Horizon Cooperative, Inc. and Blue

22  Horizon Cooperative, Inc.

23  **J.   HOFFMAN's Extensive Links to Marijuana Distributor Hung Cao,**
        **John NGUYEN, and New Age Canna, Inc., dba Canna Clinic of**
24      **Garden Grove**

25      34.   During this investigation, the investigative team in

26  this case has determined that the marijuana cultivated at the

27  Jopson Ranch in Rio Oso and the Cal-Nevada Wholesale Florist site

28  in Sacramento was distributed to, or destined for, John NGUYEN in

1  Southern California.  Documents recovered from search warrants
2  executed on June 21, 2011, at each of the marijuana cultivation
3  sites support this conclusion.  In addition, the documents
4  demonstrate that HOFFMAN was the direct link between the Northern
5  California marijuana cultivators and John NGUYEN's Southern
6  California distribution network.  Examples of this evidence
7  include the following:

8        a.   When agents searched Thomas Jopson's residence
9  (located within the Jopson Ranch in Rio Oso), they discovered
10  numerous documents, including a document dated January 15, 2011,
11  entitled "New Age Canna, Inc. dba Canna Clinic of Garden Grove,
12  Cannabis Cultivator Authorization."  This document contains
13  eleven enumerated paragraphs.  It identifies John NGUYEN as a
14  qualified patient entitled to use marijuana and shows that he is
15  a member and President of the New Age Canna, Inc. patient
16  collective dba Canna Clinic of Garden Grove.  In the document,
17  Nguyen purports to designate and authorize Black Horizon
18  Cooperative, Inc. ('Cultivator') to cultivate cannabis on behalf
19  of the membership of the Collective who are unable to cultivate
20  cannabis for themselves.  The document is signed by John NGUYEN
21  as President of New Age Canna Inc., dba Canna Clinic of Garden
22  Grove and by Nathan V. HOFFMAN, on behalf of Black Horizon
23  Cooperative, Inc., as "Cultivator."

24        b.   Another document discovered at Thomas Jopson's
25  residence contains a printed email from HOFFMAN to Aimee Sisco
26  and Tom Jopson, dated April 20, 2011.  The following is an
27  excerpt:
28  ///

1

*Note Paragraph 8:*
*I hereby authorize Cultivator and, by his/her execution*
2  *of this document, Cultivator agrees to cultivate no*
*more than 6 cannabis plants per registered member of*
3  *the Collective.  The membership records are on file and*
*available for inspection during normal business hours*
4  *Monday through Friday at the Collective's principal*
*distribution center located at 9758-B Chapman Ave.,*
5  *Garden Grove, CA 92841.*
*Any law enforcement authority should contact John*
6  *Nguyen directly at (818) 257-8316.*
*Nathan*

7

*Notice: This message is intended only for the use of*
8  *the individual(s) to which it is addressed and may*
*contain information that is privileged and/or*
9  *confidential.  If you are the intended recipient of*
*this message, you agree to keep all privileged and/or*
10  *confidential information private without written*
*consent of the sender, and will use any such*
11  *information only within the necessary scope of your*
*professional work.  If you are not the intended*
12  *recipient of this message, you have received this*
*transmission in error, and any review, distribution or*
13  *copying of this transmission is prohibited – please*
*notify sender immediately and safely dispose of this*
14  *message.*

15

16              i.    This email is significant because it

indicates that HOFFMAN brought together the marijuana cultivators
17
at the Jopson Ranch in Rio Oso with John NGUYEN.   NGUYEN's
18
purpose in this aspect of the conspiracy was to be the primary
19
marijuana distribution outlet for marijuana grown at the Rio Oso
20
cultivation site.
21
              c.    A printed email from HOFFMAN to Thomas Jopson with
22
a CC line to John NGUYEN, dated March 29, 2011, was discovered at
23
Thomas Jopson's residence.   The subject line states, "Opening
24
Dialogue bet New Age Canna and Black Horizon."  The following is
25
the email in its entirety:
26
        *Hi Tom and John:*
27
        *As follow-up to our recent telephone conversations, we*
28      *all agree that NOW is an auspicious time in the*

                                    39

1

*cultivation process to have more direct communication*
*on crop drying procedures, and other matters of mutual*
*interest, between New Age Canna, Inc. and Black Horizon*
*Cooperative.*

2

3

*Its my understanding that John would like to visit and*
*inspect the facility next month, on behalf of the New*
*Age member-patients that the medicinal product is being*
*grown for under both the CUA and MMPA.  In that regard,*
*I believe Tom is, or must formally become, a member of*
*New Age pursuant to paragraph 6 of the Cannabis*
*Cultivator Authorization document.*

4

5

6

7

*Tom please make arrangements directly with John Nguyen*
*as to a convenient date and time in April for a meeting*
*at the facility.  For ease of reference, John's*
*telephone is (818) 257-8316 and email is*
*johnsbcc@gmail.com.*

8

9

10

*Likewise John, Tom Jopson's phone is (530) 218-1271,*
*and email is tjopson@jps.net.  I look forward to*
*continuing to work with both of you on this important*
*project.*

11

12

13

*Sincerely,*
*Nathan V. Hoffman*
*Attorney at Law*
*Law Offices of Hoffman & Osorio, LLP*
*3350 Wilshire Blvd., Suite 855*
*Los Angeles, CA 90010*
*Tel: (213) 383-5721*
*Fax: (213) 383-5722*
*Cell: (310) 739-0978*
*Email: visa_atty@yahoo.com*

14

15

16

17

18

19        i.    This email illustrates that NGUYEN, through

20  his company New Canna Inc., doing business as two marijuana

21  dispensaries in Southern California, was directly involved in,

22  and aware of, the plan to cultivate, harvest, and distribute

23  marijuana from the Jopson Ranch.  Indeed, NGUYEN was key to the

24  success of the marijuana cultivators in Northern California

25  because he would be responsible for the successful sale of their

26  marijuana.

27        ii.   It is also apparent from HOFFMAN's email that

28  NGUYEN planned to inspect the marijuana cultivation site in Rio

40

1  Oso sometime during April of 2011.

2          d.    Another document discovered at Thomas Jopson's

3  residence contains a printed email from Aimee Sisco to Thomas

4  Jopson, June 4, 2011.  In an earlier email from Jopson to Sisco,

5  Jopson asked, "Are you finished with harvest and triming [sic]??

6  Progress payment??"  The following is Sisco's reply:

7          *Hi Tom,*

8          *I was just in town, we r finishing the last harvest.*
           *The entire harvest yielded 170 lbs. John has rcvd 91*
9          *lbs and is keeping 45 on a donation basis for his recs.*
           *He is charging 200 a lb for trimming and paying 1400 a*
10         *lb on the remaining 46. He is stating he has been paid*
           *in full. The remaining units I am slowing sending a*
11         *collective for no less than 2000 each.  So*
           *unfortunately, money will have to come from the next*
12         *harvest.  I have rcvd nothing on my end and we did not*
           *make a profit at all. John has only sent 61000.00 total*
13         *which has covered the supplies to get into the next*
           *harvest only.*

14

15         e.    This email is significant for a number of reasons.

16              i.    First, when Aimee Sisco mentions that, "John

17  has rcvd 91 lbs and is keeping 45 on a donation basis . . . ," I

18  believe she is referring to John NGUYEN having received 91 pounds

19  of processed marijuana from the Jopson Ranch grow.

20              ii.   Second, from the context of Sisco's comments,

21  it is apparent that she discussed with NGUYEN what he is charging

22  on a per-pound basis for the marijuana supplied from the Jopson

23  Ranch grown and distributed through NGUYEN's Southern California

24  marijuana dispensaries.

25              iii. Third, the quantities and prices of marijuana

26  mentioned in the email are inconsistent with the marijuana being

27  distributed for medicinal purposes under California law.

28  Specifically, Sisco's email makes clear that NGUYEN is purchasing

                                41

1 the Jopson Ranch marijuana for $1,400 per pound and is charging a
2 $200 cost per pound for trimming the marijuana.  Sisco goes on to
3 mention that she will seek to sell the marijuana for no less than
4 $2,000 per pound.  I believe Sisco is relating that she and her
5 co-conspirators are seeking to realize the maximum amount of
6 profit from the sale of the Jopson Ranch marijuana.

7                iv.  Finally, the email reveals that NGUYEN had
8 paid $61,000 to Sisco and Black Horizon co-conspirators in
9 exchange for multiple pounds of marijuana from the Jopson Ranch
10 grow.

11                f.  A similar set of documents linking HOFFMAN,
12 NGUYEN, and Northern California marijuana cultivators was
13 discovered during the search of the marijuana cultivation site at
14 the Cal-Nevada Wholesale Florist on Fruitridge Road in
15 Sacramento.  In addition to finding more than 3,000 marijuana
16 plants, agents discovered a document that links HOFFMAN to the
17 transportation of twelve pounds of marijuana from this site to
18 NGUYEN in Southern California.  The document is entitled
19 "Transportation Certificate," and is dated June 3, 2011.  This
20 document states that 12 pounds of "medical" marijuana was
21 transported by Yan Ebyam from Sacramento to Los Angeles on the
22 behalf of New Age Canna cooperative.  It further states, "If you
23 have any questions about the cannabis, please call Nathan
24 HOFFMAN, Esq. at (310) 739-0978."  At the bottom of the document
25 is typed "Nathan Hoffman, Collective Official's Printed Name."

26                i.  The telephone number used by HOFFMAN, (310)
27 739-0978, in the Transportation Certificate is the number he
28 lists as his cell phone in emails connected with his law office.

42

This document not only ties HOFFMAN to the transportation and
ultimate distribution of marijuana from Northern California to
Southern California, but it also shows HOFFMAN was using his
status as an attorney to attempt to provide a legitimate facade
to the transportation of marijuana if the transporter encountered
law enforcement.

**K.    Information About New Age Canna, Inc., doing business as
       South Bay Canna Clinic**

       35.   On August 3, 2011, IRS Special Agent Lisa Ulrikson,
conducted a limited surveillance of the address for South Bay
Canna Clinic located at 1555 West Sepulveda Blvd, Suite J,
Torrance, California.   Special Agent Ulrikson observed a multi-
colored commercial mall on the north side of Sepulveda Boulevard
with a sign identifying it as the "Victory Center."   The small
commercial mall is comprised of various businesses, one of which
was the South Bay Canna Clinic with two green crosses displayed
on the exterior of the building.   Within the commercial mall, I
saw a business which had a large single green cross as a sign and
another green cross decaled on the front window of the business.
Above the front door was a "J" decaled over the door.   The
windows of the business are obscured therefore prohibiting anyone
from looking into the business.   I observed what appeared to be a
large volume of foot traffic in and out of the store.   Many of
the customers I observed, appeared to be young.   Each of the
customers I observed leaving NGUYEN's dispensary were carrying
brown paper bags.   Lastly, I observed a guard posted just outside
the front door of the South Bay Canna Clinic.   In my training and
experience, the display of small green crosses, such as those

43

observed outside of the South Bay Canna Clinic, is a common
technique used by marijuana distributors at dispensaries to
advertise their location.  The green cross mimics the familiar
Red Cross logo but replaces red with green to signify marijuana.
The use of the cross is also an apparent attempt to hide behind
the "medicinal" aspect of the marijuana market.

36.  On August 18, 2011, United States Postal Inspector
Jeanne Marie Martin informed me that 1555 West Sepulveda Blvd,
Suite J, Torrance, California, was receiving mail under the name
CANNA CLINIC.  This location did not list any persons by name.

**L.   Information About New Age Canna, Inc., doing business as
Canna Clinic of Garden Grove**

37.  I conducted an internet search (Google) on the name
"Canna Clinic of Garden Grove."  It showed a website named
"potlocator.com," which describes this business as a medical
marijuana dispensary.  On August 3, 2011, I spoke with a
Detective with Garden Grove Police Department who informed me
that Canna Clinic of Garden Grove, located at 9758 Chapman
Avenue, Garden Grove, California, is currently operating as a
marijuana dispensary.

38.  California Board of Equalization documents reveal that
Hung Cao NGUYEN is the President of both New Age Canna, Inc. and
Cana Clinic, Inc. with a telephone number of (818) 257-8316.
This is the same telephone number supplied by HOFFMAN in his
emails with Thomas Jopson as a contact for John NGUYEN.  Based
upon this information, I believe that John NGUYEN is the name or
an alias used by Hung Cao NGUYEN, and that they are one and the
same person.

44

1       39.  On August 3, 2011, I conducted a limited surveillance
2  of NGUYEN's Canna Clinic of Garden Grove, located at 9758-B
3  Chapman Ave, Garden Grove, California 92841.  I followed
4  directions to the address from a website that listed this as the
5  address for Canna Clinic of Garden Grove.  In addition, after
6  following the directions from a related website, I located the
7  entrance to Canna Clinic of Garden Grove at the back parking lot
8  of the small commercial mall.  I observed a white door propped
9  open with a guard posted just inside.  Other than a "No Dumping"
10  sign and a sign indicating that there was video surveillance on
11  the premises, I did not observe any other business/advertising
12  signs posted.

13      40.  On August 18, 2011, United States Postal Inspector
14  Jeanne Marie Martin informed me that 9758-B Chapman Ave, Garden
15  Grove, California, was receiving mail under the name CANNA
16  CLINIC.  This location did not list any persons by name.

17  <u>Patriot Medical Products, Inc. and JH Management Group, Inc.</u>

18      41.  Evidence of an ongoing relationship between HOFFMAN and
19  NGUYEN in marijuana distribution is further supported by a
20  document found during the search of Thomas Jopson's residence
21  (within the Jopson Ranch in Rio Oso).  Agents found a three-page
22  document dated March 2, 2011.  Relevant facts in this document
23  include, the following:

24          a.   It is entitled "Contract For Services" between
25  Marjyn Investments, LLC and/or Patriot Medical Products, Inc.
26  (PMP) and JH Management Group, Inc. (JHMG).

27          b.   Paragraph 1 of the document states: "*Duties*: JHMG
28  shall be responsible for providing agricultural, security and

1  asset management consultation services, by whatever means and
2  methods it shall, in its sole discretion, determine." Also, "PMP
3  shall be responsible for all accounting, legal, and
4  administrative services concerning the facility operation."

5          c.   Paragraph 10 states, in part: "*Compensation*: In
6  consideration for JHMG's services hereunder, PMP agrees to pay
7  JHMG a flat rate of $10,000.00 per month commencing 14 weeks from
8  the date of this Agreement <u>or</u> when proceeds from the first JHMG
9  supervised harvest grown from seeds or clones under the
10 supervision of JHMG are paid to PMP, whichever occurs first . . .
11 both parties anticipate that date to be on or before July 1,
12 2011."

13         d.   Also within Paragraph 10, is the text:  ". . . PMP
14 shall also pay JHMG $750.00 for every unit produced under the
15 supervision of JHMG that realizes a wholesale price of more than
16 $2,500 per pound?"

17         e.   The document is signed by Nathan V. HOFFMAN as
18 Patriot Medical Group, Inc. and by Hung NGUYEN as JH Management
19 Group, Inc.

20              i.   It is worth noting that HOFFMAN signed this
21 document as Patriot Medical <u>Group</u>, Inc. rather than Patriot
22 Medical <u>Products</u>, Inc., the name in the Contract for services,
23 for it shows again that HOFFMAN and NGUYEN use multiple entities
24 or business names to conduct his marijuana business.

25         f.   Although this document does not explicitly state
26 it is a contract for the production and distribution of
27 marijuana, based on the language used, specifically, medicinal
28 products, agricultural services, harvest, seeds, clones, and

negotiating price per pound, and further based on the totality of the evidence presented in this Affidavit, in my opinion, this contract is an agreement between HOFFMAN and NGUYEN to manufacture and distribute marijuana.  Indeed, the document appears to be a profit-seeking venture between two entities controlled by HOFFMAN and NGUYEN to grow and distribute marijuana.

g.   I have reviewed a California Secretary of State record that reflect that HOFFMAN is the agent for service, as well as the Secretary and a director of Patriot Medical Products, Inc.  James Stretch is also listed as the Chief Financial Officer and a director.  The document further reflects a business address for this entity of 9201 San Leandro Street, Oakland, California, an address also associated with Marjyn, as described above.  The state records show that Patriot Medical Products, Inc. was dissolved on May 6, 2011.

**M.   HOFFMAN's Admissions to Law Enforcement on September 22, 2011**

42.   On September 22, 2011, IRS agents served a federal search warrant at HOFFMAN's residence and his law office.  During the course of the search at HOFFMAN's residence, HOFFMAN requested/agreed to speak with the "case agent."  I introduced myself to HOFFMAN as a Special Agent with IRS Criminal Investigation as I displayed my credentials for his inspection. I explained that we were there to conduct a search warrant and that he was not under arrest.  I also explained that he was free to leave.  However, HOFFMAN said that he wished to stay until the agents completed their search.  HOFFMAN indicated that he was

47

provided a copy of the search warrant.  Below is a summary of
significant information obtained from HOFFMAN during the
interview that corroborates some aspects of this investigation.

a.    As HOFFMAN was reviewing the search warrant, he
volunteered that we were likely there (conducting a search
warrant) in relation to the marijuana grows in Northern
California, that his "clients" are involved in.  HOFFMAN wouldn't
reveal who his clients were and, instead, said he would defer
that question to his attorney.

b.    HOFFMAN also said that we were likely at his
residence because we (federal law enforcement) thought he was
hiding drug proceeds from the IRS.

c.    HOFFMAN acknowledged that he is involved with
Marjyn Investments.

d.    HOFFMAN admitted that he is acutely aware that
there is a conflict between state and federal law as it relates
to marijuana.  However, he claimed that he is aware of California
law and "their" operation follows rules established by
propositions 215 and SB 420.

e.    Outside his front door, HOFFMAN was standing
amongst several other agents (including myself).  While talking
about his dog, which was fourteen years old and obviously blind,
HOFFMAN remarked that we would all end up that way (meaning
suffering like his dog) unless we used medical marijuana.

f.    HOFFMAN claimed that crime is lower in the
districts that have marijuana dispensaries.  He also said that in
the 1920's alcohol was illegal and you have to start somewhere.
///

1          g.    HOFFMAN said the marijuana grow in Oakland was

2     supposed to be a patient-run collective.  HOFFMAN identified

3     James Stretch as the CEO of that business.

4     **N.    List of Entities and Individuals Involved In Marijuana
              Schemes of NGUYEN and HOFFMAN**

5          43.   The following table contains a lists of the entities,

6     business names and associates/individuals (in alphabetical order)

7     involved with HOFFMAN in the production and distribution of

8     marijuana, as described in the above paragraphs.  For clarity,

9     the various entities listed as Horizon Cooperatives under various

10    colors (black, blue, bronze, etc.) are listed separately under

11    the title "Colored Horizons":

| **ENTITIES** | **ASSOCIATES/INDIVIDUALS** |
| --- | --- |
| 9201 SAN LEANDRO STREET, LLC. | BESON, JOSEPH |
| AMERICAN HYDROPONICS | BILTON, ELI |
| BB COLLECTIVE, INC. | DU, JULIA THUY-TIEN |
| BRONCO INVESTMENTS LIMITED, LLC | EBYAM, YAN |
| CANNA CLINIC OF GARDEN GROVE | HARRIS, MATTHEW |
| CROP KING | HENRY, JOHN JOSEPH |
| D & S GARDEN SUPPLIES | JOPSON, DAVID |
| DAN GRACE CLONES | JOPSON, THOMAS |
| DARK HEART INDUSTRIES | KNOX, KEVIN |
| JH MANAGEMENT GROUP, INC (JHMG) | MAGAZINE, JARRETT |
| MARJYN INVESTMENTS, LLC | NGUYEN, HUNG CAO JOHN |
| NEW AGE CANNA, INC. | SISCO, AIMEE |
| PATRIOT MEDICAL GROUP, INC. | STRETCH, JAMES |
| PATRIOT MEDICAL PRODUCTS, INC (PMP) | STUTZRIEM, RANDY |
| SANCTUARY HEALTH CENTER, INC. | SUTHERLAND, KEN |
| THE RAINFOREST | |
| YANKS ENTERPRISES, LLC | |

**COLORED HORIZONS**
BLACK HORIZON COOPERATIVE
BLUE HORIZON COOPERATIVE
BRONZE HORIZON COOPERATIVE,
CRIMSON HORIZON COOPERATIVE

49

EMERALD HORIZON COOPERATIVE
GOLD HORIZON COOPERATIVE
GREY HORIZON COOPERATIVE
OLIVE HORIZON COOPERATIVE
PINK HORIZON COOPERATIVE
PURPLE HORIZON COOPERATIVE
ROUGE HORIZON COOPERATIVE
SILVER HORIZON COOPERATIVE
TURQUOISE HORIZON COOPERATIVE
VIOLET HORIZON COOPERATIVE
WHITE HORIZON COOPERATIVE

**O.    Summary of Evidence Regarding HOFFMAN and NGUYEN and their
       Criminal Schemes**

     44.   Based upon the facts set forth in this Affidavit, my
training and experience, and the training and experience of
investigators that I have consulted with in preparing this
Affidavit, there is probable cause to believe that:

          a.    NGUYEN and HOFFMAN were intimately involved in the
production of marijuana at the two greenhouse grows in the
Eastern District of California, the one in Rio Oso (Jopson
Ranch/Black Horizon Cooperative) and the one in Sacramento (Cal-
Nevada/Blue Horizon Cooperative), which were found to contain
collectively more than 5,000 marijuana plants;

          b.    On April 8, 2011, a Currency Transaction Report
filed on NGUYEN revealed that he made a currency deposit of
$13,202 into the HOFFMAN-controlled Marjyn account. I believe the
money deposited by NGUYEN was earned from his distribution of
marijuana through each of the locations targeted by this warrant;

          c.    NGUYEN was directly responsible for distributing a
large amount of the marijuana cultivated at the Jopson Ranch grow
site and any other marijuana produced (or intended to be

50

1  produced) from each of the marijuana gardens described above;

2       d.   NGUYEN and HOFFMAN intended to profit from the

3  production and distribution of marijuana as evidenced by:

4            i.   HOFFMAN's sale of the commercial marijuana

5  grow located at 919 81st Street, Oakland, California (operated

6  under Marjyn) to Bronco Investments for $1,250,000;

7            ii.  HOFFMAN's email trying to entice Ken

8  Sutherland to invest $50,000 in a hydroponic facility franchise

9  and attaching a spreadsheet with conservative numbers in terms of

10 profitability;

11           iii. The Contract For Services document between

12 PMP (a HOFFMAN-controlled entity) and JHMG (a NGUYEN-controlled

13 entity) where they discuss payment of $750 for every unit

14 produced that sells for more than $2,500 per pound on the

15 wholesale market;

16           iv.  Marjyn Investments, LLC and Yanks

17 Enterprises, LLC are commercial enterprises that are or have been

18 involved in the manufacture of marijuana;

19           v.   The Marjyn Investments, LLC bank account at

20 WFB has been used to pay for materials used in the manufacture of

21 marijuana, to include rent payments, utility payments, marijuana

22 clones, hydroponic equipment and wages;

23           vi.  The Marjyn Investments, LLC bank account at

24 WFB has been used to receive and launder large amounts of

25 currency (as well as checks) believed to come from the sales of

26 marijuana;

27           vii. NGUYEN, HOFFMAN, Ebyam, and Stretch have all

28 personally deposited large amounts of currency to the Marjyn

51

Investments, LLC bank account at WFB believed to come from the
sales of marijuana;

       e.   HOFFMAN is well aware that the production and
distribution of marijuana is illegal in California as evidenced
by his own email to Thomas Jopson on February 18, 2011.  In that
email, HOFFMAN states, ". . . any industrial size cultivation
facility acting under a City Permit would be immediately targeted
by the Feds as crossing the proverbial Prop 215 line in the sand.
Later in the email, HOFFMAN warns, . . . comes the chance that
the feds will target us no matter how much security and
confidentiality we achieve on paper.";

       f.   HOFFMAN himself confirmed that he knew the
production and distribution marijuana remains illegal.
Specifically, during his voluntary statements to me on September
22, 2011, he admitted that he is acutely aware that there is a
conflict between State and Federal law as it relates to
marijuana.

       g.   Based on consensual statements made by Aimee Sisco
to law enforcement officials and documents seized in this case,
NGUYEN, through his New Age Canna, Inc., was supposedly keeping
records relating to patient "prescriptions" related to the
marijuana cultivation sites at Rio Oso and Fruitridge;

       h.   NGUYEN is linked through seized documentary
evidence to the deposit of large sums of currency into various
bank accounts of his co-conspirators, including Aimee Sisco's
reference in a June 4, 2011, to $61,000 being paid by NGUYEN for
processed marijuana from the Rio Oso cultivation site;
///

1        i.    NGUYEN distributes marijuana from his two Southern

2  California locations and based upon my training and experience,

3  and the nature of the criminal activities involved in this case,

4  he is likely to continue distributing marijuana unless he is

5  stopped by law enforcement.

6                        **CONCLUSION**

7      45.   Based upon the facts set forth in this Affidavit and

8  the attached **Exhibit A**, I respectfully request that the Court

9  issue a Criminal Complaint against Nathan V. HOFFMAN and Hung Cao

10 NGUYEN, also known as John NGUYEN for the Subject Offenses.

11     46.   I further request that an arrest warrant be issued for

12 NGUYEN.  I am not seeking an arrest warrant for HOFFMAN.

13

14                          Lisa Ulrikson
                         Special Agent, IRS

15

16

17 Subscribed and sworn to before me
   on _Oct. 4_____, 2011.

18

19

20

  KENDALL J. NEWMAN

21 United States Magistrate Judge

22

23

24

25 Approved as to form:

26 
  Jason Hitt

27 Assistant U.S. Attorney

28

.

**Exhibit A**
**Search Warrant Affidavit for HOFFMAN's Residence**

## AFFIDAVIT FOR SEARCH WARRANT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| **UNITED STATES OF AMERICA**<br>**vs.**<br><br>**THE PREMISES KNOWN AS:**<br><br>**4046 Astair Avenue**<br>**Culver City, California 90323** | DOCKET NO.    MAGISTRATE CASE NO.<br>**11-2197M**<br><br>NAME AND ADDRESS OF JUDGE [1] OR U.S. MAGISTRATE JUDGE<br>**Hon. Victor B. Kenton**<br>**United States Magistrate Judge**<br>**Los Angeles, California** |

| The undersigned being duly sworn deposes and says:  That there is reason to believe that |
|---|

| ☐ on the person of   ☒ on the premises known as | **CENTRAL DISTRICT OF CALIFORNIA** |
|---|---|

**SEE ATTACHMENT A-2**

The following property (or person) is concealed:

**SEE ATTACHMENT B**

FILED
CLERK U.S. DISTRICT COURT

SEP 2   2011

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

Affiant alleges the following grounds for search and seizure: [2]

Evidence of violations of Title 21, United States Code,  Sections 841(a)(1),  846, 856,
Title 18, United States Code, Sections 371, 1956-1957,
Title 31, United States Code, Section 5324(a)(1) & (3)

☒ See attached affidavit which is incorporated as part of this affidavit for search warrant

Affiant states the following facts establishing the foregoing grounds for issuance of a Search Warrant

**(SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED AS PART OF THIS AFFIDAVIT FOR SEARCH WARRANT)**

| SIGNATURE OF AFFIANT<br><br>Lisa S. Ulrikson | OFFICIAL TITLE, IF ANY<br><br>**SA, Internal Revenue Service** |
|---|---|

| Sworn to before me, and subscribed in my presence: |
|---|

| DATE<br><br>SEP 2 1 | JUDGE OR US MAGISTRATE JUDGE<br><br>Honorable      **VICTOR B. KENTON** |
|---|---|

[1] United States Judge or Judge of a State Court of Record
[2] If a search is to be authorized "at any time in the day or night" pursuant to Federal Rules of Criminal Procedure 41(e)(2)(A)(ii),
    show reasonable cause therefor.

D.Kowal:gf

ATTACHMENT A-2

<u>4046 Astair Avenue, Culver City, California, 90323</u>,
including any residences, garages outbuildings, structures,
storage bins or areas, trash receptacles, attics, basements,
yards and ground, or vehicles on the property (the "Hoffman
Residence").  The Hoffman Residence is a single-family residence
with a two-car garage.  It includes a cream colored, stucco sided
house with chocolate-brown trim and a sloped, red tile roof.  The
forward facing garage is also cream colored with chocolate-brown
trim.  The front entrance is located behind a brown brick wall
and an iron gate.  Directly in front of the residence are the
numbers "4046" painted on the curb of the sidewalk.  (A
photograph of the exterior of the Hoffman Residence taken on or
about August 3, 2011 is attached as Exhibit 1)

EXHIBIT 1 TO ATTACHMENT A-2



**ATTACHMENT B**

1.    Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by HOFFMAN and his co-conspirators:

a.    Title 21 U.S.C. Section 841(a)(1) - Manufacture and Distribution of Marijuana and Marijuana Plants;

b.    Title 21 U.S.C. Section 846 - Conspiracy to Manufacture and Distribute Marijuana and Marijuana Plants;

c.    Title 21 U.S.C. Section 856 - Maintaining Drug-Involved Premises;

d.    Title 21 U.S.C. Section 854 - Investment of Illicit Drug Profits;

e.    Title 18 U.S.C. Section 1956 - Money Laundering; Title 18 U.S.C.

f.    Section 1957 - Conducting Monetary Transaction with Proceeds of Specified Unlawful Activities;

g.    Title 18 U.S.C. Section 371 - Conspiracy;

h.    Title 31 U.S.C. Section 5324(a)(1) & (3) - Structuring cash transactions to evade reporting requirements.

2.    As further described in the affidavit, the specific evidence, fruits, and instrumentalities of the Target Offense for which agents may search includes:

a.    Relating directly and exclusively to Nathan

HOFFMAN as an individual, from 2008 to the present:

   i.   Controlled substances including marijuana in various forms, including growing plants, harvested plants, stalks, root balls, or drying, dried or processed marijuana, marijuana seeds and or marijuana plant clones or other controlled substances the possession and distribution of which is prohibited by Federal law;

   ii.   Records, documents, programs, applications or materials associated with and used for storage, transportation, processing, protection or distribution of marijuana, such as baggies, rolling papers, cigarette packs, small medicine containers, glass and plastic vials, rolled up papers for holding seeds, sifters, scales and other weighing devices, compression devices, drying screens, paper bags, pouches, burlap bags, plastic storage containers, boxes, chests, coolers, storage trailers, together with the receipts for these items;

   iii. Records, documents, programs, applications or materials tending to identify the location where controlled substances and other evidence of narcotics trafficking may be found, to include records and keys for vehicles, storage facilities, residences, businesses, post office boxes and safe deposit boxes;

   iv.   United States and foreign currency linked to marijuana trafficking, cultivation, or money laundering;

      v.    Records, documents, programs, applications or materials used in the packaging of currency for consolidation and transportation, such as large quantities of rubber bands, currency wrappers or bands, duct or wrapping tape, and plastic sealing machines;

      vi.  Records, documents, programs, applications or materials tending to establish the purchase and sale of controlled substances, to include buyer's lists, seller's lists, pay-owe sheets, ledgers of transactions, codes, notation logs, receipts, journals, books, supplier lists, correspondence, and other documents noting the price, quantity, date and/or times when narcotics were propagated, purchased, possessed, transferred, distributed, sold or concealed;

      vii. Records, documents, programs, applications or materials of occupancy, residency or ownership tending to establish the identity of persons in control of the premises being searched, to include rent receipts, utility bills, check books, bank account records, addressed envelopes, passports, Identification cards, driver's licenses, residence keys, vehicle registrations, videos, exposed film and photographs;

      viii.    Records, documents, programs, applications or materials reflecting travel, including airline tickets, credit card receipts, itinerary, reservation confirmation, travel vouchers, hotel and restaurant receipts,

canceled checks, maps and written directions to locations;

ix.  Records, documents, programs, applications or materials evidencing the shipment and receipt of parcels through common carriers, such as the U.S. Postal Service, Federal Express, DHL, UPS and others, including shipping confirmation receipts, address labels, envelopes, boxes, shipping printouts, receipts for payment, documents containing tracking or tracing numbers, certified and registered shipping receipts.

x.  Records, documents, programs, applications or materials evidencing the receipt of income from any source including Forms W-2, 1098 and 1099, Federal and state income tax records and work papers, employment records, pay stubs, social security statements, business receipts, business books and records, journals and ledgers, receipts, invoices, records from the sales of assets, real estate sale and purchase records, escrow records, bank records (including foreign accounts and related transactions), brokerage records, investment account statements, stock certificates, receipts documenting purchase and sale of stocks, contracts, purchase orders, estate records, loan records, letters of credit, notes payable and receivable, IOU's and other recordation of debts comprising evidence of loans and expenses, checks, passbooks and deposit receipts, check registers and checkbooks, insurance documents, money orders, cashier's checks, bank drafts, wire transfers, money drafts;

xi.   Records, documents, programs, applications or materials evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money to include money counting machines, business books and records, invoices, receipts, records of real estate or securities transactions, escrow files, vehicle and vessel purchase records, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, checkbooks, loan statements, work papers, records reflecting the purchase of assets;

xii. Records, documents, programs, applications or materials evidencing the purchase, rent or lease of real and personal property including plot maps, assessor maps, titles, deeds, deeds of trust, reconveyances, quit claim deeds, easement deeds, escrow files, title reports, appraisals, registration documents, ownership documents, receipts and storage container/locker contracts;

xiii.   Copies of any Currency Transaction Reports (CTRs), bank notification requirements for CTRs, schedules of currency activities, money orders, cashier's checks, and wire transfers;

xiv. Photographs, negatives, video tapes, films, audio tapes, undeveloped film and the contents therein, and

slides depicting the subjects of the investigation and their criminal associates, their assets and/or controlled dangerous substances;

        xv.    Personal calendars, diaries, address and/or telephone books and listings, rolodex indices, papers, and other documents, records, and materials reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, telephone bills, cellular telephones, correspondence of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

        xvi. Items in excess of $2,000.00 in value tending to establish substantial income from narcotics trafficking, to include money orders, cashier's checks, certified checks, gold, silver, jewels, negotiable securities, certificates of deposit, documents evidencing the purchase of expensive assets, real property, bank statements, canceled checks, credit card statements, business records, which includes general ledgers, general journals, cash receipts and disbursement journals, sales journals or other books of account, receipts, and other items evidencing the obtaining, secreting transfer, concealment and expenditures of large sums of currency;

        xvii.    Records, documents, programs,

applications or materials tending to establish evidence of money
laundering activity to include records of currency transactions,
foreign and domestic financial transactions, such as wire
transfers, cashier's checks and money orders, bank drafts, and
published reference material on the subject of money laundering;

xviii.    Telephone paging devices, beepers,
mobile phones, car phones, answering machines and tapes, and
other communication devices which could be used to participate in
a conspiracy.

xix. Computers, cellular telephones, and other
digital devices used to facilitate or commit a conspiracy to
manufacture or distribute of marijuana, the laundering of money,
or violation of the Target Offenses.

xx.  With respect to any digital devices falling
within the scope of the foregoing search categories, or any
digital devices containing evidence falling within the scope of
the foregoing search categories, records, documents, programs,
applications or materials, or evidence of the absence of same,
sufficient to show the actual user(s) of the digital device
during the time period between 2008 and the present.

b.    Relating to the following entities, business
names, associates, and individuals in the table below
(collectively, "the parties") from 2008 to the present:

| ENTITIES: | ASSOCIATES/INDIVIDUALS: |
|---|---|
| 9201 SAN LEANDRO STREET, LLC. | BESON, JOSEPH |
| AMERICAN HYDROPONICS | BILTON, ELI |
| BB COLLECTIVE, INC. | DU, JULIA THUY-TIEN |
| BRONCO INVESTMENTS LIMITED, LLC | EBYAM, YAN |
| CANNA CLINIC OF GARDEN GROVE | HARRIS, MATTHEW |
| CROP KING | HENRY, JOHN JOSEPH |
| D & S GARDEN SUPPLIES | JOPSON, DAVID |
| DAN GRACE CLONES | JOPSON, THOMAS |
| DARK HEART INDUSTRIES | KNOX, KEVIN |
| JH MANAGEMENT GROUP, INC (JHMG) | MAGAZINE, JARRETT |
| MARJYN INVESTMENTS, LLC | NGUYEN, HUNG CAO "JOHN" |
| NEW AGE CANNA, INC. | SISCO, AIMEE |
| PATRIOT MEDICAL GROUP, INC. | STRETCH, JAMES |
| PATRIOT MEDICAL PRODUCTS, INC (PMP) | STUTZRIEM, RANDY |
| SANCTUARY HEALTH CENTER, INC. | SUTHERLAND, KEN |
| THE RAINFOREST | |
| YANKS ENTERPRISES, LLC | |
| COLORED HORIZON entities or | |
| | |
| business names including: | |
| BLACK HORIZON COOPERATIVE | |
| BLUE HORIZON COOPERATIVE | |
| BRONZE HORIZON COOPERATIVE | |
| CRIMSON HORIZON COOPERATIVE | |
| EMERALD HORIZON COOPERATIVE | |
| GOLD HORIZON COOPERATIVE | |
| GREY HORIZON COOPERATIVE | |
| OLIVE HORIZON COOPERATIVE | |
| PINK HORIZON COOPERATIVE | |
| PURPLE HORIZON COOPERATIVE | |
| ROUGE HORIZON COOPERATIVE | |
| SILVER HORIZON COOPERATIVE | |
| TURQUOISE HORIZON COOPERATIVE | |
| VIOLET HORIZON COOPERATIVE | |
| WHITE HORIZON COOPERATIVE | |

        i.    Business documents establishing a

relationship between HOFFMAN and the above listed parties,

including payments received or paid, employment contracts,

service contracts, lease and rental contracts, bank documents,
corporate records, and communications;

        ii.   Corporate and business filings, Articles of
Incorporation, Statements of Information, Statement of Officers,
corporate minutes, stock registers, organization charts/lists,
dividend disbursements, lists of shareholders, percentage of
ownership records, dissolutions, correspondence, Board of
Director's documents, corporate resolutions, notice of meetings,
meeting attendance lists, meeting summary sheet, minutes of
shareholder and director meetings, contracts, partnership
records; investment prospectuses;

        iii. Corporate and business records, accounting
source documents, corporate financial documents, bank records,
bank statements, cancelled checks, withdrawals, interest, debit
and credit memos, check registers, copies of items deposited,
bank deposit slips, disbursement records, sales and expense
invoices, billing, balance sheets, income statements, profit and
loss statements, work papers, financial statements, tax returns,
general journals, general ledgers, subsidiary ledgers and
journals, petty cash records, inventory records, fixed asset
logs, asset acquisition documents, accounts receivable records,
accounts payable records, bad debt records, cost of goods sold
records, expenses paid by cash, loan receivable and payable
ledgers/records, travel expense records, entertainment records,

depreciation schedules, sales revenue documents, revenue
projections, vendor contracts, rental and lease contracts,
records of sales of business assets, bookkeeper and/or accountant
work-papers, and correspondence;

    iv.  Employment contracts, memoranda, employee
compensation records, copies of Forms 1099, copies of Forms W-2,
employment tax documents, lists of employees and independent
contractors, independent contractor records, payroll records;

    v.   Records, documents, programs, applications or
materials reflecting communications, correspondence, memoranda,
emails, cards, letters, and communications involving the parties.

    vi.  Records, documents, programs, applications or
materials relating to asset ownership, partnerships, contracts,
leases, or payments;

    vii. Records, documents, programs, applications or
materials evidencing the purchase, rent or lease of real and
personal property including plot maps, assessor maps, titles,
deeds, deeds of trust, reconveyances, quit claim deeds, easement
deeds, escrow files, title reports, appraisals, registration
documents, ownership documents, receipts and storage
container/locker contracts;

    viii.   Records, documents, programs,
applications or materials tending to establish evidence of money
laundering activity to include records of currency transactions,

foreign and domestic financial transactions, such as wire transfers, cashier's checks and money orders, bank drafts, and published reference material on the subject of money laundering;

c.    <u>Specifically excluded from any of the foregoing search categories or items to be seized are those records, documents, or materials containing confidential attorney-client privilege communications between HOFFMAN and his current retained counsel in this matter, Joseph Kar</u>.

d.    Computer equipment, cellular telephones, or other digital devices used to manufacture or distribute marijuana, launder money, aid in the comminations by or among HOFFMAN and the parties, or to otherwise facilitate the commission of the Target Offenses.

e.    With respect to any digital devices falling within the scope of the foregoing search categories, or any digital devices containing evidence falling within the scope of the foregoing search categories, records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show the actual user(s) of the digital device during the time period between 2008 and the present.

### Additional Privilege-Related Search and Seizure Procedures With Respect to HOFFMAN'S Legal Practice

3.    Agents will follow the following procedures during execution of the search warrants at the Subject Premises in order to ensure that privileged materials are not improperly viewed,

seized, or retained during the course of the search.

      a.   <u>Conducting the Search</u>: The search of the Subject Premises has been drawn as specifically as possible, consistent with the requirements of the investigation, to minimize the need to search and review privileged material to which no exception applies.  Agents will make every effort to avoid viewing privileged material that pertains to HOFFMAN's legal services to clients of his immigration practice whether they are located at his law office or his residence.  It is anticipated that agents executing this warrant may be required to conduct a limited review of arguably privileged material to ascertain whether the material is covered by this warrant.

      b.   <u>Designation of a Privilege Team</u>: Based upon these anticipated concerns and to protect any privileges applying to HOFFMAN's immigration practice, while also ensuring that the investigation is not compromised by exposure to privileged material relating to the investigation or to defense strategy, the investigating agents shall designate a privilege team (the "privilege team"), to conduct the searches at the Subject Premises.  This privilege team shall consist of IRS or other federal agents or employees, and at least one Assistant United States Attorney for the Eastern District of California.  All members of the privilege team will not be members of the investigative or prosecutive team in the underlying investigation

of HOFFMAN, Nguyen, and the other co-conspirators identified
throughout this affidavit.

        c.   Prior to execution of these search warrants,
instructions shall be given to members of the privilege team
setting forth procedures designed to minimize the intrusion into
privileged material of HOFFMAN's immigration-based practice.
Specifically, privilege team agents shall not examine, search, or
seize material, in any form, that relates to HOFFMAN's
representation of individual or corporate clients before the U.S.
Immigration Courts in family-based and employment-based
immigration matters, including client files, client
correspondence, or billing records related to HOFFMAN's
immigration law practice. If privilege team agents must examine
an item because the nature of its contents are unclear, privilege
team agents shall not disclose any information to investigative
or prosecutive team agents or lawyers unless and until so
instructed by the privilege team lawyer. A privilege team lawyer
shall be available off-site, to advise the privilege team agents
during the course of the search, but shall not participate in the
searches themselves.

        d.   <u>Review Procedures</u>: Privilege team members shall
employ procedures designed to ensure that attorney-client
privileges are not violated.

        i.   In the event privilege team members executing

the warrants in this case seize material that may be arguably privileged or arguably subject to an exception to the privilege, such materials shall be submitted to United States District Judge John A. Mendez, Eastern District of California for further instruction from Judge Mendez.   Judge Mendez is the District Judge assigned to the two marijuana trafficking indictments of HOFFMAN's co-conspirators currently pending in the Eastern District of California: United States v. Ebyam, Case No. 2:11-cr-00275 JAM, and United States v. Ebyam, et al., Case No. 2:11-cr-00276 JAM.

ii.   Copies of all seized materials will be provided to HOFFMAN or his legal representative in order to ensure that: a) disruption of HOFFMAN's law operation is minimized; and b) HOFFMAN is afforded an opportunity to participate in the process of submitting disputed documents to the court by raising specific claims of privilege.

### Additional Digital Search Definitions and Procedures

4.   As used above in paragraphs above defining the items to be seized, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form, including in digital form on any digital device and any forensic copies thereof.   As used both above and below, the term "digital device" includes any electronic system or device capable of storing

and/or processing data in digital form, including: central
processing units; laptop or notebook computers; personal digital
assistants; wireless communication devices such as telephone
paging devices, beepers, and mobile telephones; peripheral
input/output devices such as keyboards, printers, scanners,
plotters, monitors, and drives intended for removable media;
related communications devices such as modems, cables, and
connections; storage media such as hard disk drives, floppy
disks, compact disks, magnetic tapes used to store digital data
(excluding analog tapes such as VHS), and memory chips; and
security devices.

5.    In searching for digital devices and in searching
digital data stored on digital devices, law enforcement personnel
executing this search warrant will employ the following
procedure:

a.    The physical search of the premises will be
conducted by law enforcement agents who are investigating the
crimes described in the affidavit (the "investigating agents").
Upon securing the premises, these investigating agents will, if
they can do so without reviewing the contents of the digital data
contained on any digital device, seek to determine if the digital
device itself falls within or contains data falling within the
scope of the items to be seized under this warrant. If, without
reviewing the contents of the digital data contained thereon, the

investigating agents can make the determination that a digital device itself falls within or contains data falling within the scope of the items to be seized under this warrant, that digital device will be seized.  In attempting to determine whether any digital device itself falls within or contains data falling within the scope of the items to be seized as described in this warrant, the investigating agents will not review the digital contents of any such device or any indexes or summaries thereof.

b.   If the investigating agents conclude that they cannot make the determination that a digital device itself falls within or contains data falling within the scope of the items to be seized under this warrant without reviewing the contents of the digital data contained on the digital device, the investigating agents will consult with the privilege team and/or others aiding acting at their direction who are not involved in the investigation of the crimes described in the affidavit.  The privilege team will include law enforcement personnel and/or others aiding law enforcement personnel and acting at their direction specially trained in searching, seizing, and segregating digital data (the "computer personnel").  The privilege team will be consulted (either on-site or off-site) and will, in its discretion, either search the digital device on-site or seize and transport the device to an appropriate law enforcement laboratory or similar facility to be searched at that

location.

   c. Following a seizure of a digital device pursuant to subparagraphs (a) or (b) above, the privilege team will conduct the search of the digital device by using search protocols specifically designed to identify items to be seized under this warrant.

   i. The privilege team may examine all of the data contained in the digital device capable of containing items to be seized as specified in this warrant to determine whether the data falls within the items to be seized as set forth herein. The privilege team may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein. The team searching the digital device also may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

   d. When searching a digital device pursuant to the specific protocols selected, the team searching the digital device shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

   e. If the privilege team searching a digital device pursuant to the selected protocols encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately

discontinue its search of that digital device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

      f.    The privilege team will not disclose to this affiant or any other investigating agent, or any Assistant United States Attorney involved in this investigation, any data contained on the digital device other than that which is seized as falling within the scope of the items to be seized under this warrant except with prior Court authorization.  The privilege team may disclose to this affiant and any other investigating agent any data contained on the digital device that is seized as being within the scope of the items to be seized under this warrant without further order of the Court.

      g.    Unless a digital device is itself determined to be an item to be seized, the privilege team will return original digital devices as soon as is practicable, but no later than 30 days after the execution of the search.  The search of the forensic image of a returned digital device may continue until 60 days after the date of execution of the warrant.  If a digital device is itself determined to be an item to be seized, the privilege team will make available all of the files on the digital device to the person or entity from whom the device was

seized. The privilege team will complete its search of digital devices, whether a forensic image or an original, as soon as is practicable but not to exceed 60 days from the date of execution of the warrant. If additional time is needed, the government may seek an extension of this time period from the Court within the original 60 day period from the date of execution of the warrant.

h. At the conclusion of the search of digital devices as set forth in subparagraph (c) above, any digital device determined to be itself an instrumentality of the offense(s) and all the data thereon shall be retained by the privilege team until further order of court or one year after the conclusion of the criminal case/investigation.

i. Notwithstanding the above, after the completion of the search of the digital devices as set forth in subparagraph (c) above, the government shall not access digital data falling outside the scope of the items to be seized in this warrant on any retained digital devices or digital data absent further order of court.

j. If the search determines that a digital device is not an instrumentality of any offense under investigation and does not contain any data falling within the list of the items to be seized pursuant to this warrant, the government will as soon as practicable return the digital device and delete or destroy all the forensic copies thereof.

Attachment B - Page 19

k.    If the search determines that the digital device
is not an instrumentality of the offense but does contain data
falling within the list of the items to be seized pursuant to
this warrant, the government will either (I) within the time
period authorized by the Court for completing the search, return
to the Court for an order authorizing retention of the digital
device; or (ii) retain only a copy of the data found to fall
within the list of the items to be seized pursuant to this
warrant and return the digital device and delete or destroy all
the forensic copies thereof.

6.    In order to search for data that is capable of being
read or interpreted by a digital device, law enforcement
personnel are authorized to seize the following items, subject to
the procedures set forth above:

a.    Any digital device capable of being used to
commit, further or store evidence of the offense listed above;

b.    Any equipment used to facilitate the transmission,
creation, display, encoding or storage of digital data, including
word processing equipment, modems, docking stations, monitors,
printers, plotters, encryption devices and optical scanners;

c.    Any magnetic, electronic or optical storage device
capable of storing data, such as floppy disks, hard disks, tapes,
CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory
buffers, smart cards, PC cards, memory calculators, electronic

dialers, electronic notebooks, cellular telephones and personal
digital assistants;

        d.   Any documentation, operating logs and reference
manuals regarding the operation of the digital device or software
used in the digital device;

        e.   Any applications, utility programs, compilers,
interpreters and other software used to facilitate direct or
indirect communication with the digital device;

        f.   Any physical keys, encryption devices, dongles and
similar physical items that are necessary to gain access to the
digital device or data stored on the digital device; and

        g.   Any passwords, password files, test keys,
encryption codes or other information necessary to access the
digital device or data stored on the digital device.

       7.   The special procedures relating to digital media found
in this warrant govern only the search of digital media pursuant
to the authority conferred by this warrant and do not apply to
any search of digital media pursuant to any other court order.

1

**TABLE OF CONTENTS**

2
                                                                        **PAGE**

3  AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS . . . . . . . . . . .  1

4  AGENT'S TRAINING AND EXPERIENCE . . . . . . . . . . . . . . .  1

5  OVERVIEW OF AFFIDAVIT . . . . . . . . . . . . . . . . . . . .  3

6
   PREMISES TO BE SEARCHED . . . . . . . . . . . . . . . . . . .  5
7
   ITEMS TO BE SEIZED  . . . . . . . . . . . . . . . . . . . . .  6
8
9  FACTS ESTABLISHING PROBABLE CAUSE . . . . . . . . . . . . . .  24

10         A.    April and May of 2011 – Identification of Two
11               Industrial Marijuana Cultivation Sites in Sutter
                 and Sacramento Counties, California  . . . . . . .  24
12
           B.    June 21, 2011 – Federal Search Warrants Uncover
13               More than 5,000 Marijuana Plants at the Two
14               Marijuana Cultivation Sites . . . . . . . . . . .  26

15         C.    Documentary Evidence Seized Reveals Los Angeles-Based
                 Attorney Nathan HOFFMAN is Heavily Involved in
16               Both Eastern District Industrial Marijuana
17               Cultivation Sites  . . . . . . . . . . . . . . . .  27

18         D.    March 2010 to the Present - Documentary Evidence
                 Establishes HOFFMAN's Earlier Involvement in
19               Oakland-Based Marijuana Cultivation Sites and
20               MARJYN Investments, LLC . . . . . . . . . . . . .  38

21         E.    Credits to A HOFFMAN-Controlled Wells Fargo Bank
                 Account Corroborate HOFFMAN's Involvement in
22               Various Marijuana-Related Transactions  . . . . .  41

23
           F.    Currency Transaction Reports And Other Financial
24               Analysis Link HOFFMAN and the Hoffman Law Office
                 To Large-Scale Marijuana Trafficking  . . . . . .  44
25
26         G.    September 8, 2011 – Oakland Police Confirm 9201
                 San Leandro Marijuana Cultivation Site has
27               Relocated to a New, Unknown Location  . . . . . .  52

28

i

**TABLE OF CONTENTS** (continued)

PAGE

H.  Other Marijuana-Related Entities and Individuals
    Tied to HOFFMAN . . . . . . . . . . . . . . . . .  55

I.  HOFFMAN's Extensive Links to Marijuana Distributor
    Hung Cao, John Nguyen, and New Age Canna, Inc.,
    dba Canna Clinic of Garden Grove  . . . . . . . .  61

J.  Information About New Age Canna, Inc., doing
    business as Canna Clinic of Garden Grove  . . . .  65

K.  List of Entities and Individuals Involved In
    HOFFMAN'S Marijuana Schemes . . . . . . . . . . .  68

L.  Additional Information about HOFFMAN's Law
    Firm  . . . . . . . . . . . . . . . . . . . . . .  69

M.  Additional Information about HOFFMAN's
    Residence . . . . . . . . . . . . . . . . . . . .  72

N.  Additional Information about HOFFMAN's
    Residence . . . . . . . . . . . . . . . . . . . .  74

O.  Summary of Evidence Regarding Hoffman and his
    Criminal Schemes  . . . . . . . . . . . . . . . .  74

P.  Additional Training and Experience Regarding
    The Methods and Practices of Marijuana Cultivators
    and Distributors and Money Launderers . . . . . .  77

Q.  Training and Experience Regarding Computers
    and Digital Devices . . . . . . . . . . . . . . .  89

R.  Request for Sealing of Affidavit  . . . . . . . .  93

ii

1          **AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS**

2          I, Lisa S. Ulrikson, being duly sworn, declare and state:

3               **AGENT'S TRAINING AND EXPERIENCE**

4          1.   I am an investigative and law enforcement officer of

5     the United States within the meaning of Title 18, United States

6     Code, Section 2510(7), who is empowered to conduct investigations

7     of, and to make arrests for, the offenses enumerated in Title 18,

8     United States Code, Section 2516.

9          2.   I am employed as Special Agent ("SA") by the Internal

10    Revenue Service ("IRS") Criminal Investigations and have been so

11    employed for over 11 years.   I am presently assigned to the

12    Sacramento, California office.   In the course of my employment, I

13    have conducted or been involved in over 50 investigations of

14    alleged criminal violations, which have included: income tax

15    evasion (Title 26, U.S.C. Section 7201); subscribing to false

16    income tax returns (Title 26 U.S.C. Section 7206(1)); money

17    laundering (Title 18 U.S.C. Sections 1956 and 1957); structuring

18    cash transactions (Title 31 U.S.C. Section 5324(3)); mail fraud

19    (Title 18 U.S.C. Section 1341); distribution of controlled

20    substances and conspiracy (Title 21 U.S.C. Sections 841(a)(1) and

21    846); continuing criminal enterprise (Title 21 U.S.C. Section

22    848); and forfeiture (Title 18 U.S.C. Section 981).   Most of

23    these investigations focused on individuals deriving income from

24    illegal sources (narcotics or fraud).   I also have a Bachelor's

25    of Science Degree in Accounting from Arizona State University.

26         3.   I have worked with Organized Crime Drug Enforcement

27    Task Force (OCDETF) operations in the Eastern District of

28    California.   This task force concentrates on the investigation

                                   1

and prosecution of large-scale narcotics trafficking organizations.

4.    I have attended over 1,000 hours of training in various aspects of criminal investigation as well as attending and instructing classes and seminars dealing specifically with money laundering, international tax and money laundering, seizure, forfeiture, various financial investigative techniques, advanced interviewing and related financial and narcotic investigations.

5.    I have participated in the execution of at least 25 Federal and state search warrants involving the seizure of contraband and records relating to the concealment of assets and proceeds from fraud and/or the distribution and sales of controlled substances; records including, but not limited to, telephone bills, personal telephone books, photographs and letters that have identified co-conspirators and others involved in the fraud, records pertaining to the purchase of real and personal property, bank records, escrow records, credit card records, tax returns, business books and records and computer hardware and software.

6.    From my training and experience, I know that Marihuana (the spelling used by Congress in § 812(c), Schedule I(c)(10), and commonly spelled herein and elsewhere "marijuana") and those substances found to contain tetra-hydro-cannabinols (THC) (see § 812(c), Schedule I(c)(17)), the active ingredient in marijuana, are Schedule I controlled substances, which under federal law means that it is not recognized for having any medical value, and

2

1  any distribution is in violation of federal law.[1]

2       7.   Additional training and experience that I have with

3  respect to the methods and practices of marijuana cultivators and

4  distributors, and with respect to digital devices, is set forth

5  below at the end of the probable cause section of this affidavit.

6                        **OVERVIEW OF AFFIDAVIT**

7       8.   I am one of the case agents investigating Nathan V.

8  Hoffman ("HOFFMAN") and his co-conspirators for violations of

9  numerous federal criminal statutes relating to money laundering

10 and the manufacture and distribution of marijuana, crimes

11 described below in detail as "the Target Offenses." As described

12 in the Probable Cause section of the affidavit, HOFFMAN and

13 others formed, supported, and developed two large-scale

14 commercial marijuana cultivation sites in the Eastern District of

15 California, one large-scale commercial marijuana cultivation site

16 in the Northern District of California, and he is currently

17 linked to an ongoing commercial marijuana cultivation site in the

18 Northern District of California.  HOFFMAN also orchestrated the

19 distribution of marijuana manufactured from these commercial

20

21 _____

[1]     I have confirmed with Assistant United States Attorneys
22 David Kowal, one of the prosecutors with whom I have consulted
   regarding this affidavit and the search warrant requested herein,
23 my understanding that any distribution of marijuana is a
   violation of federal law, regardless whether it is exempted from
24 prosecution under California or other state laws.  See Gonzales
   v. Raich, 545 U.S. 1 (2006) (holding that Controlled Substances
25 Act, even as applied to intrastate possession of marijuana, is
   within Commerce Clause powers); United States v. Oakland Cannabis
26 Buyers' Co-op., 532 U.S. 483 (2001) (holding that no medical
27 necessity defense exists to prohibitions on manufacture and
28 distribution of marijuana under the Controlled Substances Act).

                                   3

1  cultivation sites through marijuana stores or "dispensaries"
2  located in the Central District of California and conducted
3  numerous financial transactions to support and obtain money from
4  these activities.  This affidavit requests permission to search
5  two locations associated with Hoffman and these crimes, Hoffman's
6  law office and his personal residence, which locations are
7  described fully below under Premises to Be Searched and in
8  Attachments A-1 and A-2.  These searches seek documentary
9  evidence of these crimes, which items are described below under
10 the Items To Be Seized section of the affidavit, and in
11 Attachments B.  Also described in Items To Be Seized section are
12 additional procedures for protecting attorney-client material
13 related to HOFFMAN'S immigration law practice, and for searching
14 computer and other digital devices as part of execution of the
15 warrants.

16      9.    This affidavit is submitted solely to establish
17 probable cause for the requested search warrants and does not
18 purport to set forth all of my investigation or knowledge of this
19 matter.  The facts and information contained in this affidavit
20 are based on my personal knowledge, as well as that of other law
21 enforcement officers involved in this investigation.  Unless
22 otherwise indicated, where actions, conversations, and statements
23 of others are related in this affidavit, they are related in
24 substance and in part, and based on the reasonable
25 interpretations of the officers and agents involved in the
26 investigation when reviewing these matters in light of their
27 substantial experience and training.

28

4

1          **PREMISES TO BE SEARCHED**

2          10.   The two premises to be searched, collectively

3    referenced herein as the "Subject Premises" (and set forth in

4    Attachments A-1 and A-2, respectively), are the following:

5          a.   3350 Wilshire Blvd., Suite 855, Los Angeles,

6    California 90010, specifically, the offices of Nathan V. Hoffman

7    and public areas within the property (the "Hoffman Law Office").

8    Suite 855 is part of a multi-story building at 3350 Wilshire

9    Blvd., Los Angeles, California housing numerous offices.  The

10   main entrance is at street level and has two sets of glass doors

11   with each having the numerals "3350" decaled over them.  (A

12   photograph of the exterior of the building taken on or about

13   August 3, 2011 is attached as Exhibit 1 to Attachment A-1 of this

14   search warrant).  Upon entering the building a bank of elevators

15   are located just to the right of a reception desk.  On the 8th

16   floor, suite "855" is located halfway down the hallway on the

17   right side.  The entrance to the suite has solid wood, double

18   doors.  To the left of the doors is a sign indicating, "855 Law

19   Offices."  (A photograph of the exterior of suite 855 taken on or

20   about August 3, 2011 is attached as Exhibit 2 to Attachment A-1).

21         b.   4046 Astair Avenue, Culver City, California,

22   90323, including any residences, garages outbuildings,

23   structures, storage bins or areas, trash receptacles, attics,

24   basements, yards and ground, or vehicles on the property (the

25   "Hoffman Residence").  The Hoffman Residence is a single-family

26   residence with a two-car garage.  It includes a cream colored,

27   stucco sided house with chocolate-brown trim and a sloped, red

28   tile roof.  The forward facing garage is also cream colored with

                                    5

chocolate-brown trim.  The front entrance is located behind a
brown brick wall and an iron gate.  Directly in front of the
residence are the numbers "4046" painted on the curb of the
sidewalk.  (A photograph of the exterior of the Hoffman Residence
taken on or about August 3, 2011 is attached as Exhibit 1 to
Attachment A-2).

**ITEMS TO BE SEIZED**

11.  I am requesting authorization to search and seize
property that constitutes evidence, fruits, and instrumentalities
of violations of the following federal statutes (the "Target
Offenses"), committed by HOFFMAN and his co-conspirators:

a.   Title 21 U.S.C. Section 841(a)(1) - Manufacture
and Distribution of Marijuana and Marijuana Plants;

b.   Title 21 U.S.C. Section 846 - Conspiracy to
Manufacture and Distribute Marijuana and Marijuana Plants;

c.   Title 21 U.S.C. Section 856 - Maintaining Drug-
Involved Premises;

d.   Title 21 U.S.C. Section 854 - Investment of
Illicit Drug Profits;

e.   Title 18 U.S.C. Section 1956 - Money Laundering;
Title 18 U.S.C.

f.   Section 1957 - Conducting Monetary Transaction
with Proceeds of Specified Unlawful Activities;

g.   Title 18 U.S.C. Section 371 - Conspiracy;

h.   Title 31 U.S.C. Section 5324(a)(1) & (3) -
Structuring cash transactions to evade reporting requirements.

12.  The specific evidence, fruits, and instrumentalities of
the Target Offense for which I seek authorization to search (as

6

1  also set forth in attachment B) are:

2      a.   Relating directly and exclusively to Nathan
3  HOFFMAN as an individual, from 2008 to the present:

4      i.   Controlled substances including marijuana in
5  various forms, including growing plants, harvested plants,
6  stalks, root balls, or drying, dried or processed marijuana,
7  marijuana seeds and or marijuana plant clones or other controlled
8  substances the possession and distribution of which is prohibited
9  by Federal law;

10      ii.   Records, documents, programs, applications or
11  materials associated with and used for storage, transportation,
12  processing, protection or distribution of marijuana, such as
13  baggies, rolling papers, cigarette packs, small medicine
14  containers, glass and plastic vials, rolled up papers for holding
15  seeds, sifters, scales and other weighing devices, compression
16  devices, drying screens, paper bags, pouches, burlap bags,
17  plastic storage containers, boxes, chests, coolers, storage
18  trailers, together with the receipts for these items;

19      iii. Records, documents, programs, applications or
20  materials tending to identify the location where controlled
21  substances and other evidence of narcotics trafficking may be
22  found, to include records and keys for vehicles, storage
23  facilities, residences, businesses, post office boxes and safe
24  deposit boxes;

25      iv.   United States and foreign currency linked to
26  marijuana trafficking, cultivation, or money laundering;

27      v.   Records, documents, programs, applications or
28  materials used in the packaging of currency for consolidation and

7

1  transportation, such as large quantities of rubber bands,
2  currency wrappers or bands, duct or wrapping tape, and plastic
3  sealing machines;

4          vi.   Records, documents, programs, applications or
5  materials tending to establish the purchase and sale of
6  controlled substances, to include buyer's lists, seller's lists,
7  pay-owe sheets, ledgers of transactions, codes, notation logs,
8  receipts, journals, books, supplier lists, correspondence, and
9  other documents noting the price, quantity, date and/or times
10 when narcotics were propagated, purchased, possessed,
11 transferred, distributed, sold or concealed;

12         vii. Records, documents, programs, applications or
13 materials of occupancy, residency or ownership tending to
14 establish the identity of persons in control of the premises
15 being searched, to include rent receipts, utility bills, check
16 books, bank account records, addressed envelopes, passports,
17 Identification cards, driver's licenses, residence keys, vehicle
18 registrations, videos, exposed film and photographs;

19         viii.     Records, documents, programs,
20 applications or materials reflecting travel, including airline
21 tickets, credit card receipts, itinerary, reservation
22 confirmation, travel vouchers, hotel and restaurant receipts,
23 canceled checks, maps and written directions to locations;

24         ix.   Records, documents, programs, applications or
25 materials evidencing the shipment and receipt of parcels through
26 common carriers, such as the U.S. Postal Service, Federal
27 Express, DHL, UPS and others, including shipping confirmation
28 receipts, address labels, envelopes, boxes, shipping printouts,

8

1  receipts for payment, documents containing tracking or tracing
2  numbers, certified and registered shipping receipts.

3            x.   Records, documents, programs, applications or
4  materials evidencing the receipt of income from any source
5  including Forms W-2, 1098 and 1099, Federal and state income tax
6  records and work papers, employment records, pay stubs, social
7  security statements, business receipts, business books and
8  records, journals and ledgers, receipts, invoices, records from
9  the sales of assets, real estate sale and purchase records,
10  escrow records, bank records (including foreign accounts and
11  related transactions), brokerage records, investment account
12  statements, stock certificates, receipts documenting purchase and
13  sale of stocks, contracts, purchase orders, estate records, loan
14  records, letters of credit, notes payable and receivable, IOU's
15  and other recordation of debts comprising evidence of loans and
16  expenses, checks, passbooks and deposit receipts, check registers
17  and checkbooks, insurance documents, money orders, cashier's
18  checks, bank drafts, wire transfers, money drafts;

19            xi.   Records, documents, programs, applications or
20  materials evidencing the obtaining, secreting, transfer, and/or
21  concealment of assets and the obtaining, secreting, transfer,
22  concealment and/or expenditure of money to include money counting
23  machines, business books and records, invoices, receipts, records
24  of real estate or securities transactions, escrow files, vehicle
25  and vessel purchase records, bank statements and related records,
26  passbooks, money drafts, letters of credit, money orders, bank
27  drafts, cashier's checks, bank checks, checkbooks, loan
28  statements, work papers, records reflecting the purchase of

1 | assets;

2 |          xii. Records, documents, programs, applications or
3 | materials evidencing the purchase, rent or lease of real and
4 | personal property including plot maps, assessor maps, titles,
5 | deeds, deeds of trust, reconveyances, quit claim deeds, easement
6 | deeds, escrow files, title reports, appraisals, registration
7 | documents, ownership documents, receipts and storage
8 | container/locker contracts;

9 |          xiii.    Copies of any Currency Transaction
10 | Reports (CTRs), bank notification requirements for CTRs,
11 | schedules of currency activities, money orders, cashier's checks,
12 | and wire transfers;

13 |          xiv. Photographs, negatives, video tapes, films,
14 | audio tapes, undeveloped film and the contents therein, and
15 | slides depicting the subjects of the investigation and their
16 | criminal associates, their assets and/or controlled dangerous
17 | substances;

18 |          xv.   Personal calendars, diaries, address and/or
19 | telephone books and listings, rolodex indices, papers, and other
20 | documents, records, and materials reflecting names, addresses,
21 | telephone numbers, pager numbers, fax numbers and/or telex
22 | numbers, telephone bills, cellular telephones, correspondence of
23 | the subjects of the investigation and their criminal associates,
24 | sources of supply, customers, financial institutions, and other
25 | individuals or businesses with whom a financial relationship
26 | exists;

27 |          xvi. Items in excess of $2,000.00 in value tending
28 | to establish substantial income from narcotics trafficking, to

1  include money orders, cashier's checks, certified checks, gold,
2  silver, jewels, negotiable securities, certificates of deposit,
3  documents evidencing the purchase of expensive assets, real
4  property, bank statements, canceled checks, credit card
5  statements, business records, which includes general ledgers,
6  general journals, cash receipts and disbursement journals, sales
7  journals or other books of account, receipts, and other items
8  evidencing the obtaining, secreting transfer, concealment and
9  expenditures of large sums of currency;

10             xvii.    Records, documents, programs,
11  applications or materials tending to establish evidence of money
12  laundering activity to include records of currency transactions,
13  foreign and domestic financial transactions, such as wire
14  transfers, cashier's checks and money orders, bank drafts, and
15  published reference material on the subject of money laundering;

16             xviii.   Telephone paging devices, beepers,
17  mobile phones, car phones, answering machines and tapes, and
18  other communication devices which could be used to participate in
19  a conspiracy.

20             xix. Computers, cellular telephones, and other
21  digital devices used to facilitate or commit a conspiracy to
22  manufacture or distribute of marijuana, the laundering of money,
23  or violation of the Target Offenses.

24             xx.   With respect to any digital devices falling
25  within the scope of the foregoing search categories, or any
26  digital devices containing evidence falling within the scope of
27  the foregoing search categories, records, documents, programs,
28  applications or materials, or evidence of the absence of same,

11

1  sufficient to show the actual user(s) of the digital device

2  during the time period between 2008 and the present.

3          b.    Relating to the following entities, business

4  names, associates, and individuals in the table below

5  (collectively, "the parties") from 2008 to the present:

| ENTITIES: | ASSOCIATES/INDIVIDUALS: |
|---|---|
| 9201 SAN LEANDRO STREET, LLC. | BESON, JOSEPH |
| AMERICAN HYDROPONICS | BILTON, ELI |
| BB COLLECTIVE, INC. | DU, JULIA THUY-TIEN |
| BRONCO INVESTMENTS LIMITED, LLC | EBYAM, YAN |
| CANNA CLINIC OF GARDEN GROVE | HARRIS, MATTHEW |
| CROP KING | HENRY, JOHN JOSEPH |
| D & S GARDEN SUPPLIES | JOPSON, DAVID |
| DAN GRACE CLONES | JOPSON, THOMAS |
| DARK HEART INDUSTRIES | KNOX, KEVIN |
| JH MANAGEMENT GROUP, INC (JHMG) | MAGAZINE, JARRETT |
| MARJYN INVESTMENTS, LLC | NGUYEN, HUNG CAO "JOHN" |
| NEW AGE CANNA, INC. | SISCO, AIMEE |
| PATRIOT MEDICAL GROUP, INC. | STRETCH, JAMES |
| PATRIOT MEDICAL PRODUCTS, INC (PMP) | STUTZRIEM, RANDY |
| SANCTUARY HEALTH CENTER, INC. | SUTHERLAND, KEN |
| THE RAINFOREST | |
| YANKS ENTERPRISES, LLC | |
| COLORED HORIZON entities or | |
| business names including: | |
| BLACK HORIZON COOPERATIVE | |
| BLUE HORIZON COOPERATIVE | |
| BRONZE HORIZON COOPERATIVE | |
| CRIMSON HORIZON COOPERATIVE | |
| EMERALD HORIZON COOPERATIVE | |
| GOLD HORIZON COOPERATIVE | |
| GREY HORIZON COOPERATIVE | |
| OLIVE HORIZON COOPERATIVE | |
| PINK HORIZON COOPERATIVE | |
| PURPLE HORIZON COOPERATIVE | |
| ROUGE HORIZON COOPERATIVE | |
| SILVER HORIZON COOPERATIVE | |
| TURQUOISE HORIZON COOPERATIVE | |
| VIOLET HORIZON COOPERATIVE | |

12

WHITE HORIZON COOPERATIVE

i.   Business documents establishing a
relationship between HOFFMAN and the above listed parties,
including payments received or paid, employment contracts,
service contracts, lease and rental contracts, bank documents,
corporate records, and communications;

ii.   Corporate and business filings, Articles of
Incorporation, Statements of Information, Statement of Officers,
corporate minutes, stock registers, organization charts/lists,
dividend disbursements, lists of shareholders, percentage of
ownership records, dissolutions, correspondence, Board of
Director's documents, corporate resolutions, notice of meetings,
meeting attendance lists, meeting summary sheet, minutes of
shareholder and director meetings, contracts, partnership
records; investment prospectuses;

iii. Corporate and business records, accounting
source documents, corporate financial documents, bank records,
bank statements, cancelled checks, withdrawals, interest, debit
and credit memos, check registers, copies of items deposited,
bank deposit slips, disbursement records, sales and expense
invoices, billing, balance sheets, income statements, profit and
loss statements, work papers, financial statements, tax returns,
general journals, general ledgers, subsidiary ledgers and
journals, petty cash records, inventory records, fixed asset
logs, asset acquisition documents, accounts receivable records,
accounts payable records, bad debt records, cost of goods sold
records, expenses paid by cash, loan receivable and payable

13

1  ledgers/records, travel expense records, entertainment records,
2  depreciation schedules, sales revenue documents, revenue
3  projections, vendor contracts, rental and lease contracts,
4  records of sales of business assets, bookkeeper and/or accountant
5  work-papers, and correspondence;

6          iv.  Employment contracts, memoranda, employee
7  compensation records, copies of Forms 1099, copies of Forms W-2,
8  employment tax documents, lists of employees and independent
9  contractors, independent contractor records, payroll records;

10          v.  Records, documents, programs, applications or
11  materials reflecting communications, correspondence, memoranda,
12  emails, cards, letters, and communications involving the parties.

13          vi.  Records, documents, programs, applications or
14  materials relating to asset ownership, partnerships, contracts,
15  leases, or payments;

16          vii. Records, documents, programs, applications or
17  materials evidencing the purchase, rent or lease of real and
18  personal property including plot maps, assessor maps, titles,
19  deeds, deeds of trust, reconveyances, quit claim deeds, easement
20  deeds, escrow files, title reports, appraisals, registration
21  documents, ownership documents, receipts and storage
22  container/locker contracts;

23          viii.  Records, documents, programs,
24  applications or materials tending to establish evidence of money
25  laundering activity to include records of currency transactions,
26  foreign and domestic financial transactions, such as wire
27  transfers, cashier's checks and money orders, bank drafts, and
28  published reference material on the subject of money laundering;

14

c.    <u>Specifically excluded from any of the foregoing</u>
<u>search categories or items to be seized are those records,</u>
<u>documents, or materials containing confidential attorney-client</u>
<u>privilege communications between HOFFMAN and his current retained</u>
<u>counsel in this matter, Joseph Kar</u>.

d.    Computer equipment, cellular telephones, or other
digital devices used to manufacture or distribute marijuana,
launder money, aid in the comminations by or among HOFFMAN and
the parties, or to otherwise facilitate the commission of the
Target Offenses.

e.    With respect to any digital devices falling within
the scope of the foregoing search categories, or any digital
devices containing evidence falling within the scope of the
foregoing search categories, records, documents, programs,
applications or materials, or evidence of the absence of same,
sufficient to show the actual user(s) of the digital device
during the time period between 2008 and the present.

**Additional Privilege-Related Search and Seizure Procedures With**
**Respect to HOFFMAN'S Legal Practice**

13.   Agents will follow the following procedures during
execution of the search warrants at the Subject Premises in order
to ensure that privileged materials are not improperly viewed,
seized, or retained during the course of the search.

a.    <u>Conducting the Search</u>: The search of the Subject
Premises has been drawn as specifically as possible, consistent
with the requirements of the investigation, to minimize the need
to search and review privileged material to which no exception
applies.  Agents will make every effort to avoid viewing

1 privileged material that pertains to HOFFMAN's legal services to
2 clients of his immigration practice whether they are located at
3 his law office or his residence.  It is anticipated that agents
4 executing this warrant may be required to conduct a limited
5 review of arguably privileged material to ascertain whether the
6 material is covered by this warrant.

7        b.   Designation of a Privilege Team: Based upon these
8 anticipated concerns and to protect any privileges applying to
9 HOFFMAN's immigration practice, while also ensuring that the
10 investigation is not compromised by exposure to privileged
11 material relating to the investigation or to defense strategy,
12 the investigating agents shall designate a privilege team (the
13 "privilege team"), to conduct the searches at the Subject
14 Premises.  This privilege team shall consist of IRS or other
15 federal agents or employees, and at least one Assistant United
16 States Attorney for the Eastern District of California.  All
17 members of the privilege team will not be members of the
18 investigative or prosecutive team in the underlying investigation
19 of HOFFMAN, Nguyen, and the other co-conspirators identified
20 throughout this affidavit.

21        c.   Prior to execution of these search warrants,
22 instructions shall be given to members of the privilege team
23 setting forth procedures designed to minimize the intrusion into
24 privileged material of HOFFMAN's immigration-based practice.
25 Specifically, privilege team agents shall not examine, search, or
26 seize material, in any form, that relates to HOFFMAN's
27 representation of individual or corporate clients before the U.S.
28 Immigration Courts in family-based and employment-based

16

immigration matters, including client files, client
correspondence, or billing records related to HOFFMAN's
immigration law practice.  If privilege team agents must examine
an item because the nature of its contents are unclear, privilege
team agents shall not disclose any information to investigative
or prosecutive team agents or lawyers unless and until so
instructed by the privilege team lawyer.  A privilege team lawyer
shall be available off-site, to advise the privilege team agents
during the course of the search, but shall not participate in the
searches themselves.

     d.  <u>Review Procedures</u>:  Privilege team members shall
employ procedures designed to ensure that attorney-client
privileges are not violated.

     i.  In the event privilege team members executing
the warrants in this case seize material that may be arguably
privileged or arguably subject to an exception to the privilege,
such materials shall be submitted to United States District Judge
John A. Mendez, Eastern District of California for further
instruction from Judge Mendez.  Judge Mendez is the District
Judge assigned to the two marijuana trafficking indictments of
HOFFMAN's co-conspirators currently pending in the Eastern
District of California: <u>United States v. Ebyam</u>, Case No. 2:11-cr-
00275 JAM, and <u>United States v. Ebyam, et al.</u>, Case No. 2:11-cr-
00276 JAM.

     ii.  Copies of all seized materials will be
provided to HOFFMAN or his legal representative in order to
ensure that: a) disruption of HOFFMAN's law operation is
minimized; and b) HOFFMAN is afforded an opportunity to

17

1 participate in the process of submitting disputed documents to
2 the court by raising specific claims of privilege.

3               **Additional Digital Search Definitions and Procedures**

4       14.   As used above in paragraphs above defining the items to
5 be seized, the terms records, documents, programs, applications
6 or materials include records, documents, programs, applications
7 or materials created, modified or stored in any form, including
8 in digital form on any digital device and any forensic copies
9 thereof.   As used both above and below, the term "digital device"
10 includes any electronic system or device capable of storing
11 and/or processing data in digital form, including: central
12 processing units; laptop or notebook computers; personal digital
13 assistants; wireless communication devices such as telephone
14 paging devices, beepers, and mobile telephones; peripheral
15 input/output devices such as keyboards, printers, scanners,
16 plotters, monitors, and drives intended for removable media;
17 related communications devices such as modems, cables, and
18 connections; storage media such as hard disk drives, floppy
19 disks, compact disks, magnetic tapes used to store digital data
20 (excluding analog tapes such as VHS), and memory chips; and
21 security devices.

22       15.   In searching for digital devices and in searching
23 digital data stored on digital devices, law enforcement personnel
24 executing this search warrant will employ the following
25 procedure:

26            a.   The physical search of the premises will be
27 conducted by law enforcement agents who are investigating the
28 crimes described in the affidavit (the "investigating agents").

                                    18

1   Upon securing the premises, these investigating agents will, if
2   they can do so without reviewing the contents of the digital data
3   contained on any digital device, seek to determine if the digital
4   device itself falls within or contains data falling within the
5   scope of the items to be seized under this warrant.  If, without
6   reviewing the contents of the digital data contained thereon, the
7   investigating agents can make the determination that a digital
8   device itself falls within or contains data falling within the
9   scope of the items to be seized under this warrant, that digital
10  device will be seized.  In attempting to determine whether any
11  digital device itself falls within or contains data falling
12  within the scope of the items to be seized as described in this
13  warrant, the investigating agents will not review the digital
14  contents of any such device or any indexes or summaries thereof.
15          b.    If the investigating agents conclude that they
16  cannot make the determination that a digital device itself falls
17  within or contains data falling within the scope of the items to
18  be seized under this warrant without reviewing the contents of
19  the digital data contained on the digital device, the
20  investigating agents will consult with the privilege team and/or
21  others aiding acting at their direction who are not involved in
22  the investigation of the crimes described in the affidavit.  The
23  privilege team will include law enforcement personnel and/or
24  others aiding law enforcement personnel and acting at their
25  direction specially trained in searching, seizing, and
26  segregating digital data (the "computer personnel").  The
27  privilege team will be consulted (either on-site or off-site) and
28  will, in its discretion, either search the digital device on-site

19

1  or seize and transport the device to an appropriate law
2  enforcement laboratory or similar facility to be searched at that
3  location.

4           c.   Following a seizure of a digital device pursuant
5  to subparagraphs (a) or (b) above, the privilege team will
6  conduct the search of the digital device by using search
7  protocols specifically designed to identify items to be seized
8  under this warrant.

9           i.   The privilege team may examine all of the
10  data contained in the digital device capable of containing items
11  to be seized as specified in this warrant to determine whether
12  the data falls within the items to be seized as set forth herein.
13  The privilege team may search for and attempt to recover
14  "deleted," "hidden" or encrypted data to determine whether the
15  data falls within the list of items to be seized as set forth
16  herein. The team searching the digital device also may use tools
17  to exclude normal operating system files and standard third-party
18  software that do not need to be searched.

19           d.   When searching a digital device pursuant to the
20  specific protocols selected, the team searching the digital
21  device shall make and retain notes regarding how the search was
22  conducted pursuant to the selected protocols.

23           e.   If the privilege team searching a digital device
24  pursuant to the selected protocols encounters immediately
25  apparent contraband or other evidence of a crime outside the
26  scope of the items to be seized, the team shall immediately
27  discontinue its search of that digital device pending further
28  order of the Court and shall make and retain notes detailing how

20

1  the contraband or other evidence of a crime was encountered,
2  including how it was immediately apparent contraband or evidence
3  of a crime.

4          f.    The privilege team will not disclose to this
5  affiant or any other investigating agent, or any Assistant United
6  States Attorney involved in this investigation, any data   .
7  contained on the digital device other than that which is seized
8  as falling within the scope of the items to be seized under this
9  warrant except with prior Court authorization.   The privilege
10 team may disclose to this affiant and any other investigating
11 agent any data contained on the digital device that is seized as
12 being within the scope of the items to be seized under this
13 warrant without further order of the Court.

14         g.    Unless a digital device is itself determined to be
15 an item to be seized, the privilege team will return original
16 digital devices as soon as is practicable, but no later than 30
17 days after the execution of the search.   The search of the
18 forensic image of a returned digital device may continue until 60
19 days after the date of execution of the warrant.   If a digital
20 device is itself determined to be an item to be seized, the
21 privilege team will make available all of the files on the
22 digital device to the person or entity from whom the device was
23 seized.   The privilege team will complete its search of digital
24 devices, whether a forensic image or an original, as soon as is
25 practicable but not to exceed 60 days from the date of execution
26 of the warrant.   If additional time is needed, the government may
27 seek an extension of this time period from the Court within the
28 original 60 day period from the date of execution of the warrant.

1        h.    At the conclusion of the search of digital devices
2  as set forth in subparagraph (c) above, any digital device
3  determined to be itself an instrumentality of the offense(s) and
4  all the data thereon shall be retained by the privilege team
5  until further order of court or one year after the conclusion of
6  the criminal case/investigation.

7        i.    Notwithstanding the above, after the completion of
8  the search of the digital devices as set forth in subparagraph
9  (c) above, the government shall not access digital data falling
10 outside the scope of the items to be seized in this warrant on
11 any retained digital devices or digital data absent further order
12 of court.

13       j.    If the search determines that a digital device is
14 not an instrumentality of any offense under investigation and
15 does not contain any data falling within the list of the items to
16 be seized pursuant to this warrant, the government will as soon
17 as practicable return the digital device and delete or destroy
18 all the forensic copies thereof.

19       k.    If the search determines that the digital device
20 is not an instrumentality of the offense but does contain data
21 falling within the list of the items to be seized pursuant to
22 this warrant, the government will either (I) within the time
23 period authorized by the Court for completing the search, return
24 to the Court for an order authorizing retention of the digital
25 device; or (ii) retain only a copy of the data found to fall
26 within the list of the items to be seized pursuant to this
27 warrant and return the digital device and delete or destroy all
28 the forensic copies thereof.

22

1    16.    In order to search for data that is capable of being
2  read or interpreted by a digital device, law enforcement
3  personnel are authorized to seize the following items, subject to
4  the procedures set forth above:

5         a.    Any digital device capable of being used to
6  commit, further or store evidence of the offense listed above;

7         b.    Any equipment used to facilitate the transmission,
8  creation, display, encoding or storage of digital data, including
9  word processing equipment, modems, docking stations, monitors,
10  printers, plotters, encryption devices and optical scanners;

11         c.    Any magnetic, electronic or optical storage device
12  capable of storing data, such as floppy disks, hard disks, tapes,
13  CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory
14  buffers, smart cards, PC cards, memory calculators, electronic
15  dialers, electronic notebooks, cellular telephones and personal
16  digital assistants;

17         d.    Any documentation, operating logs and reference
18  manuals regarding the operation of the digital device or software
19  used in the digital device;

20         e.    Any applications, utility programs, compilers,
21  interpreters and other software used to facilitate direct or
22  indirect communication with the digital device;

23         f.    Any physical keys, encryption devices, dongles and
24  similar physical items that are necessary to gain access to the
25  digital device or data stored on the digital device; and

26         g.    Any passwords, password files, test keys,
27  encryption codes or other information necessary to access the
28  digital device or data stored on the digital device.

1    17.   The special procedures relating to digital media found
2  in this warrant govern only the search of digital media pursuant
3  to the authority conferred by this warrant and do not apply to
4  any search of digital media pursuant to any other court order.

5                **FACTS ESTABLISHING PROBABLE CAUSE**

6  **A.   April and May of 2011 - Identification of Two Industrial
        Marijuana Cultivation Sites in Sutter and Sacramento
7        Counties, California**

8    18.   Based on my review of reports from Sutter County
9  Sheriff Deputy Matthew Maples and my discussions with him, I know
10  the following:

11          a.   On April 20, 2011, Deputy Maples contacted Thomas
12  Jopson at the Jopson Family Ranch located near Rio Oso,
13  California.  Rio Oso is located in rural Sutter County, within
14  the Eastern District of California.  During the course of their
15  conversation, Thomas Jopson said that medical marijuana was being
16  grown on his property.  Jopson invited Deputy Maples into the
17  greenhouse containing the marijuana cultivation operation.  At
18  that time, Deputy Maples observed in excess of 3,000 growing
19  marijuana plants.

20          b.   On April 28, 2011, Deputy Maples returned to the
21  Jopson Ranch and had another conversation with Thomas Jopson.
22  During this conversation, Jopson stated that Yan Ebyam was the
23  person leasing the greenhouse to cultivate marijuana and that the
24  lease was signed in January 2011.  Deputy Maples again toured the
25  greenhouse containing the marijuana garden and observed thousands
26  of marijuana plants in various stages of growth.

27          c.   On May 5, 2011, Deputy Maples returned to the
28  Jopson Ranch and spoke to Yan Ebyam.

                              24

1              i.   Ebyam told Deputy Maples that:

2                     (1)   Ebyam was in the process of selling his
3    interest in the marijuana cultivation operation to Aimee Sisco
4    and that she was in the process of changing the lease agreement
5    with Jopson.

6                     (2)   Ebyam was starting a separate business
7    in a different area.

8              ii.   Deputy Maples also spoke with Aimee Sisco,
9    who said the following:

10                    (1)   She was in the process of changing the
11   lease because of conflicts with Ebyam, and

12                    (2)   She had invested over $350,000 into the
13   marijuana operation and that it was costing her over $40,000 each
14   month to operate.

15                    (3)   Ebyam had invested about $150,000.

16         d.    On May 26, 2011, Deputy Maples again returned to
17   the Jopson Ranch and made contact with Aimee Sisco.  She took
18   Deputy Maples into the greenhouse containing the marijuana
19   cultivation operation.  Deputy Maples noticed that the vast
20   majority of the marijuana plants he had previously observed, were
21   gone.  During the meeting, Sisco provided the following
22   information to Deputy Maples:

23              i.   Ebyam moved the missing marijuana plants to a
24   new greenhouse location off Fruitridge called Cal-Nevada
25   Wholesale Florist (later determined to be located at 9445
26   Fruitridge Road in Sacramento, California).

27              ii.   Ebyam was conducting business under a company
28   called Blue Horizon, and that she (Sisco) had taken over Black

                              25

1  [Horizon].

2           iii. Ebyam has a Blue [Horizon], an Orange
3  [Horizon], Purple [Horizon].

4           iv.  Ebyam is part of Marjyn.. Sisco described the
5  Marjyn entity as a wholesaler in Oakland, California, located in
6  the Northern District of California.

7           v.   Sisco provided Deputy Maples with a copy of a
8  lease with Jopson Ranch, Inc., identifying Ebyam and Black
9  Horizon as the tenant and users se of the property.

10          vi.  Sisco said that her dealings with
11  distributors are protected by legal contracts drawn up by
12  HOFFMAN, an attorney and associate of Ebyam's.

13 **B.   June 21, 2011 – Federal Search Warrants Uncover More than
       5,000 Marijuana Plants at the Two Marijuana Cultivation
14     Sites**

15     19.  From my own participation in the operation and review
16  of reports and conversations with agents involved, I know that on
17  June 21, 2011, federal and state agents executed seven federal
18  search warrants in Sacramento, Sutter, and Tehama Counties within
19  the Eastern District of California.  Two of these warrants were
20  executed on the large, commercial greenhouses located at the
21  Jopson Ranch in Rio Oso and at Cal-Nevada Wholesale Florist site
22  in, Sacramento.  Law enforcement officers seized over 5,000
23  marijuana plants in all stages of growth from these two
24  locations, approximately 2,168 marijuana plants at the Jopson
25  Ranch grow, and approximately 3,305 plants at the Cal-Nevada
26  Wholesale Florist grow.

27     20.  Numerous individuals were arrested at the search
28  warrant locations, including Yan Ebyam and Aimee Sisco.  At the

26

1  time of their arrests, both Ebyam and Sisco, made post-Miranda

2  statements admitting their involvement in the marijuana

3  cultivation business.  Ebyam and Sisco were both later indicted

4  crimes relating to their marijuana cultivation in two related

5  cases in the Eastern District of California: <u>United States v.</u>

6  <u>Ebyam</u>, Case No. 2:11-cr-00275 JAM, and <u>United States v. Ebyam, et</u>

7  <u>al.</u>, Case No. 2:11-cr-00276 JAM.

8  **C.  Documentary Evidence Seized Reveals Los Angeles-Based**
   **Attorney Nathan HOFFMAN is Heavily Involved in Both Eastern**
9  **District Industrial Marijuana Cultivation Sites**

10       21.  From my participation in the operations, discussions

11  with other agents, and my review of the evidenced seized, I know

12  that during execution of the seven search warrants connected to

13  the two industrial marijuana cultivation sites at the Jopson

14  Ranch grow in Rio Oso and the Cal-Navada Florist grow in

15  Sacramento, agents seized documents revealing showing that Nathan

16  HOFFMAN helped to form, plan, finance, and operate of the two

17  sites and the marijuana cultivation therein.

18       <u>Documents Seized from the Cal-Nevada Wholesale Florist Grow</u>

19       22.  Specifically, I know the following evidence connected

20  to Hoffman was seized at the Cal-Nevada Wholesale Florist grow at

21  9445 Fruitridge Road, Sacramento, CA on June 21, 2011:

22            a.  A printed email string between Ken Sutherland and

23  Nathan HOFFMAN.  That document contained the following excerpt

24  from HOFFMAN to Sutherland, with a carbon copy (herein after

25  "CC") to Yan Ebyam and Eli Bilton, dated June 1, 2009:

26       *As follow-up to your recent conference with Yan Ebyam,*
        *attached herewith is a General Agreement template for the*
27       *consideration of your prospective investor(s) desirous of*
        *opening a hydroponic facility franchise under the management*
28       *of YANKS/Blue Horizon Cooperative.  A $50,000 investment*

27

*will secure a 25% interest in an indoor legal medical marijuana franchise cultivating approximately 900 plants. Assumptions regarding PRICE and CAPACITY for 4 harvests per year are delineated in the attached Excel Spreadsheet. If you have any additional questions, don't hesitate to contact Yan or myself by cell.*

        i.    Based on the totality of my investigation and training and experience, in my opinion, this email from HOFFMAN along with the referenced spreadsheet (not found with the document) was a prospectus sent to by HOFFMAN to Ken Sutherland to entice him and/or his investors to invest in indoor (hydroponic) marijuana growing franchises controlled by HOFFMAN's company. At that time, June of 2009, HOFFMAN was referring to his marijuana company as YANKS/Blue Horizon Cooperative.

        b.    A printed email from HOFFMAN to Sutherland dated June 2, 2009. The e-mail states in part, in pertinent part:

        i.    "Attached is same spreadsheet data on 'Price & Capacity' on Word format. The conservative numbers speak for themselves in terms of profitability . . . but there is always risk in quasi-grey area business even in Oakland. That's why professional and honest management is the critical factor towards achieving success."

        (1)    Based on this email, and my training and experience, and especially the reference to the "quasi-grey area" of business in Oakland, an area known as one of the most permissive localities regarding the distribution of marijuana, I believe that HOFFMAN understands that his involvement in the manufacturing of marijuana is illegal.

        (2)    The sender address listed in this email from the address of "visa_atty@yahoo.com." This is the same

28

1   email address that HOFFMAN lists on the website used to advertise
2   his legal services for immigration clients as part of the Law
3   Offices of Hoffman & Osorio, LLP, as I later learned from
4   reviewing the website for that firm.  Based on my review of the
5   California Bar website, I know that this email address is also
6   the email address that HOFFMAN lists on his legal profile with
7   the California State Bar.

8              ii.   This June 2, 2009 Hoffman to Sutherland e-
9   mail contains the following closing text:

10             *Nathan V. Hoffman*
             *Attorney at Law*
11             *Law Offices of Hoffman & Osorio, LLP*
             *3350 Wilshire Blvd., Suite 855*
12             *Los Angeles, CA 90010*
             *Tel: (213) 383-5721*
13             *Fax: (213) 383-5722*
             *Cell: (310) 739-0978*
14             *Email: visa_atty@yahoo.com*

15             *Notice: This message is intended only for the use of*
             *the individual(s) to which it is addressed and may*
16             *contain information that is privileged and/or*
             *confidential.  If you are the intended recipient of*
17             *this message, you agree to keep all privileged and/or*
             *confidential information private without written*
18             *consent of the sender, and will use any such*
             *information only within the necessary scope of your*
19             *professional work.  If you are not the intended*
             *recipient of this message, you have received this*
20             *transmission in error, and any review, distribution or*
             *copying of this transmission is prohibited – please*
21             *notify sender immediately and safely dispose of this*
             *message.*

22
             (1)   This closing text, and its referenced to
23
    HOFFMAN and the Hoffman Law Office confirms that HOFFMAN used his
24
    title as an attorney, the Hoffman Law Office, and associated
25
    methods of communication connected to that office such as email,
26
    telephone, and address, to facilitate the cultivation and
27
    distribution of marijuana.
28

                                   29

1    iii.   I have also reviewed a public record from
2  the California Secretary of State that that lists HOFFMAN is the
3  agent for service for Blue Horizon with an address of 3350
4  Wilshire Blvd., Suite 855, Los Angeles, California, the Hoffman
5  Law Office.

6    (1)   This documents is notable in connecting
7  HOFFMAN and the Hoffman Law Office to the marijuana grows because
8  during the May 26, 2011 consensual meeting between Aimee Sisco
9  and Deputy Maples, Sisco volunteered that Ebyam does business
10  under the name Blue Horizon and Sisco does business under the
11  name Black Horizon.  Furthermore, the lease for the marijuana
12  greenhouse at Cal-Nevada Wholesale Florist grow was with Blue
13  Horizon, LLC.

14    c.   A document from the Department of Treasury
15  relating to the Electronic Federal Tax Payment system, addressed
16  as "Black Horizon Cooperative Inc. c/o Nathan Hoffman 3350
17  Wilshire Blvd Ste 855 /Los Angeles, CA."

18    i.   This document connects Hoffman to the two
19  industrial grows in two ways.  First, as set forth above, Black
20  Horizon Cooperative, Inc. is the business used by Sisco to
21  manufacture marijuana at the Jopson Ranch grow.  Second,
22  according to his legal profile with the California State Bar,
23  that I have review, the listed address at 3350 Wilshire Blvd.,
24  Suite 855, Los Angeles, CA, is the location for HOFFMAN's law
25  practice at the Law Offices of Hoffman & Osorio, LLP.

26    23.  On June 22, 2011, the day after the execution of the
27  search warrant at the Cal-Nevada Wholesale Florist grow, the
28  operators of Cal-Nevada Wholesale Florist faxed my office a copy

30

1  of the commercial lease between Blue Horizon, LLC and Cal-Nevada
2  Wholesale Florist.  This lease appeared to be a legal document
3  whicj defines the terms of rental contract between the parties.
4  It appears to be signed by Yan Ebyam as the tenant of the
5  location where the marijuana plants were growing.

### Documents Seized from A Residence
### Located And the The Jopson Ranch Grow

24.  On June 21, 2011, during execution of the federal
search warrant at the Jopson Ranch agents also discovered the
following documents further tying HOFFMAN and the Hoffman Law
Office to this industrial marijuana grow:

a.    Copies of Articles of Incorporation and a
Statement of Information filed with the California Secretary of
State for Black Horizon Cooperative, Inc.  These documents listed
the agent of service of Black Horizon Cooperative, Inc. as Nathan
V. Hoffman, at 3350 Wilshire Boulevard, Suite 855, Los Angeles,
California, the Hoffman Law Office.  This is the address of The
Law Offices of Hoffman and Osorio, LLP.  The Articles of
Incorporation are dated December 8, 2010, and appear to contain
the signature of HOFFMAN as the Incorporator.  This document
states that its purpose is to engage in any lawful act or
activity for which a corporation may be organized under such law.
The Statement of Information is signed by Aimee K. Sisco as
manager and dated July 22, 2011.  The document lists HOFFMAN as
the agent for service and Ebyam as the Chief Financial Officer.
As mentioned above, Black Horizon Cooperative, Inc. was the
business used by Sisco to manufacture marijuana at the Jopson
Ranch in Rio Oso, California.  These documents created a legal

31

1  entity devoted exclusively to cultivating and distributing
2  marijuana.

3        b.    A multi-page, printed copy of Black Horizon
4  Cooperatives, Inc.'s check register.  This register reflects
5  several deposits categorized as loans from HOFFMAN as detailed
6  below:

| DATE | AMOUNT |
|------|--------|
| 01/04/2011 | $1,500 |
| 01/10/2011 | $1,000 |
| 01/18/2011 | $2,000 |
| 01/31/2011 | $   100 |
| 01/31/2011 | $   500 |
| 02/04/2011 | $3,200 |
| 02/08/2011 | $2,300 |
| 02/10/2011 | $1,300 |
| 02/11/2011 | $1,400 |
| 03/01/2011 | $   550 |
| 03/07/2011 | $   600 |
| 03/11/2011 | $1,100 |
| 03/14/2011 | $   600 |
| 03/15/2011 | $   600 |
| 03/15/2011 | $   600 |

        i.    Based upon this check register, all of these
loans were repaid and most were repaid within a few days of the
date of the loan.  Based on the account balances, the rapid
repayment of these loans, and some account notations, I believe
that these loans from HOFFMAN were short-term loans needed to
cover immediate expenses incurred in the marijuana growing
operation at the Jopson Ranch greenhouse complex.  HOFFMAN's

32

1  lending of money to the effort by Ebyam, Sisco, and others to
2  cultivate large quantities of marijuana at the Rio Oso marijuana
3  cultivation site is indicative of HOFFMAN's significant
4  investment in the success of the overall conspiracy.

5          c.   A document entitled Employee List for Black
6  Horizon Cooperative, Inc., with five columns.  The columns
7  include Employee Name, Date of Birth, Hire Date, Hourly Wage, and
8  SSN.  The document lists numerous individuals under Employee Name
9  including: Aimee Sisco, Yan Ebyam and Nathan HOFFMAN.  The
10 document also lists their respective Dates of Birth and social
11 security numbers but is blank for Hire Date and Hourly Wage.

12         <u>Documents Seized from Residence of David Jopson at the
13         Marijuana Cultivation Site on Jopson Ranch - 1245 Pleasant
           Grove, Rio Oso</u>

14         25.  On June 21, 2011, during the search of the residence of
15 David Jopson, 1245 Pleasant Grove, Rio Oso, at the Jopson Ranch,
16 agents discovered a document containing a printed email from
17 Nathan HOFFMAN to (Sutter County) Supervisor Gallagher
18 (jgallagher@co.sutter.ca.us) with a CC to Thomas Jopson.  The
19 printed email is dated December 20, 2010, and the subject line is
20 entitled "Hypothetical Question on Medical Cannabis in Sutter
21 County."  The following is an excerpt from the printed email:

22         *Dear Supervisor Gallagher:*

23         *Can you pose the following hypothetical question to
           Community Services and the County Sheriff:*
24
           *Can a Medical Cannabis Cultivator (not Dispensary) operating
25         under Prop. 215, (Compassionate Use Act), SB 420 (MMPA), and
           the California Attorney General Guidelines of 2007, lawfully
26         grow Medical Cannabis on behalf of member-patients of a
           Cooperative duly organized under the Consumer Cooperative
27         Corporation Law?  How will it be treated by the County
           Sheriff and/or Community Services in light of current case
28         law on the subject?*

                                    33

*Thank you for your attention to this matter*

*Sincerely,*

*Nathan V. Hoffman*
*Attorney at Law*
*3350 Wilshire Blvd., Suite 855*
*Los Angeles, CA*
*Tel: (213) 383-5721*
*Fax: (213) 383-5722*
*Cell: (310) 739-0978*
*Email: visa_atty@yahoo.com*

a.    (NOTE: This email also closes with the same notice used by HOFFMAN in a previously discussed email relating to attorney-client privileged material.  Due to its length, the notice is not reproduced here.)

b.    Based on this email, I believe that HOFFMAN initiated this contact with Supervisor Gallagher in an attempt to secure legal cover for the marijuana cultivation site at the Jopson Ranch.  HOFFMAN knew that the cultivation of marijuana was in violation of federal law, as evidenced by the previously detailed email between he and Ken Sutherland dated June 2, 2009 (and further discussed in later sections of this Affidavit).  The closing indicates to me that HOFFMAN is using his title as an attorney, the Hoffman Law Office, and associated methods of communication to facilitate the conspiracy's illegal acts.

c.    I have attempted to contact Supervisor Gallagher to discuss this email from HOFFMAN by leaving both email and telephonic messages.  However, I have not received a response from him at this time.

### Documents Seized from Residence of Thomas Jopson Located on Jopson Ranch.

26.    On June 21, 2011, during the search of the residence of

34

1  Thomas Jopson, 1159 Pleasant Grove, Rio Oso, at the Jopson Ranch,

2  agents discovered the following documents pertinent to HOFFMAN:

3       a.   A printed email from Nathan HOFFMAN to Thomas

4  Jopson, Yan Ebyam, and others, dated February 17, 2011.  The

5  following is an excerpt:

6  *While I would love to revisit Rio Oso for the meeting on
   Friday, I have to defer this time around.*

7
   *However, I whole-heartedly agree with the sum and substance*
8  *of your 'proposal', and by this email affirm my vote to: (1)*
   *appoint Tom Jopson as 'Team Leader' and head manager of the*
9  *GH; (2) Vest primary authority with Tom, Brook and David to*
   *work out a tentative crop schedule and rotation; (3) Yan &*
10 *Jesus to handle all Finances and Sales; (4) Aimee and Autumn*
   *remain in charge of HR and Accounting functions; and (5)*
11 *Nathan remains responsible for Legal and assists with*
   *Southern CA sales.*
12
   *Nathan*
13
14      i.   (Note: This email also closes with the same

15 notice used by HOFFMAN in a previously discussed email relating

16 to attorney-client privileged material.  Due to its length, the

17 notice is not reproduced here.)

18      ii.  This email demonstrates that HOFFMAN played

19 an integral role in the formation of the Black Horizon entity and

20 leadership within the Jopson Ranch grow in Rio Oso.

21 Specifically, the email reveals that HOFFMAN had the authority to

22 vote among the members of Black Horizon and took responsibility

23 for legal matters associated with the Black Horizon effort to

24 cultivate and distribute marijuana.  In addition, HOFFMAN admits

25 that he is responsible for distributing marijuana in Southern

26 California that originates from the cultivation site in Rio Oso.

27 Agents have identified HOFFMAN's associate in marijuana

28 distribution as John Nguyen, a marijuana distributor based in

セ

1   Garden Grove, California, operating through an entity known as
2   New Cana, Inc.  Nguyen's participation in the distribution of
3   large quantities of marijuana from the Rio Oso cultivation site
4   is discussed later in this Affidavit.  Although no email address
5   is listed for HOFFMAN on this portion of the document, earlier
6   emails that are part of this conversation and included in this
7   document were written by Jopson and sent to HOFFMAN at the email
8   address related to the Hoffman Law Office, his law firm
9   (visa_atty@yahoo.com).

10          b.   A printed email from HOFFMAN to Thomas Jopson,
11  dated February 18, 2011.  The following is an excerpt from that
12  e-mail:

13      *Hi Tom:*

14      *Thank you for sharing your idea.  I'm in Oakland now dealing*
        *with the MarJyn investor/member meeting.  As you can imagine*
15      *a lot of disgruntled investors that the facility is not in*
        *the black yet and struggling with union labor issues.  This*
16      *is not an easy business…and now of course the City licensing*
        *and permitting process is indefinitely suspended as a result*
17      *of the US Attys ominous public pronouncement against the*
        *City plan.  In particular, that any industrial size*
18      *cultivation facility acting under a City Permit would be*
        *immediately targeted by the Feds as crossing the proverbial*
19      *Prop 215 line in the sand.*

20      *Anyway, the idea of making 'Black Horizon' a model facility*
        *producing only 'pharmaceutical grade' cannabis has great*
21      *merit.  Frankly, that was the hope of MarJyn initially, but*
        *Yan and I were unable to achieve that type of high quality*
22      *product indoors...*
        *Even with positive publicity about BH quality comes the*
23      *chance that the feds will target us no matter how much*
        *security and confidentiality we achieve on paper…*
24
25          i.   The content of this email from HOFFMAN to
26  Thomas Jopson demonstrates that HOFFMAN and Jopson were well
    aware that large-scale marijuana cultivation remains illegal
27  under federal law.  As explained below, HOFFMAN's reference to
28

                                36

1 | MarJyn is to a legal entity created by HOFFMAN for marijuana
2 | cultivation sites in Oakland, California.  The marijuana sites in
3 | Oakland were created earlier than the marijuana cultivation sites
4 | in Rio Oso and Sacramento.  From the quoted language above, it
5 | appears that HOFFMAN and Ebyam viewed the large-scale Oakland
6 | marijuana sites as a model to be followed at the Rio Oso and
7 | Sacramento marijuana cultivation sites.  Again, no email address
8 | is listed for HOFFMAN on this portion of the document but earlier
9 | emails that are part of this conversation and included in this
10 | document were written by Jopson and sent to HOFFMAN at the email
11 | address related to his law firm (visa_atty@yahoo.com).

12 |              ii.  Based on my training and experience, I know
13 | that HOFFMAN's email references to "the feds and US Attys ominous
14 | public pronouncement against the City plan" refers to a letter
15 | from the U.S. Attorney for the Northern District of California,
16 | the Honorable Melinda Haag, dated February 1, 2011, and addressed
17 | to Oakland City Attorney Daniel Russo.  The content of the letter
18 | was widely reported in the press.  See, e.g.
19 | http://articles.sfgate.com/2011-02-03/bay-   .
20 | area/27098495_1_marijuana-farm-ordinance-dispensaries-pot.
21 | According to press accounts (and HOFFMAN's email above), the
22 | letter warns the City Attorney for Oakland that permitting
23 | licensing of industrial-scale marijuana cultivation sites will
24 | run afoul of federal law and could lead to criminal or civil
25 | actions by the Department of Justice.  A copy of this letter is
26 | available online at the following address:
27 | http://info.swlaw.com/reaction/2011/MedicalMarijuanaUpdate_May201
28 | 1_HTML/California%20Med%20Marijuana%20DOJ%20Ltr.PDF

1  **D.  March 2010 to the Present - Documentary Evidence Establishes**
2      **HOFFMAN's Earlier Involvement in Oakland-Based Marijuana**
       **Cultivation Sites and MARJYN Investments, LLC**

3      27.  The investigation of HOFFMAN, Ebyam, and others in this
4  case uncovered earlier efforts by these individuals to establish
5  industrial-scale marijuana cultivation sites in Oakland,
6  California, between approximately March of 2010 and the present.
7  The primary legal entity utilized by HOFFMAN and his co-
8  conspirators to further their illegal marijuana cultivation sites
9  is known as Marjyn Investments, LLC.

10      a.  <u>Secretary of State Records</u>:  As part of this
11  investigation, I obtained a corporate report from the State of
12  California Secretary of State's Office (Secretary of State)
13  relating to Marjyn Investments, LLC (hereafter referred to as
14  "Marjyn").  This online report reveals that Marjyn Investments,
15  LLC was filed as a legal entity on March 23, 2010.  I also
16  obtained a copy of the Statement of Information from the
17  Secretary of State that lists, as of July 22, 2010, Yan Ebyam,
18  James Stretch, and Nathan HOFFMAN are members or managers of
19  Marjyn.  Furthermore, it lists the Chief Executive Officer as Yan
20  Ebyam at 9201 San Leandro Street, Bldg B, Oakland, California.
21  The agent for service is listed as Nathan Hoffman at 3350
22  Wilshire Blvd., Suite 855, Los Angeles, California, which, as
23  detailed in this affidavit, is the address of the Hoffman Law
24  Office.

25      b.  <u>Police Reports</u>: HOFFMAN's Marjyn Investments, LLC
26  is directly linked to an ongoing large-scale indoor urban
27  marijuana cultivation site within the City of Oakland located at
28  9201 San Leandro Street.  This link was discovered because during

1 │ 2010, the Oakland Police Department was called to respond to
2 │ theft or attempted thefts of marijuana, described below, at the
3 │ ongoing marijuana cultivation site at 9201 San Leandro Street in
4 │ Oakland on multiple occasions.  Furthermore, this is the address
5 │ used by Ebyam in the above-described Secretary of State filings.
6 │ The following summaries of thefts at 9201 San Leandro, Oakland,
7 │ California, are derived from copies of numerous Oakland Police
8 │ Department Crime Reports from 2010:

9

10 │           i.    November 25, 2010 – Burglary at Marijuana
11 │ Cultivation Site in Oakland:  A crime report dated November 25,
12 │ 2010, details the reported robbery of 471 harvest ready marijuana
13 │ plants worth $129,000 from Marjyn Investments located at 9201 San
14 │ Leandro Street in Oakland.  The reporting officer concluded that
15 │ the robber(s) were aided by the security guard hired to protect
16 │ the premises.  The reporting officer does not indicate how he
17 │ knew this premises was associated with Marjyn.

18 │           ii.   December 17, 2010 – Burglary at Marijuana
19 │ Cultivation Site in Oakland:  A crime report dated December 17,
20 │ 2010, details the reported burglary of approximately 600 ready to
21 │ harvest marijuana plants.  The report estimated the value of
22 │ stolen marijuana plants as approximately $165,000.  The reporting
23 │ officer wrote that 9201 San Leandro Street is a warehouse with
24 │ approximately 3,000 medical marijuana plants, and that he had
25 │ been dispatched there several times for crimes associated with
26 │ the marijuana such as a burglary, robbery, and kidnaping.  The
27 │ report indicates that the plants were stolen from Marjyn
28 │ Investments at 9201 San Leandro Street in Oakland.  The reporting

1  officer does not indicate how he knew this premises was
2  associated with Marjyn.

3                    iii. <u>December 25, 2010 – Burglary at Marijuana</u>
4  <u>Cultivation Site in Oakland</u>:  The last crime report dated
5  December 25, 2010, details the investigation of a burglary in
6  progress at Marjyn Investments located at 9201 San Leandro
7  Street, Oakland.  The reporting officer wrote, "This facility
8  grows medical marijuana and houses the plants and product on
9  site."  The witness to this crime listed his occupation as
10 Security Guard and his employer as Marjyn Investments.  The
11 report does not indicate how he knew this premises was associated
12 with Marjyn.

13                    c.   <u>Financial Investigation of Marjyn Investments,</u>
14 <u>LLC</u>:  The financial investigation into Marjyn confirms HOFFMAN's
15 direct participation in the running of Marjyn and the underlying
16 business of marijuana cultivation at 9201 San Leandro Street in
17 Oakland.  Based on my participation in this investigation, I know
18 that IRS has conducted an investigation of Marjyn's financial
19 activities throughout 2010 and 2011.  This investigation reveals
20 that HOFFMAN's financial activities demonstrate that he uses his
21 law practice to conduct marijuana cultivation with growers and
22 dispensaries throughout California, including San Jose and Los
23 Angeles.

24                    d.   <u>Bank Records</u>:

25                    i.   A financial investigation into HOFFMAN
26 revealed a Wells Fargo Bank (WFB) account in the name of Marjyn
27 Investments, LLC, with an address of 3350 Wilshire Blvd, Suite
28 855, Los Angeles, California 90010.  Nathan V. HOFFMAN and James

1  Stretch are the two signers to this account. The State Bar of
2  California website reflects that Nathan V. HOFFMAN is an active
3  attorney associated with the firm of Law Offices of Hoffman &
4  Osorio, LLP located at this same address, 3350 Wilshire Blvd.,
5  Suite 855, Los Angeles, California 90010.

6          ii.  The account was opened on March 31, 2010.
7  WFB has produced the monthly statements for this account spanning
8  from March 31, 2011, through May 31, 2011. A very limited number
9  of cancelled checks and deposited items have also been produced.
10 The vast bulk of the banking transactions associated with this
11 account have not as yet been produced for analysis.    The
12 following analysis is based on the limited records received to
13 date.

14 **E.    Credits to A HOFFMAN-Controlled Wells Fargo Bank Account**
         **Corroborate HOFFMAN's Involvement in Various Marijuana-**
15       **Related Transactions**

16      28.  A total of seven deposited items have been obtained for
17 analysis.  From my participation and review in the analysis of
18 this financial data, I know that:

19          a.    four of these deposited checks were drawn on the
20 account of BB Collective Inc. [dba] The Rainforest at 12515
21 Venice Blvd., Los Angeles, California.

22          b.    Three of the checks are dated in November 2010 and
23 the other one is dated January 2011.  The checks ($6,940, $6,450,
24 $6,450, and $6,600) total $26,450 and are made payable to Marjyn
25 or Marjyn Investments.

26          c.    The memo lines on three of the checks bear the
27 following handwritten notations: Inv., Inventory, and IC.  Two of
28 these checks bear the endorsement of Nathan V. HOFFMAN for

                                   41

1   deposit into the Marjyn checking account.

2          d.   An internet search (Google) conducted on the name
3   BB Collective Rainforest revealed a Facebook page for The
4   Rainforest Collective located at 12515 Venice Blvd., Los Angeles,
5   California.   Their Facebook page states, The RainForest
6   Collective is a medical marijuana "collective" with quality
7   strains, clones, concentrates and much more.

8          e.   Further internet research revealed a Los Angeles
9   Times article dated May 3, 2011, entitled "City attorney sues
10  medical marijuana dispensaries."   See
11  http://latimesblogs.latimes.com/lanow/2011/05/city-attorney-sues-
12  medical-marijuana-dispensaries.html   According to the article,
13  the Los Angeles City Attorney sued seven medical marijuana
14  dispensaries to bar the shops from storing, selling, distributing
15  or giving away marijuana.  One of the listed dispensaries is the
16  Rainforest Collective at 12515 Venice Blvd.  I had an IRS
17  financial investigator call can on August 3, 2011 to the
18  telephone number listed for the Rainforest Collective.  The phone
19  was disconnected.

20         i.   Based on the notations on the memo lines of
21  the checks and the fact that The RainForest Collective was a
22  marijuana dispensary, I believe that these checks were issued in
23  payment for marijuana (or marijuana-related items because
24  inventory for a marijuana dispensary is likely to be marijuana)
25  supplied to the marijuana dispensary by HOFFMAN (or someone on
26  his behalf) doing business as Marjyn.  It is also worth noting
27  that the checks deposited and endorsed by HOFFMAN are not for
28  legal services or legal advice of any type.

42

1            f.    Another deposited item, dated November 5, 2011, is
2   a $4,100 cashier's check drawn on Chase Bank and purchased by
3   Sanctuary Health Center, Inc. (remitter)  and made payable to
4   Marjyn Investments.  An internet search (Google) conducted on the
5   name Sanctuary Health Center Inc. revealed a medical marijuana
6   dispensary located in San Jose, California.  On August 3, 2011,
7   an investigator working with me place a call to the telephone
8   number listed for Sanctuary Health Center, Inc. confirming that
9   it is a medical marijuana dispensary.

10           i.    Based on this information about the type of
11  business run by the Sanctuary Health Center, Inc., I believe that
12  this check was for the payment for marijuana (or marijuana-
13  related items) supplied to them by Nathan V. HOFFMAN (or someone
14  on his behalf) doing business as Marjyn.

15           g.    HOFFMAN is linked to another deposited item on
16  this WFB account that I believe is marijuana related.
17  Specifically, there is a $65 check, dated February 16, 2011,
18  drawn on the account of the Teamsters Local Union No. 70 in
19  Oakland, California, and made payable to MarJYN Investments at
20  9201 San Leandro Blvd., Oakland, CA.

21           i.    An internet search (Google) conducted on the
22  name Marjyn revealed an article in the Washington Times dated
23  September 20, 2010.  This article, entitled "Union Protects
24  Growers of Pot," describes how "the Teamsters added nearly 40
25  members this month by organizing the country's first group of
26  unionized marijuana growers."  The article reports, that "[t]he
27  new members work as gardeners, trimmers and cloners for Marjyn
28  Investments, LLC, an Oakland business that contracts with medical

43

1 | marijuana patients to grow their pot for them."  <u>See</u>
2 | http://www.washingtontimes.com/news/2010/sep/20/union-protects-
3 | growers-of-pot/

4 |          ii.   Based on the forgoing, I believe this $65
5 | check drawn on the Teamster's account is probably some type of
6 | reimbursement for overpayment of fees by Marjyn relating to the
7 | employment of Teamster Union members tending marijuana grows
8 | under their control.

9 |          h.   The WFB monthly bank statements for Marjyn reflect
10 | both the gross deposits and the gross <u>currency</u> deposits for each
11 | month.  Over the 15-month period (March 2010 through May 2011)
12 | covered by the monthly statements, a total of $2,487,571 in gross
13 | deposits were made to the account.  Of this, a total of
14 | $1,631,300 was in the form of currency.  This equates to more
15 | than 65% of the total deposits to this account being in currency.
16 | Due to the paucity of backup records (deposit slips, deposited
17 | items, cancelled checks, etc.), I have been unable to determine
18 | who made each of the numerous deposits to this bank account.
19 | However, as set forth below, an analysis of filed Currency
20 | Transaction Reports sheds some light on this matter.

21 | **F.   Currency Transaction Reports And Other Financial Analysis**
| **Link HOFFMAN and the Hoffman Law Office To Large-Scale**
22 | **Marijuana Trafficking**

23 |     29.  <u>Currency Transaction Reports</u>:  I have analyzed 50
24 | Currency Transaction Reports (CTR) filed on Marjyn.  These CTR's
25 | were triggered whenever someone (or a group of individuals)
26 | associated with the HOFFMAN-controlled WFB account conducted a
27 | financial transaction with more than $10,000 in currency in a
28 | single day.  This analysis disclosed that:

44

1          a.    Yan Ebyam (using the Hoffman Law Office at the
2    address of 3350 Wilshire Blvd., Suite 855, Los Angeles,
3    California) made at least four large currency deposits to this
4    account during the month of July 2010.  These four CTR's reflect
5    a total of $180,530 in currency deposited.  All of these deposits
6    took place in Oakland, California.  On one occasion, July 29,
7    2010, both HOFFMAN and Ebyam made currency deposits on the same
8    day at the same bank deposit location.

9          b.    20 CTR's were filed between August 2010 and March
10   2011 reflecting Nathan HOFFMAN as the person conducting the
11   deposit.  During this eight-month time period, these 20 CTR's
12   show a total of $549,285 in currency deposited into the Marjyn
13   account.  These deposits occurred in Oakland, Hollywood, Culver
14   City, Alameda, Studio City, Beverly Hills, Torrance, and two
15   locations in Los Angeles.

16         c.    14 CTR's were filed on James Stretch, the co-
17   signer on the account along with HOFFMAN.  Stretch deposited
18   $438,885 in currency into the Marjyn account.  These deposits
19   occurred in the cities of Oakland, Hayward, and San Mateo.  As
20   developed more fully below, I believe James Stretch is a Bay
21   Area-based marijuana cultivator and distributor working with
22   HOFFMAN in an ongoing marijuana cultivation site within a
23   warehouse located at 9201 San Leandro Street, Oakland,
24   California.

25         d.    One CTR was filed on Hung C. Nguyen for a currency
26   deposit of $13,202 into the Marjyn account on April 8, 2011.  As
27   detailed later in this affidavit, Nguyen is the President of New
28   Age Canna, doing business as Canna Clinic of Garden Grove, a

                                  45

1  medical marijuana dispensary located in the Central District of
2  California.  Evidence in this investigation establishes that
3  Nguyen is critical to HOFFMAN's success in the marijuana
4  cultivation business because Nguyen is a distributor for much of
5  the marijuana obtained from HOFFMAN's cultivation sites in
6  Northern California.

7         e.    CTR's also show that currency deposits were made
8  to the Marjyn account by John Joseph Henry, Jarrett Magazine,
9  Randy Stutzriem, Kevin Knox, and Matthew Harris.

10         f.    Based on my experience, I know that the most
11  common method of paying for illicit drugs is with the use of
12  currency because many drug purchasers do not want to leave a
13  paper trail demonstrating that they bought illegal controlled
14  substances.  In addition, many drug addicts must purchase drugs
15  using money obtained from the streets.  This money is frequently
16  broken down into small denominations of currency, such as $5,
17  $10, and $20 bills.  Based on the totality of the facts in this
18  investigation, I believe that the vast majority of currency
19  deposited to HOFFMAN's WFB Marjyn account came from the sales of
20  marijuana.

21      30.  Debits (withdrawals) to the Marjyn Account: As
22  mentioned earlier, WFB has supplied the monthly bank statements
23  relating to the Marjyn account for the time period March 31, 2010
24  through May 31, 2011 (approximately 15 months).  During this time
25  period, the monthly statements reveal hundreds of checks written
26  on this account.  To date, I have only received 22 of these
27  checks.  My analysis of these materials shows the following:

28         a.    Seven of the 22 checks are made payable to PG&E.

46

1  These checks vary from a low of $15,606 to a high of $44,000
2  between November of 2010 and April of 2011.  The memo section on
3  these checks reflects notations such as "Dec. current charge,"
4  "Account - 7264353980-1," and "Payment plan installment."  All of
5  these checks were signed by James Stretch.  One of the checks was
6  co-signed by HOFFMAN.

7              i.   In my training and experience, and the
8  training and experience of marijuana investigators that I have
9  consulted in preparing this affidavit, I know that energy is a
10 large and necessary expense for any hydroponic/indoor marijuana
11 cultivation site.  Hydroponic/indoor marijuana grows are energy-
12 intensive because they use powerful, high-wattage lights to
13 assist and accelerate the marijuana growth cycle.  The larger the
14 cultivation site, the more lights and energy must be expended.
15 In addition, marijuana cultivators must utilize extensive
16 irrigation mechanisms to feed the plants.  Often, these
17 irrigation mechanisms use electronic pumps to filter and remove
18 the water from the plants on a periodic basis.  The larger the
19 cultivation site, the more pumps and energy are needed.  For
20 these reasons, large monthly utility expenditures can be an
21 objective indicator of an ongoing marijuana cultivation site.
22 This training and experience is corroborated in this particular
23 case because the marijuana cultivation sites uncovered at the
24 Jopson Ranch and Cal-Nevada Wholesale Florist on June 21, 2011,
25 both required an extensive amount of energy to support the
26 ongoing large-scale marijuana cultivation.

27             ii.   Pacific Gas and Electric Company (PG&E)
28 supplied records relating to customer account number 7264353980-

47

1    1.   This is the account number written in the memo section of
2    checks drawn on the Marjyn account at WFB that are detailed
3    above.   The PG&E records establish that Marjyn is the customer
4    associated with this account, the account was established on May
5    27, 2010, and the premise covered is located at 9201 San Leandro
6    Street, Oakland, California.   The customer information includes a
7    cell phone contact for "Nathan" and a business number for "Jim."
8    I believe these first names correspond to Nathan HOFFMAN and
9    James (or Jim) Stretch.   The last payment to PG&E from this
10   account was on June 17, 2011, for $25,580.   The last billing from
11   PG&E on this account was on June 29, 2011, for $58,404.

12              iii. Based on the forgoing, I believe the seven
13   checks drawn on the Marjyn account and payable to PG&E for
14   between $15,606 to $44,000 during March 2010 and May 2011, and
15   the most recent payment of $25,580 on June 17, 2011, and a
16   billing of $58,404 on June 29, 2011, are all indicative of these
17   funds being paid for electricity bills to support an ongoing
18   marijuana cultivation site. Specifically, I believe that HOFFMAN
19   and Stretch are involved in an ongoing effort to cultivate
20   marijuana.   Until recently, their effort centered on a marijuana
21   cultivation site located at 9201 San Leandro Street in Oakland
22   associated with PG&E Account No. 7264353980-1.   As detailed
23   further below, recent events confirm that 9201 San Leandro Street
24   in Oakland did contain a marijuana cultivation site, but James
25   Stretch and his co-conspirators recently moved that marijuana to
26   a new, unknown location.   I believe HOFFMAN continues to conspire
27   with Stretch to cultivate marijuana at a new, unknown location.
28              b.   Six of the 22 checks are dated between November

48

2010 and April 2011 and are made payable to "9201 San Leandro Street, LLC." Five of these checks are for $18,900 and the remaining check is $20,790. The memo section for each of these checks shows they are for the payment of rent. All of these checks were signed by James Stretch.

i.    I believe these checks are rental payments for an indoor marijuana growing facility currently, or recently, located at 9201 San Leandro Street, Oakland, California.

c.    One check for $2,596, dated November 9, 2010, is made payable to "Darkheart Industries." In the memo section of this check is the handwritten notation "clones." This check was signed by HOFFMAN. I believe HOFFMAN's notation of "clones" for this particular check means that HOFFMAN paid $2,596 to purchase marijuana clones for a marijuana cultivation site.

i.    Based on my training and experience, I know that Clones are important to a marijuana cultivation operation because they guarantee a shorter growing cycle (as compared to growing from female marijuana seeds) and high-priced clones deliver high-potency strains of marijuana that command a premium when the marijuana is processed and sold.

d.    The remaining eight checks are to businesses or individuals and based on the notations in the memo sections appear to be for payroll, expenses, payments toward notes, and unknown purposes.

31.  Monthly Bank Account Statements:  The WFB monthly statements also reflect transfers between accounts, point-of-sale transactions, and check card purchases. An analysis of these transactions reveals the following:

49

1          a.    An April 5, 2010 online transfer (deposit) of
2    $50,000 with the notation partial cap contribution Fx Nathan and
3    Yan.   I believe this transfer was a capital contribution by
4    HOFFMAN and Ebyam to cover Marjyn's initial startup costs.

5          b.    An April 7, 2010 online transfer (withdrawal) of
6    $400 with the notation April rent balance for Yan.

7          c.    An April 15, 2010 online transfer (deposit) of
8    $3,000 with the notation from checking Nvh cap loan to cover bal
9    on clones.

10          i.   Based on the abbreviations, I believe this
11    transfer from HOFFMAN's checking account was to cover the cost of
12    marijuana clones.   This is based on Nvh representing the initials
13    of Nathan V. HOFFMAN and cap loan meaning a capital loan to cover
14    the bal (balance) on clones (marijuana clones).   It is worth
15    noting that a capital loan is generally understood in the
16    business world to mean contribution of capital, in the form of
17    money or property, to a business by an owner, partner, or
18    shareholder. The contribution increases the owner's equity
19    interest in the business.   Thus, one interpretation of HOFFMAN's
20    notation is to suggest that each capital contribution he makes
21    toward purchasing marijuana clones increases his equity in the
22    marijuana cultivation operation.

23          d.    An April 30, 2010 online transfer (deposit) of
24    $1,400 with the notation from business checking Nvh cap contrib.
25    for Dan Grace Clones.

26          i.   I believe that this is another transfer from
27    HOFFMAN's checking account to cover a "cap contrib." (capital
28    contribution) to purchase marijuana clones from Dan Grace.

50

1  According to a July 20, 2010 article appearing in the Los Angeles
2  Times (retrieved at
3  http://articles.latimes.com/2010/jul/20/local/la-me-big-pot-
4  20100720), Dan Grace is the owner of Dark Heart Nursery in
5  Oakland, California.  According to the article, Dark Heart
6  Nursery raises about 10,000 marijuana clones a month in a 3,000-
7  square-foot space located in Oakland.

8          e.    On July 30, 2010, there was an online transfer
9  (withdrawal) of $2,470 with the notation "checking reimb to Nvh
10  for Dark Heart clone buy."

11               i.    Based upon the notation and amount of the
12  transfer, I believe this was another large purchase of marijuana
13  clones by HOFFMAN from the Dark Heart Nursery run by Dan Grace in
14  Oakland.

15               ii.   On November 9, 2010, there is a check from
16  this account for $2,596, made payable to "Darkheart Industries."
17  I believe this may be an operating name for the Dark Heart
18  Nursery run by Dan Grace in Oakland.

19          f.    A June 6, 2010 online transfer (withdrawal) of
20  $4,500 with the notation "Prop 215 stipends Horizon patients."

21               i.    I believe the notation of "Prop 215" is in
22  reference to the California law concerning the use of medical
23  marijuana and that Horizon refers to one of the colored Horizon
24  Cooperative detailed later in this affidavit.

25               ii.   A July 20, 2010 online transfer (withdrawal)
26  of $2,000 with the notation "transfer to cc marjyn nutrient
27  purchase."

28          g.    Two check card purchases from American

                            51

1  Hydroponics.   The first purchase was in August 2010 for $2,949
2  and the second was in March 2011 for $623.

3          i.   Based on my experience and training, I know
4  that growing marijuana hydroponically requires no soil but
5  instead uses an inert growing medium and all of the plants'
6  nutrients are supplied by mixing nutrients with water.   Indoor
7  marijuana cultivators often use hydroponic growing methods (or
8  some hybrid system) since it is cleaner, requires less space, is
9  less labor intensive, allows more control over the environment
10  and can produce higher yields.

11          h.   Three online transfers (withdrawals) for credit
12  card payment to Cropking.   An internet search (Google) conducted
13  on the name "CropKing" revealed a website called "cropking.com."
14  A review of the website by an investigator working with me showed
15  that Cropking is a business located in Lodi, Ohio, and offers a
16  variety of products including hydroponic systems and greenhouses.

17          i.   Twenty-two check card purchases from D & S Garden
18  Supplies in San Leandro, California.   An internet search (Google)
19  conducted on the name D & S Garden Supplies revealed a website
20  called "dshydro.com."   A review of the website by an investigator
21  working with me revealed that D & S Garden Supplies is located in
22  San Leandro, California, and offers a variety of products related
23  to hydroponic growing systems.

24  G.   September 8, 2011 - Oakland Police Confirm 9201 San Leandro
         Marijuana Cultivation Site has Relocated to a New, Unknown
25       Location

26       32.   Based on information provided to me by Oakland Police
27  Detective Teddy C. Chu, I know the following:

28          a.   On September 8, 2011, Oakland Police Detective

52

1   Teddy C. Chu conducted surveillance of the warehouse located at
2   9201 San Leandro, Oakland, California.  This location was
3   previously identified as a possible indoor marijuana cultivation
4   facility operated by James Stretch.

5          b.    When he arrived at the warehouse, Det. Chu
6   observed several individuals in and around 9201 San Leandro and
7   requested that Oakland Police officers investigate.

8          c.    When uniformed Oakland Police officers arrived,
9   they met with an individual who identified himself as Ron Smith.
10  Smith, who was not under arrest or give _Miranda_ warnings, told
11  the law enforcement officers the following:

12          i.    He worked for Service West, a property
13  management company.

14          ii.   The previous tenants had been involved in the
15  growing of marijuana at 9201 San Leandro Street.

16          iii. The prior tenants (unnamed) moved out the
17  last week of June (2011) and had chopped all the plants down and
18  removed all their equipment in thirty U-Haul trucks.

19          iv.   The prior tenants had been the victims of
20  multiple robberies, including the loss of 900 marijuana plants on
21  one occasion and the theft of lights and ballasts.

22          v.    One of the original investors in this
23  operation had left and gone somewhere else, where he was arrested
24  by the Feds.

25          (1)   Based on the totality of this
26  investigation, I believe that Smith was referring to Yan Ebyam as
27  an original investor in the San Leandro marijuana cultivation
28  site, later arrested on June 21, 2011, in this investigation.

53

1        d.    The was currently no marijuana at 9201 San Leandro
2   Street.

3        33.   Based on the investigation described above, I believe
4   that, as a result of the previously executed search warrants in
5   the Eastern District of California on June 21, 2011, James
6   Stretch became aware of federal law enforcement action against
7   his co-conspirators in the Eastern District and therefore decided
8   to move his marijuana cultivation operation to a new, unknown
9   location.  I believe Stretch did this in an effort to avoid law
10  enforcement detection of his ongoing criminal activity of
11  cultivating marijuana in the Northern District of California.
12  Based upon the documentary evidence detailed above that links
13  HOFFMAN directly to Stretch in ongoing marijuana cultivation
14  efforts, I believe HOFFMAN was aware of search warrants executed
15  on June 21, 2011 in the Eastern District and may have informed
16  Stretch of the need to relocate their marijuana cultivation site
17  from 9201 San Leandro Street in Oakland to a new location.  In my
18  experience drug traffickers will not throw out information
19  pertinent to their business when they move, but will store them
20  or move them to new locations.  Given HOFFMAN's close connection
21  to this part of the operations, and his closes ties to the
22  Subject Premises, I believe that evidence, fruits, and
23  instrumentalities reflecting HOFFMAN and Stretch's ongoing effort
24  to illegally cultivate marijuana, as well as information
25  reflecting their moving marijuana and other paraphernalia from
26  9201 San Leandro Street to a new location will be discovered at
27  the Hoffman Law Office, and/or the Hoffman Residence.

28

54

**H.   Other Marijuana-Related Entities and Individuals Tied to HOFFMAN**

34.   The investigation into HOFFMAN revealed numerous entities, associates, and individuals tied to the production and distribution of marijuana.  The next several sections of this Affidavit detail the facts, testimony, and documents relating to these entities, associates, and individuals and HOFFMAN's involvement with each.  Unless stated otherwise, the information below is based on my personal review of the various documents, web sites, and other referenced materials.

<u>Yanks Enterprises, LLC</u>

35.   I am aware of civil litigation in Alameda County Superior Court involving Yanks Enterprises, LLC (Yanks) and Bronco Investments Limited, LLC, doing business as Bronze Horizon Cooperative, LLC (Bronco).  I have reviewed documents online (alameda.courts.ca.gov) filed as part of this litigation.  Based on these documents, I learned the following

a.   Yanks was owned by HOFFMAN, Yan Ebyam, and Eli Bilton.  Each owned a one-third interest.

b.   According to a filing by Bronco's attorneys, "until January 15, 2010, Yanks was managing and operating a medical marijuana cultivation facility at 919 81st Avenue, Oakland, CA."

c.   On January 15, 2010, Bronco agreed to purchase the assets of Yanks' medical marijuana cultivation business for $1,250,000.  The payment, quality of product (marijuana), quantity of product (marijuana), representations made, and construction defects were all part of the litigation.

55

1          d.    In a letter dated May 3, 2010, written by Bronco's

2    attorneys and addressed to HOFFMAN, they addressed certain

3    problems with the sale.  One alleged problem was:

4               *Yanks representation that the crop would have
                significantly higher yields than what actually*
5               *occurred.  Yanks represented that Bronco would be
                purchasing a crop that should yield at least a pound*
6               *per light.  There were a total of 454 lights in the 16
                rooms that Bronco acquired from Yanks.  Actual yields*
7               *from these rooms totaled 61% of the quantity that Yanks
                had represented would be harvested.  Several times*
8               *Yanks represented that Bronco was purchasing a crop
                that would generate well in excess of $1 Million.  The*
9               *reality is that actual proceed were significantly lower
                than $1 Million and took more than three months to sell*
10              *rather than the immediate readiness for sale that Yanks
                represented would happen.*

11
12              e.    In a letter dated May 4, 2010, HOFFMAN responded:

13              *No specific representations were made as to what the
                crop's actual yields would be in the 16 ongoing rooms*
                *Bronco acquired from Yanks.*

14
15              f.    In a letter dated May 10, 2010, Bronco's attorneys

16    responded directly to HOFFMAN:

17              *Regarding the quantity of the product for sale at the
                time of the Purchase by Yanks – all of the Bronco*
                *principals distinctly remember you saying on several*
18              *occasions that they were walking into a crop that would
                produce over a Million Dollars – that the figure $1.2*
19              *Million was stated by you on several occasions.  The
                crop went for significantly less than that. . . .*

20
21              g.    In an exhibit to a filing by Bronco's attorneys,

22    is a letter dated March 1, 2011, sent by Bronco's attorney's to

23    Yanks' attorney stating:

24              *As you must know if you have been following any of the
                extensive coverage of the Oakland ordinance process*
                *regarding permits for medical marijuana growing*
25              *facilities such as the one that is the subject of the
                APA* [Agreement of Purchase and Sale of Assets] *and*
26              *related events, in a formal opinion requested by the
                Oakland City Attorney, the U.S. Attorney has expressly*
27              *singled out such facilities as being prohibited under
                federal law.*

28

                              56

1        h.   On file in the civil litigation is an "Agreement
2   of Purchase and Sale of Assets" (APA) document.  It states that
3   the seller, Yanks, is in the business of managing and operating
4   agricultural cooperatives, growers, and suppliers of agricultural
5   products and included in the purchase price are "<u>book materials</u>,
6   equipments, fixtures and furnishings." (Emphasis added).  Further
7   on in this agreement, under Seller's Representations Regarding
8   Business section, is the following:

9               *Seller hereby represents to Buyer that, to the best of*
                *Seller's knowledge the <u>books of account for the</u>*
10              *<u>business constitute a complete record of the financial</u>*
                *<u>affairs of the business and accurately set forth all</u>*
11              *<u>liabilities, assets, and other matters regarding the</u>*
                *<u>financial condition of the business</u>.*
12              [Emphasis added]

13        i.   The Bill of Sale of Business also states that
14   Yanks sells to Bronco:

15              *All of the equipment, fixtures, merchandise, <u>books,</u>*
                *<u>records</u> and other tangible assets of the business.*
16              [emphasis added]

17        j.   The Alameda County civil litigation filings
18   establish that HOFFMAN created Yanks as a business for the
19   manufacturing of marijuana for sale, that his intent for growing
20   the marijuana was to make a substantial profit, that he was aware
21   it was prohibited by federal law, and that there are books and
22   records (or retained copies) relating to this business that are
23   in his possession, custody, and control.

24        k.   Also on file with the court is an email in which a
25   mediator notified the Alameda County Superior Court that an
26   agreement had been reached between Yanks and Bronco on July 7,
27   2011, and the case was resolved.  The following is an excerpt:

28              *Hi.   Here's an odd one.  I was contacted by counsel in*

                                    57

1
2
3
4

> *a matter – Yanks v. Bronco. . . . They did not have any order to go to mediation, that matter is pending in Alameda Superior. They asked me if I would mediate with the 2 free hours provided by the Program and at my posted rate, even though they were not going through the Program. I said OK, did the mediation, case resolved last Thursday.*

5            i.   It is interesting to note the timing of
6  this settlement, which occurred just over two weeks after the
7  execution of the search warrants on the marijuana cultivation
8  sites at Jopson Ranch in Rio Oso, and Cal-Nevada Wholesale
9  Florist in Sacramento. From the tenor of the email, it appears
10 that this settlement was a sudden and odd occurrence. The
11 execution of the search warrants may have provided HOFFMAN and
12 the other litigants with a powerful incentive to settle the
13 litigation. No settlement terms were disclosed in the filings.

14    36.  Bank records obtained from WFB reveal that Yanks
15 Enterprises LLC opened business checking and savings accounts on
16 September 8, 2008, with HOFFMAN signing as the owner/customer and
17 using the address of 3350 Wilshire Boulevard, Ste. 850, Los
18 Angeles, California.

19    37.  On May 5, 2010, HOFFMAN opened a Business High Yield
20 Savings account and a Money Services Business (MSB) account at
21 WFB in the name of Yanks Enterprises LLC. He describes the
22 business as "Law Office" and uses the address of 3350 Wilshire
23 Blvd., Ste 855, Los Angeles, California. Also listed on this
24 account are Joseph Beson and Julie Thuy-Tien Du. As detailed
25 above, and also later in this affidavit, I believe that the
26 Hoffman Law Office is located in Suite 855.

27    38.  On September 25, 2008, a Statement of Information for
28 Yanks was filed with the California Secretary of State. This

1  document reflects that Nathan HOFFMAN was the initial agent for
2  service as well as a member of this LLC.  Within the box entitled
3  California office where records are maintained is the address
4  3350 Wilshire Blvd., Suite 855, Los Angeles, California.  Yan
5  Ebyam is listed as the Chief Executive Officer (CEO).  The entity
6  was dissolved on April 8, 2010.

Horizon Cooperatives

8       39.  As noted above, during the 2011 investigation of the
9  marijuana cultivation site at the Jopson Ranch in Rio Oso, Aimee
10 Sisco told Deputy Maples that Yan Ebyam was conducting business
11 under a company called "Blue Horizon," and she had taken over
12 "Black Horizon."  Sisco also said that Ebyam has a Blue
13 [Horizon], an Orange [Horizon], and Purple [Horizon].  Sisco also
14 provided Deputy Maples with a copy of a property lease and a
15 Seller's Permit.  I have reviewed both of these documents and
16 they both demonstrate HOFFMAN's integral role in developing the
17 two large-scale marijuana cultivation sites at Rio Oso and
18 Fruitridge.

19      40.  Black Horizon Documents:  The unsigned lease, dated
20 December 15, 2010, is an agreement between Jopson Ranch, Inc.,
21 leaser, and Black Horizon Cooperative, LLC (Black Horizon),
22 lessee, for a 28,800 square foot greenhouse located at 1251
23 Pleasant Grove Road, Rio Oso, California.  This is the same
24 greenhouse that was raided on June 21, 2011, and found to contain
25 in excess of 2,000 marijuana plants.  The lease lists a billing
26 address for Black Horizon (c/o Yan Ebyam) of 3350 Wilshire Blvd,
27 Ste. 855, Los Angeles, California 90010.  This is the location of
28 the Hoffman Law Office.  The Seller's Permit, dated April 11,

59

· 1 | 2011, is in the name of "Black Horizon Cooperative, Inc." with an
2 | address of 1252 Pleasant Grove Rd., Rio Oso, California.

3 |          a.    During the execution of the search warrants at the
4 | Jopson Ranch greenhouse and related structures on June 21, 2011,
5 | numerous documents were discovered relating to Black Horizon,
6 | detailed earlier in this affidavit, including the Articles of
7 | Incorporation and Statement of Information for Black Horizon, a
8 | copy of Black Horizon's Profit and Loss Statement and check
9 | register, Black Horizon's employee list, and email correspondence
10 | between HOFFMAN and co-conspirators.

11 |      41.  Blue Horizon Documents:  During the June 21, 2011
12 | execution of the search warrant at the Cal-Nevada Wholesale
13 | Florist greenhouse on Fruitridge Road in Sacramento, several
14 | documents were discovered (and some subsequently provided by fax)
15 | relating to HOFFMAN's connection with Blue and Black Horizon, as
16 | detailed earlier in this affidavit, including a commercial lease,
17 | correspondence and email correspondence with coconspirators.

18 |      42.  Colored Horizons: On July 20, 2011, I obtained from the
19 | California Secretary of State the Articles of Incorporation for
20 | the below listed companies.  As summarized in the chart below,
21 | these documents show that HOFFMAN is listed as the Agent of
22 | Service for each of the corporations:

| Company Name | Date Filed | Agent of Service |
|---|---|---|
| Grey Horizon Cooperative Inc. | 02/09/20 09 | Nathan V. Hoffman |
| Blue Horizon Cooperative Inc. | 04/21/20 09 | Nathan V. Hoffman |
| Purple Horizon Cooperative Inc. | 06/12/20 09 | Nathan V. Hoffman |
| Emerald Horizon Cooperative Inc. | 06/18/20 09 | Nathan V. Hoffman |

60

| | | 06/18/20 | Nathan V. |
| Rouge Horizon Cooperative Inc. | | 09 | Hoffman |
| | | 11/23/20 | Nathan V. |
| Gold Horizon Cooperative Inc. | | 09 | Hoffman |
| | | 11/23/20 | Nathan V. |
| Silver Horizon Cooperative Inc. | | 09 | Hoffman |
| | | 11/23/20 | Nathan V. |
| Violet Horizon Cooperative Inc. | | 09 | Hoffman |
| | | 05/18/20 | Nathan V. |
| Crimson Horizon Cooperative Inc. | | 10 | Hoffman |
| | | 05/18/20 | Nathan V. |
| Olive Horizon Cooperative Inc. | | 10 | Hoffman |
| | | 05/18/20 | Nathan V. |
| Pink Horizon Cooperative Inc. | | 10 | Hoffman |
| Turquoise Horizon Cooperative | | 05/18/20 | Nathan V. |
| Inc. | | 10 | Hoffman |
| | | 05/18/20 | Nathan V. |
| White Horizon Cooperative Inc. | | 10 | Hoffman |
| | | 12/09/20 | Nathan V. |
| Black Horizon Cooperative Inc. | | 10 | Hoffman |

43.   In each instance, HOFFMAN listed his address for

service as 3350 Wilshire Blvd., #855, Los Angeles, California.

This is the address of the Hoffman Law Office.

44.   WFB records also show that HOFFMAN is the signer on

accounts in the name of Black Horizon Cooperative, Inc. and Blue

Horizon Cooperative, Inc.

I.   **HOFFMAN's Extensive Links to Marijuana Distributor Hung Cao, John Nguyen, and New Age Canna, Inc., dba Canna Clinic of Garden Grove**

45.   During this investigation, I and other investigators

have determined that the marijuana cultivated at the Jopson Ranch

in Rio Oso and the Cal-Nevada Wholesale Florist site in

Sacramento was distributed to, or destined for, John Nguyen in

Southern California.   Documents recovered from search warrants

executed on June 21, 2011, at each of the marijuana cultivation

sites support this conclusion.   In addition, the documents

demonstrate that HOFFMAN was the direct link between the Northern

California marijuana cultivators and John Nguyen's Southern

1 California distribution network.  Examples of this evidence
2 include the following:

3          a.    When agents searched Thomas Jopson's residence
4 (located within the Jopson Ranch in Rio Oso), they discovered
5 numerous documents, including a document dated January 15, 2011,
6 entitled "New Age Canna, Inc. dba Canna Clinic of Garden Grove,
7 Cannabis Cultivator Authorization."  This document contains
8 eleven enumerated paragraphs.  It identifies John Nguyen as a
9 qualified patient entitled to use marijuana and shows that he is
10 a member and President of the New Age Canna, Inc. patient
11 collective dba Canna Clinic of Garden Grove.  In the document,
12 Nguyen purports to designate and authorize Black Horizon
13 Cooperative, Inc. ('Cultivator') to cultivate cannabis on behalf
14 of the membership of the Collective who are unable to cultivate
15 cannabis for themselves.  The document, is signed by John Nguyen
16 as President of New Age Canna Inc., dba Canna Clinic of Garden
17 Grove and by Nathan V. HOFFMAN, on behalf of Black Horizon
18 Cooperative, Inc.,  as "Cultivator."

19          b.    Another document discovered at Thomas Jopson's
20 residence contains a printed email from HOFFMAN to Aimee Sisco
21 and Tom Jopson, dated April 20, 2011.  The following is an
22 excerpt:

23                *Note Paragraph 8:*
                 *I hereby authorize Cultivator and, by his/her execution*
24               *of this document, Cultivator agrees to cultivate no*
                 *more than 6 cannabis plants per registered member of*
25               *the Collective.  The membership records are on file and*
                 *available for inspection during normal business hours*
26               *Monday through Friday at the Collective's principal*
                 *distribution center located at 9758-B Chapman Ave.,*
27               *Garden Grove, CA 92841.*
                 *Any law enforcement authority should contact John*
28               *Nguyen directly at (818) 257-8316.*

1    *Nathan*

2    *Notice: This message is intended only for the use of*
     *the individual(s) to which it is addressed and may*
3    *contain information that is privileged and/or*
     *confidential.  If you are the intended recipient of*
4    *this message, you agree to keep all privileged and/or*
     *confidential information private without written*
5    *consent of the sender, and will use any such*
     *information only within the necessary scope of your*
6    *professional work.  If you are not the intended*
     *recipient of this message, you have received this*
7    *transmission in error, and any review, distribution or*
     *copying of this transmission is prohibited – please*
8    *notify sender immediately and safely dispose of this*
     *message.*

9

10          i.    This email is significant because it

indicates that HOFFMAN brought together the marijuana cultivators
11
at the Jopson Ranch in Rio Oso with John Nguyen, the marijuana
12
distributor in Garden Grove.
13
            c.    A printed email from HOFFMAN to Thomas Jopson with
14
a CC line to John Nguyen, dated March 29, 2011 was discovered at
15
Thomas Jopson's residence.  The subject line states Opening
16
Dialogue bet New Age Canna and Black Horizon.  The following is
17
the email in its entirety:
18
     *Hi Tom and John:*
19
     *As follow-up to our recent telephone conversations, we*
20   *all agree that NOW is an auspicious time in the*
     *cultivation process to have more direct communication*
21   *on crop drying procedures, and other matters of mutual*
     *interest, between New Age Canna, Inc. and Black Horizon*
22   *Cooperative.*

23   *Its my understanding that John would like to visit and*
     *inspect the facility next month, on behalf of the New*
24   *Age member-patients that the medicinal product is being*
     *grown for under both the CUA and MMPA.  In that regard,*
25   *I believe Tom is, or must formally become, a member of*
     *New Age pursuant to paragraph 6 of the Cannabis*
26   *Cultivator Authorization document.*

27   *Tom please make arrangements directly with John Nguyen*
     *as to a convenient date and time in April for a meeting*
28   *at the facility.  For ease of reference, John's*

                                63

1     telephone is (818) 257-8316 and email is
  _johnsbcc@gmail.com._

2

3     Likewise John, Tom Jopson's phone is (530) 218-1271,
  and email is _tjopson@jps.net_. I look forward to
  continuing to work with both of you on this important
4     project.

5     Sincerely,
  Nathan V. Hoffman
6     Attorney at Law
  Law Offices of Hoffman & Osorio, LLP
7     3350 Wilshire Blvd., Suite 855
  Los Angeles, CA 90010
8     Tel: (213) 383-5721
  Fax: (213) 383-5722
9     Cell: (310) 739—0978
  Email: _visa_atty@yahoo.com_

10

    i.   [Note: This email also closes with the same
11

notice used by HOFFMAN in a previously discussed email relating
12

to attorney-client privileged material. Due to its length, the
13

notice is not reproduced here.]
14

    ii.   This email illustrates HOFFMAN's direct
15

involvement in the cultivation, harvest, and subsequent
16

distribution of the marijuana cultivated at the Jopson Ranch.
17

    d.   A similar set of documents linking HOFFMAN,
18

Nguyen, and Northern California marijuana cultivators was
19

discovered during the search of the marijuana cultivation site at
20

the Cal-Nevada Wholesale Florist on Fruitridge Road in
21

Sacramento. In addition to finding more than 3,000 marijuana
22

plants, agents discovered a document that links HOFFMAN to the
23

transportation of twelve pounds of marijuana from this site to
24

John Nguyen in Southern California. The document is entitled
25

"Transportation Certificate," and is dated June 3, 2011. This
26

document states that 12 pounds of "medical" marijuana was
27

transported by Yan Ebyam from Sacramento to Los Angeles on the
28

1 | behalf of New Age Canna cooperative.  It further states, "If you
2 | have any questions about the cannabis, please call Nathan
3 | HOFFMAN, Esq. at (310) 739-0978."  At the bottom of the document
4 | is typed "<u>Nathan Hoffman</u>, Collective Official's Printed Name."

5 |         i.   The telephone number used by HOFFMAN, (310)
6 | 739-0978, in the Transportation Certificate is the number he
7 | lists as his cell phone in emails connected with his law office.
8 | Furthermore, the reference to "Esq." after HOFFMAN's name is
9 | commonly associated with someone licensed to practice law.  This
10 | document not only ties HOFFMAN to the transportation and ultimate
11 | distribution of marijuana from Northern California to Southern
12 | California, but it also shows HOFFMAN was using his status as an
13 | attorney to legitimize the transportation of marijuana in the
14 | event the transporter encountered law enforcement.

15 | **J.**    **Information About New Age Canna, Inc., doing business as**
        **Canna Clinic of Garden Grove**
16 |

17 |       46.  I conducted an internet search (Google) on the name
18 | "Canna Clinic of Garden Grove."  It showed a website named
19 | "potlocator.com," which describes this business as a medical
20 | marijuana dispensary.  On August 3, 2011, I spoke with a
21 | Detective with Garden Grove Police Department who informed me
22 | that Canna Clinic of Garden Grove, located at 9758 Chapman
23 | Avenue, Garden Grove, California, is currently operating as a
24 | marijuana dispensary.

25 |       47.      California Board of Equalization documents reveal
26 | that Hung Cao Nguyen is the President of both New Age Canna, Inc.
27 | and Cana Clinic, Inc. with a telephone number of (818) 257-8316.
28 | This is the same telephone number supplied by HOFFMAN in his

1   emails with Thomas Jopson as a contact for John Nguyen.  Based
2   upon this information, I believe that John Nguyen is the name or
3   an alias used by Hung Cao Nguyen, and that they are one and the
4   same person.

5       Patriot medical Products, Inc. and JH Management Group, Inc.

6       48.  Evidence of an ongoing relationship between HOFFMAN and
7   Nguyen in marijuana distribution is further supported by a
8   document found during the search of Thomas Jopson's residence
9   (within the Jopson Ranch in Rio Oso).  Agents found a three-page
10  document dated March 2, 2011.  Relevant facts in this document
11  include, the following:

12          a.   It is entitled "Contract For Services" between
13  Marjyn Investments, LLC and/or Patriot Medical Products, Inc.
14  (PMP) and JH Management Group, Inc. (JHMG).

15          b.   Paragraph 1 of the document states: "*Duties*: JHMG
16  shall be responsible for providing agricultural, security and
17  asset management consultation services, by whatever means and
18  methods it shall, in its sole discretion, determine."  Also, "PMP
19  shall be responsible for all accounting, legal, and
20  administrative services concerning the facility operation."

21          c.   Paragraph 10 states, in part: "*Compensation*: In
22  consideration for JHMG's services hereunder, PMP agrees to pay
23  JHMG a flat rate of $10,000.00 per month commencing 14 weeks from
24  the date of this Agreement or when proceeds from the first JHMG
25  supervised harvest grown from seeds or clones under the
26  supervision of JHMG are paid to PMP, whichever occurs first . . .
27  both parties anticipate that date to be on or before July 1,
28  2011."

66

1    d.   Also within Paragraph 10, is the text:  ". . . PMP
2  shall also pay JHMG $750.00 for every unit produced under the
3  supervision of JHMG that realizes a wholesale price of more than
4  $2,500 per pound?

5    e.   The document is signed by Nathan V. HOFFMAN as
6  Patriot Medical Group, Inc. and by Hung Nguyen as JH Management
7  Group, Inc.

8    i.   It is worth noting that HOFFMAN signed this
9  document as Patriot Medical Group, Inc. rather than Patriot
10  Medical Products, Inc., the name in the Contract for services,
11  for it shows again that HOFFMAN uses multiple entities or
12  business names to conduct his marijuana business.

13    f.   Although this document does not explicitly state
14  it is a contract for the production and distribution of
15  marijuana, based on the language used, specifically, medicinal
16  products, agricultural services, harvest, seeds, clones, and
17  negotiating price per pound, and further based on the totality of
18  the evidence presented in this Affidavit, in my opinion, this
19  contract to be an agreement between HOFFMAN and Nguyen to
20  manufacture and distribute marijuana.  Indeed, the document
21  appears to be a profit-seeking venture between two entities
22  controlled by HOFFMAN and Nguyen to grow and distribute
23  marijuana.

24    g.   I have reviewed a California Secretary of State
25  record that reflect that HOFFMAN is the agent for service, as
26  well as the Secretary and a director of Patriot Medical Products,
27  Inc.  James Stretch is also listed as the Chief Financial Officer
28  and a director.  The document further reflects a business address

67

for this entity of 9201 San Leandro Street, Oakland, California, an address also associated with Marjyn, as described above.  The state records show that Patriot Medical Products, Inc. was dissolved on May 6, 2011.

## K.  List of Entities and Individuals Involved In HOFFMAN'S Marijuana Schemes

49.  The following table contains a lists of the entities, business names and associates/individuals (in alphabetical order) involved with HOFFMAN in the production and distribution of marijuana, as described in the above paragraphs.  For clarity, the various entities listed as Horizon Cooperatives under various colors (black, blue, bronze, etc.) are listed separately under the title "Colored Horizons.":

| ENTITIES | ASSOCIATES/INDIVIDUALS |
| --- | --- |
| 9201 SAN LEANDRO STREET, LLC. | BESON, JOSEPH |
| AMERICAN HYDROPONICS | BILTON, ELI |
| BB COLLECTIVE, INC. | DU, JULIA THUY-TIEN |
| BRONCO INVESTMENTS LIMITED, LLC | EBYAM, YAN |
| CANNA CLINIC OF GARDEN GROVE | HARRIS, MATTHEW |
| CROP KING | HENRY, JOHN JOSEPH |
| D & S GARDEN SUPPLIES | JOPSON, DAVID |
| DAN GRACE CLONES | JOPSON, THOMAS |
| DARK HEART INDUSTRIES | KNOX, KEVIN |
| JH MANAGEMENT GROUPT, INC (JHMG) | MAGAZINE, JARRETT |
| MARJYN INVESTMENTS, LLC | NGUYEN, HUNG CAO JOHN |
| NEW AGE CANNA, INC. | SISCO, AIMEE |
| PATRIOT MEDICAL GROUP, INC. | STRETCH, JAMES |
| PATRIOT MEDICAL PRODUCTS, INC (PMP) | STUTZRIEM, RANDY |
| SANCTUARY HEALTH CENTER, INC. | SUTHERLAND, KEN |
| THE RAINFOREST | |
| YANKS ENTERPRISES, LLC | |

COLORED HORIZONS
BLACK HORIZON COOPERATIVE

BLUE HORIZON COOPERATIVE
BRONZE HORIZON COOPERATIVE,
CRIMSON HORIZON COOPERATIVE
EMERALD HORIZON COOPERATIVE
GOLD HORIZON COOPERATIVE
GREY HORIZON COOPERATIVE
OLIVE HORIZON COOPERATIVE
PINK HORIZON COOPERATIVE
PURPLE HORIZON COOPERATIVE
ROUGE HORIZON COOPERATIVE
SILVER HORIZON COOPERATIVE
TURQUOISE HORIZON COOPERATIVE
VIOLET HORIZON COOPERATIVE
WHITE HORIZON COOPERATIVE

**L.   Additional Information about HOFFMAN's Law Firm**

50.   I have conducted internet research on HOFFMAN's law firm and learned the following:

a.   A (Google) conducted on the name "Law Office Hoffman and Osorio" revealed the website unitedstatesvisa.com.

b.   The homepage of this website displays the website for the Law Office of Hoffman & Osorio, LLP, at 3350 Wilshire Blvd., Suite 855, Los Angeles, CA.

c.   A small banner in the upper left corner of the website states, "The Fiancee Visa Attorneys." The narrative on the homepage explains that Hoffman and Osorio, LLP can assist men in getting their foreign fiancée to America. They offer two options. The first option is legal representation and the second option is the do-it-yourself "K-1 Kit."

d.   The website has several tabs across the top which allow for navigation through the pages of the website. One of the tabs is entitled "The Attorneys." Navigating to this page reveals personal biographies of HOFFMAN and Spyros L. Osorio.

69

1  HOFFMAN's biography states, "He has been a practicing attorney
2  since 1989, and has represented individual and corporate clients
3  before the U.S. Immigration Courts in family-based and
4  employment-based immigration matters.  Mr. Hoffman is a member of
5  the American Immigration Lawyers Association (AILA), and former
6  President of the Juvenile Courts Bar Association of California.
7  Mr. Hoffman has successfully processed visas for beneficiaries
8  from the Philippines, Russia, Ukraine, China, and Indonesia."
9  Osorio's biography also says that he is an immigration attorney.

10         e.    Another of the tabs is entitled "Contact Us."
11  Navigating to this page reveals the following:

12             Law Offices of Hoffman & Osorio, LLP
               *Immigration and Naturalization Lawyers*
13             Affiliate Offices in Texas, New York, New Jersey and
               Washington, D.C.
14             Satellite Offices Nationwide
               International Offices: Philippines, China, Ukraine,
15             Bulgaria and Russia
               Main:                    3350 Wilshire Blvd
16                                       Suite 855
                                         Los Angeles, CA 90010
17             Direct                    (213) 383-5721
               Fax                       (213) 383-5722
18             Web Site                  http://www.unitedstatesvisa.com
               E-mail                    visa_atty@yahoo.com
19

20
           f.    Based on this website information, and the
21  totality of this investigation, I believe that HOFFMAN and his
22  law firm specialize in immigration law.  Given HOFFMAN's heavy
23  involvement in multiple industrial-sized marijuana cultivation
24  projects in Northern California, it is worth noting that HOFFMAN
25  does not represent himself on his website to be a specialist in
26  criminal, marijuana, real estate, employment, corporate, or other
27  such areas of law.  In addition, as detailed extensively
28

                              70

1  throughout this Affidavit, HOFFMAN has frequently and recently
2  used the email address of visa_atty@yahoo.com, the same email
3  account that he used for the Hoffman Law Office to communicate
4  with John Nguyen, Thomas Jopson, Aimee Sisco, and other co-
5  conspirators about the ongoing cultivation and distribution of
6  marijuana.

7       51.   Based on the facts presented in this Affidavit, which
8  include bank records, corporate filings, online database
9  searches, and search warrant records, I believe HOFFMAN conducts
10 business related to the manufacture and distribution of marijuana
11 from his law office located at 3350 Wilshire Boulevard, Suite
12 855, Los Angeles, California, the Hoffman Law Office.
13 Furthermore, I believe records relating to his extensive, ongoing
14 criminal activities relating to the manufacture and distribution
15 of marijuana will be found at this location, including on the
16 computer and server that HOFFMAN uses to communicate with the
17 email address: visa_atty@yahoo.com, as well as the files and
18 records from the Black Horizon marijuana cultivation site at the
19 Jopson Ranch in Rio Oso and the Blue Horizon marijuana
20 cultivation site at Fruitridge Road in Sacramento.

21      52.   HOFFMAN appears to be the person responsible for
22 drafting and keeping the executed copies of many of the
23 agreements covering the industrial marijuana cultivation sites
24 discovered on June 21, 2011, the banking activity in support of
25 these grows, and the various agreements between John Nguyen and
26 the Northern California marijuana cultivators arrested at that
27 time.   Furthermore, based on the totality of this investigation
28 and the evidence stated above, I believe that documents, records,

1  and files relating to Marjyn, Yanks, PMP, all the Colored

2  Horizons, and all of the marijuana related businesses detailed in

3  this Affidavit will be found at HOFFMAN's law office.

4      53.  On August 3, 2011, I entered the building bearing the

5  address of 3350 Wilshire Boulevard, Los Angeles, CA.  It is a

6  multi-story building housing numerous offices.  Located in the

7  lobby of this building I observed a building directory stating

8  "Law Offices of Hoffman and Herrera, LLP "located in Suite 855.

9  I proceeded up the elevator to the 8th floor and went to Suite

10  855.  Posted to the left of the door was a sign stating "855 Law

11  Offices."

12      54.  I am requesting the issuance of a search warrant for

13  HOFFMAN's office, more particularly described in Attachment A-1,

14  to search for those records more particularly described in

15  Attachment B.

16  **M.  Additional Information about HOFFMAN's Residence**

17      55.  From my background, training, and experience I know

18  that individuals, including persons engaged in illicit

19  activities, such as drug trafficking and/or money laundering,

20  normally maintain records of their financial activity, such as

21  receipts for expenditures by cash and check, bank records, tax

22  returns, escrow files and other financial documents, in their

23  personal residences, place of business, rented storage units,

24  vehicles, or other places under their control.  Residence are a

25  location place where those involved in illegal schemes tend to

26  keep particularly sensitive documents.  Unlike a business office,

27  for example, a residence provides easy access to the document

28  owner, but does not afford access to members of the public or

1    other business associates and employees.  Thus, often drug
2    traffickers and money launderers will keep sensitive information,
3    especially financial documents and records at their home rather
4    than at the office.  For example, in this case, as set forth
5    above, HOFFMAN has engaged in extensive bank activity include
6    cash deposits and withdrawal to support his marijuana and money
7    schemes.  In my experience, people often keep records and
8    receipts of such deposits at their residences.

9         56.  I provide further training and experience regarding the
10   connection between those involved in illegal activities and the
11   use of their homes to conceal evidence, further below in this
12   affidavit in a more general discussion of my training and
13   experience in this area.

14        57.  On July 12, 2011, I made an online query through
15   Courthouse Direct (courthousedirect.com) for properties owned by
16   HOFFMAN.  Through this website a copy of a Grant Deed was
17   produced.  I have reviewed this document.  It shows that on May
18   1, 1996, a Grant Deed was filed with the Los Angeles County
19   Recorder's Office reflecting that Nathan and Ellen Hoffman
20   purchased the real property described by Assessor Property Number
21   (APN) 4208-030-036.

22        58.  On July 19, 2011, I called the Los Angeles County
23   Assessor's Office, Real Property, Culver City (West District)
24   Division and spoke with a representative.  The representative
25   informed me that the property described by APN 4208-030-036 is
26   currently owned by Nathan and Ellen Hoffman and has the address
27   of 4046 Astaire Avenue, Culver City, California.  The Grant Deed
28   also reflects 4046 Astaire Avenue, Culver City, California, as a

1 | mailing address of HOFFMAN.

2 |     59.  On August 3, 2011, I conducted surveillance of 4046
3 | Astaire Avenue, Culver City, California.  I observed a vehicle
4 | bearing license plate number 6GDH644 enter the garage of the
5 | residence.  This vehicle was driven by a white, male adult
6 | matching the description and DMV photo of HOFFMAN.

7 |     60.  California Department of Motor Vehicles (DMV) records
8 | reflect license plate number 6GDH644 is registered to "Nathan V.
9 | Hoffman" using the address 4046 Astaire Avenue, Culver City,
10 | California.

11 |     61.  For the forgoing reasons, and the totality of this
12 | investigation described above, I am requesting the issuance of a
13 | search warrant for HOFFMAN's personal residence, more
14 | particularly described in Attachment A-2, to search for those
15 | records more particularly described in Attachment B

16 | **N.    Additional Information about HOFFMAN's Residence**

17 |     62.  On or about July 25, 2011, I learned from a prosecutor
18 | in the Eastern District of California that Joseph Kar, an
19 | attorney, contacted the United States Attorney's Office in the
20 | Eastern District of California to inform the prosecutors in this
21 | investigation that he (Kar) had been retained to represent
22 | HOFFMAN.

23 |     63.  As a result, this Affidavit specifically does not seek
24 | to search for, or seize, any documents, communications, or other
25 | such material containing confidential attorney-client
26 | communications between Joseph Kar and HOFFMAN.

27 | **O.    Summary of Evidence Regarding Hoffman and his Criminal**
   |        **Schemes**
28 |

1    64.   Based upon the facts set forth in this Affidavit, my
2  training and experience, and the training and experience of
3  investigators that I have consulted with in preparing this
4  affidavit, there is probable cause to believe that:

5         a.    HOFFMAN was intimately involved in the production
6  of marijuana at the two greenhouse grows in the Eastern District
7  of California, the one in Rio Oso (Jopson Ranch/Black Horizon
8  Cooperative) and the one in Sacramento (Cal-Nevada/Blue Horizon
9  Cooperative), which were found to contain collectively more than
10  5,000 marijuana plants;

11         b.    HOFFMAN was directly involved in the production
12  and distribution of marijuana at 919 81st Avenue, Oakland, CA
13  (Yanks Enterprises, LLC/Bronco Investments Limited, LLC);

14         c.    HOFFMAN is currently involved in the production
15  and distribution of marijuana at 9201 San Leandro Street,
16  Oakland, California (through Marjyn Investments, LLC);

17         d.    HOFFMAN was intimately involved in the sales of
18  marijuana produced (or intended to be produced) from each of
19  these marijuana gardens;

20         e.    HOFFMAN intended to profit from the production and
21  distribution of marijuana as evidenced by:

22              i.   His sale of the commercial marijuana grow
23  located at 919 81st Street, Oakland, California (operated under
24  Marjyn) to Bronco Investments for $1,250,000;

25              ii.  His email trying to entice Ken Sutherland to
26  invest $50,000 in a hydroponic facility franchise and attaching a
27  spreadsheet with conservative numbers in terms of profitability;

28              iii. The Contract For Services document between

75

1  PMP and JHMG where they discuss payment of $750 for every unit
2  produced that sells for more than $2,500 per pound on the
3  wholesale market;

4          iv.   Marjyn Investments, LLC and Yanks
5  Enterprises, LLC are commercial enterprises that are or have been
6  involved in the manufacture of marijuana;

7          v.   The Marjyn Investments, LLC bank account at
8  WFB has been used to pay for materials used in the manufacture of
9  marijuana, to include rent payments, utility payments, marijuana
10 clones, hydroponic equipment and wages;

11         vi.   The Marjyn Investments, LLC bank account at
12 WFB has been used to receive and launder large amounts of
13 currency (as well as checks) believed to come from the sales of
14 marijuana;

15         vii. HOFFMAN, Ebyam, and Stretch have all
16 personally deposited large amounts of currency to the Marjyn
17 Investments, LLC bank account at WFB believed to come from the
18 sales of marijuana;

19      f.   Based on copies of email traffic and referred to
20 Excel spreadsheets, HOFFMAN owns and uses computer media and
21 electronic storage devices;

22      g.   Based on civil litigation documents, publicly
23 filed documents, and email traffic, HOFFMAN is known to keep
24 records of business transactions of and with the numerous
25 entities and individuals detailed in this Affidavit;

26      h.   Any books, records, and documents kept by HOFFMAN
27 relating to any of the entities and individuals detailed in this
28 Affidavit are unrelated to his advertised legal expertise and the

1  practice at the Hoffman Law Office, which is primarily
2  immigration law.

3         i.    HOFFMAN is well aware that the production and
4  distribution of marijuana is illegal in California as evidenced
5  by his own email to Thomas Jopson on February 18, 2011.   In that
6  email, HOFFMAN states, ". . . any industrial size cultivation
7  facility acting under a City Permit would be immediately targeted
8  by the Feds as crossing the proverbial Prop 215 line in the sand.
9  Later in the email, HOFFMAN warns, . . . comes the chance that
10  the feds will target us no matter how much security and
11  confidentiality we achieve on paper.

12         j.    Much of HOFFMAN marijuana cultivation and
13  distribution scheme, and the financial activity that supports it
14  is directly tied to both the email account and address at the
15  Hoffman Law Office.   This conclusion is supported by HOFFMAN's
16  own emails to his associates, public documents, and bank records.

17         k.    Hoffman resides at the Hoffman Residence, and,
18  based on my training and experience, and the nature of the
19  criminal activities involved in this case, he is likely to keep
20  documents, records, and other materials relating to his marijuana
21  activities at that residence.

22  **P.    Additional Training and Experience Regarding The Methods and
       Practices of Marijuana Cultivators and Distributors and
23     Money Launderers**

24         65.   I have worked this investigation with the help of a
25  team of law enforcement officers, including Special Agent Robert
26  Marchi with the Drug Enforcement Agency (DEA).   Marchi has been a
27  Special Agent with DEA since 1991.   Special Agent Marchi has
28  received training relating to criminal organizations engaged in

the conspiracies to manufacture and/or possess with intent to distribute marijuana, cocaine, cocaine base, heroin, methamphetamine, and other dangerous drugs prohibited by law.  He has received specialized training on the subject of indoor and outdoor marijuana grow operations, to include:  marijuana plant botany and horticulture, the equipment used to conduct indoor and outdoor marijuana growing operations; common indicators of indoor and outdoor marijuana grow operations and investigative techniques and safety standards as applied to indoor and outdoor marijuana grow operations.  He has attended conferences and roundtable meetings with other experienced agents, officers, and agencies to discuss techniques used to investigate marijuana grow operations.

66.  As a result of my training and experience and discussions with Special Agent Marchi and other experienced narcotics officers, I am generally familiar with the methods and practices of marijuana manufacturers and traffickers.  I have encountered and become familiar with various tools, methods, trends, paraphernalia, and related items utilized by various manufacturers and traffickers in their efforts to cultivate, conceal, and distribute marijuana.  This includes fake identification papers such as social security cards, driver licenses, and false addresses used to evade detection and give false leads to law enforcement officials.

67.  Furthermore, I know that marijuana manufacturers and/or traffickers keep and maintain the evidence and items described in the Items to Be Seized section above (and Attachment B) used in connection with their drug operations: on their persons; in their

78

1 residences, stash or safe houses, locations under their control,
2 motor vehicles, recreational vehicles, trailers, vessels, storage
3 lockers, and outbuildings; on and/or buried under property under
4 their control, whether such places and/or such items are
5 registered in their names, the names of their friends, family,
6 associates, businesses, shell/shelf corporations and/or under
7 fictitious names.

8     68.   Based on my training and experience I am familiar with
9 the methods and practices used by individuals and organizations
10 involved in illicit activities that generate large amounts of
11 income.   The methods and schemes used by these individuals to
12 dispose of the currency are collectively called money laundering.
13 I am familiar with the methods and practices used by individuals
14 and organizations involved in illicit activities that generate
15 large amounts of income.

16     69.   These methods include cash purchases, conducting cash
17 transactions in amounts less than $10,000 to avoid reporting
18 requirements, the use of aliases and nominees, the use of
19 businesses as fronts in an attempt to legitimize and conceal
20 their activities, the use of wire remitter companies to convert
21 currency into wire transfers below reporting requirements, the
22 use of money orders and cashier's checks to avoid depositing
23 currency into bank accounts, structuring transactions to avoid
24 currency reporting forms, the use of off-shore banking in an
25 attempt to break the paper trail and the use of bank safe deposit
26 boxes to conceal and secure their proceeds, to name but a few of
27 the methods.

28     70.   From my background and experience I know that

79

individuals, including persons engaged in illicit activities,
such as narcotics trafficking and/or money laundering, normally
maintain records of their financial activity, such as receipts
for expenditures by cash and check, bank records, tax returns,
escrow files and other financial documents, in their personal
residences, place of business, rented storage units, vehicles, or
other places under their control.  These records may be in the
form of written notes and correspondence, receipts, negotiated
instruments, contracts, bank records, tax documents and other
records.  Furthermore, individuals engaged in an income-producing
business keep records of the financial activities of the business
for numerous reasons and often use accountants to complete
financial statements and tax returns for their business and
personal tax returns.

71.  From my background and experience I know that
individuals, including persons engaged in illicit activities
and/or money laundering, often maintain such records for long
periods of time, particularly when they are involved in ongoing
criminal conduct over a long period of time.  Based on my
experience and review of United States v. Greany, 929 F.2d 523
(9th Cir. 1991), where there is a long-term or ongoing criminal
business or where the evidence is of a nature that would be kept
long after the criminal activity has ceased (e.g., financial
records), the passage of long periods of time will not make the
evidence supporting the issuance of a warrant stale.

72.  There are many reasons why individuals, including
criminal offenders, maintain evidence for long periods of time.
The evidence may be necessary business records which must be kept

80

for information reporting purposes, such as for state and Federal
tax returns, loan applications, to produce profit-and-loss
statements and balance sheets and for parent company reporting.
The evidence may be highly valuable to the offender or have high
utility for legal applications, such as valuable investments
(e.g., art jewelry, precious metals and stones, real estate,
securities), large sums of currency, drug ledgers, safes,
supplier and customer lists, firearms, communication equipment,
money counters, counter-surveillance equipment, scales, and
packaging equipment.  The offender may not realize that the items
are evidence.  The offender may not be able to easily remove the
evidence.  The evidence may also be innocuous at first glance
(e.g., financial, credit card and banking documents, travel
documents, receipts, documents reflecting purchases of assets,
personal calendars, telephone and address directories, check
books, videotapes and photographs, utility records, ownership
records, letters and notes, tax returns and financial records,
escrow files, telephone and pager bills, keys to safe deposit
boxes, packaging materials) but have significance and relevance
when considered in light of other evidence.  The individual,
including the criminal offender, may no longer realize he/she
still possesses the evidence or may believe law enforcement could
not obtain a search warrant to seize the evidence.

73.        Often, the method of distribution generates
records of events as well.  These records can be in the form of
bills of lading, contracts, air waybills, delivery receipts,
billings, manifests, log books, fuel receipts, motel/hotel
receipts, travel records, credit card charges and other related

1  business documents.

2       74.       Individuals who amass proceeds from illegal
3  activities routinely attempt to further that conduct and/or
4  conceal the existence and source of their funds by engaging in
5  financial transactions with domestic and foreign institutions,
6  and others, through all manner of financial instruments,
7  including cash, cashier's checks, money drafts, traveler's
8  checks, wire transfers, money orders, etc.  Records of such
9  instruments are routinely maintained at the individual's
10 residence or place of business.

11      75.   Illicit drug traffickers and manufacturers sometimes
12 maintain assets such as real estate, bank and financial accounts,
13 businesses, and financial assets in names other than their own in
14 order to avoid the detection and seizure of such assets by law
15 enforcement.  However, even though such assets may be in other
16 people's names, the criminal violator continues to utilize these
17 assets and exercise dominion and control over them.  These
18 records may be in the form of written notes and correspondence,
19 receipts, negotiated instruments, contracts, bank statements,
20 escrow files and other records.  Records of this kind are also
21 often stored on computer media.  Persons engaged in illicit
22 activity, such as drug trafficking and/or money laundering,
23 frequently use corporations, trusts, partnerships and other
24 business entities to facilitate and/or conceal the money trail
25 and the illicit activity.

26      76.   I know, based on my training and experience, that the
27 number of criminal violators using computers, electronic
28 information storage devices, and electronic communications

82

1  devices, like the general population as a whole, is steadily
2  increasing, and such computer hardware, software, documentation,
3  passwords, and electronic information storage devices may be
4  instrumentalities, fruits, or evidence of crime and/or transmit
5  information about crimes.  Moreover, computers offer marijuana
6  cultivators and distributors excellent and convenient devices for
7  recording information concerning their product, including
8  marijuana seed, plants, marijuana sources, co-conspirators and
9  customers, marijuana plant yields and harvest information, plant
10  and processed marijuana prices, marijuana plant maintenance and
11  growing schedules, marijuana plant identification and reference
12  codes, and any other information deemed pertinent by the
13  marijuana cultivator and distributor.  Much of the electronic
14  media storage devices, such as floppy disks, zip disks, thumb
15  drives, CD-ROM, SD memory cards, are very small, detachable,
16  portable, and can be secreted in small containers, such as safes
17  and clothing pockets.  I also know, based on my training and
18  experience, that drug manufacturers and traffickers often
19  communicate with their criminal associates through the use of
20  electronic mail, instant messaging, text messaging, telephone
21  answering machines, voicemail, pagers, and telephones (cellular
22  and land line).  To the criminal violator, these communication
23  devices are part of his normal business equipment.

24      77.  I have found that the manufacture, use, and sales of
25  marijuana and other controlled substances is so pervasive in the
26  lives of those who engage in these activities that evidence of
27  the manufacture, use and sales of these drugs is so intermingled
28  in the minutia of daily living that even when the producers,

83

1  users, and sellers of drugs know, or suspect, that law
2  enforcement is inquiring into their activities, they cannot
3  completely rid themselves of all evidence of the production, use,
4  and sales of controlled substances.  I have found in previous
5  searches that manufacturers of marijuana have had receipts for:
6  purchases of food supplies for the persons manufacturing the
7  marijuana plants; purchases of supplies used for the production
8  of marijuana, such as waterline, fertilizer, growing containers,
9  greenhouses, hydroponic equipment, waterline fittings, and hand
10  tools in the homes and vehicles many months after the purchases,
11  and after members of their conspiracy have been arrested by law
12  enforcement for those activities.

13      78.  Through my training and experience, I have learned that
14  criminal violators use prepaid or debit calling cards, public
15  telephones, wireless communications technology such as paging
16  devices and cellular telephones, email, instant messages, and use
17  of codes in communications in an attempt to avoid detection by
18  law enforcement.  I also know that violators of the controlled
19  substances laws often purchase telephone or subscribe to
20  telephone services using false names and/or other individuals'
21  names to avoid detection by law enforcement.

22      79.  Individuals involved in drug dealing often maintain at
23  their residence, vehicles, vessels, motor homes and in structures
24  of various types, as well as on their persons records and ledgers
25  evidencing their trafficking activities in order to keep track of
26  the ordering, purchasing, storage, distribution, and
27  transportation of drugs.  Even after the drugs are sold,
28  documentary records and ledgers often remain for long periods of

1  time to memorialize past transactions, the status of accounts
2  receivable and accounts payable, and the names and telephone
3  numbers of suppliers, customers and co-conspirators.  These
4  records are often maintained not only on paper, but also as
5  computer data in the form of computer hardware and software.  As
6  a result of my training and experience, I know that traffickers
7  dealing in various quantities of controlled substances of those
8  that assist in such ventures often create and maintain accounts
9  and records relating to drug transaction.  Such records and
10 accounts often detail manufacture, movement, acquisition,
11 distribution, and the location of various amounts of money and
12 drugs.  They also may indicate the identity of co-conspirators.
13 I have seen these records maintained in physical form, such as
14 papers, notebooks, ledgers, and in electronic form, such as on a
15 computer.  In my experience, drug traffickers tend to keep these
16 accounts and records in their residence and in the areas under
17 their control.  It is my training and experience, that in the
18 case of drugs dealers, evidence is likely to be found where the
19 traffickers live.  United States v. Angulo-Lopez, 791 F2d 1934,
20 1399 (9th Cir. 1986).

21      80.  Individuals involved in drug dealing must often rely on
22 others to obtain the drugs and to help them market the drugs.
23 Evidence of the identities of these co-conspirators are often
24 mainlined at their residence, in their vehicles, motor-homes and
25 in structures of various types, as well as on their persons, in
26 various forms including, but not limited to photographs, videos,
27 letters, and ledgers.

28      81.  Individuals involved in drug dealing often do not have

85

1    a legitimate form of employment to account for the large sums of
2    money they earn from drugs trafficking and often try to
3    legitimize these.  In order to do this, they attempt to secrete,
4    transfer, and conceal the money in a number of different ways,
5    including, but not limited to; (a) placing assets in names other
6    than their own name to avoid detection while maintaining control;
7    (b) laundering money through what appears to be a legitimate
8    business or businesses; (c) hiding money in their homes, sages
9    and safety deposit boxes; or (d) using the money to buy assets
10   which are difficult to trace by law enforcement.  Records of
11   these transactions are often found at their residences, in their
12   vehicles, and on their persons.

13         82.   Individuals involved in drug dealing often maintain on
14   hand large amounts of United States currency in order to finance
15   their ongoing drug business.  In addition, other assets generated
16   by their drug business, or purchased with case earned, such as
17   precious metals and stones, and jewelry, automobiles and other
18   items of value and or proceeds of drug transactions are typically
19   kept by drug dealers at their residence, in their vehicles,
20   motor-homes and in structures of various types, as well as on
21   their persons to avoid detection by authorities.

22         83.   Individuals involved in drug dealing frequently use
23   vehicles under their control to transport, conceal, and store the
24   items sought by the warrants sought herein.  Violators frequently
25   use vehicles registered to another person as a means of avoiding
26   detection by law enforcement.  Possession of the keys to
27   vehicles, statements by witnesses, Department of Motor Vehicle
28   records, suspect admissions and the suspect's actual use of the

1   vehicle are some of the best means of determining which
2   vehicle(s) are under the violator's control.  Therefore, I seek
3   search warrant authorization to search all vehicles located on
4   any of the premises described above to be search that under the
5   control of, or used by, Nathan Hoffman as established by his
6   possession of keys for such vehicles and/or by any future
7   statements made by them or witnesses who have knowledge of such
8   facts.

9       84.   Individuals involved in marijuana manufacturing and
10  dealing often take, or cause to be taken, photographs of
11  themselves their associates, their property, and their drugs, and
12  usually maintain these photographs in the possession and/or on
13  their computers or phones.

14      85.   Premises used by individuals involved in drug dealing
15  usually contain articles of personal property evidencing the
16  identity of persons occupying, possessing, residing in, owning,
17  frequenting or controlling the premises.

18      86.   In addition, these traffickers tend to attempt to
19  legitimize their assets by establishing domestic and foreign
20  businesses, by creating shell corporations, by utilizing bank
21  haven countries and attorney's specializing in drafting and
22  establishing such entities employed to launder the proceeds
23  derived from the distribution of controlled substances.

24      87.   The net worth/source and application of funds
25  analyses show that a person's known expenditures and/or
26  accumulation of assets substantially exceed his/her legitimate or
27  reported sources of income to prove that the person is engaged in
28  either illegal or unreported money generating activities, such as

87

narcotics trafficking or unreported business sales.  The net
worth analysis compares an individual's net worth (cost value of
total assets minus total liabilities) at a time just before
he/she has commenced his/her purported criminal or unreported
enterprise, to his/her net worth at the approximate time of
his/her arrest.  The source and application of funds analysis
focuses on an individual's expenditures during the time period of
the purported illegal or unreported income generating activities
and compares such expenditures with his legitimate or reported
sources of income.  Both analyses require evaluation of bank
records, credit records, loan records, escrow files, documents
evidencing ownership of assets, and other documents evidencing
the financial profile of the individual during the course of the
purported illegal or unreported income generating activity, as
well as a short time period prior to the illegal or unreported
activity (e.g., one year).  Other than assisting in the net
worth/source and application of funds analyses, a financial
profile of an individual prior to the purported criminal or
unreported income generating activity evidences changes in
lifestyle, asset accumulation, and expenditures between the time
period prior to the illegal or unreported activity and the time
period of the illegal or unreported activity that are consistent
with a person generating income from illegal·or unreported income
generating activities (e.g., narcotics trafficking, real estate
investing), as compared to a person earning income from
legitimate or reported sources.  Evidence of an individual's
expenditures, asset accumulation, financial life-style, net
worth/source and application of funds analysès, and underlying

88

financial documents necessary for such analyses are admissible
evidence under Federal case law in narcotic trafficking and money
laundering cases. Thus the need for such documents to be taken
during the execution of a search warrant.

88. I am aware that the proceeds generated from both legal
and illegal activities may be spent many years after the activity
has stopped. Thus, records reflecting income and expenditures
for the time period spanning the activity and those years
immediately following the end of this activity are essential to
any financial investigation.

**Q.   Training and Experience Regarding Computers and Digital Devices**

89. As used below, the term "digital device" includes any
electronic system or device capable of storing and/or processing
data in digital form, including: central processing units; laptop
or notebook computers; personal digital assistants; wireless
communication devices such as telephone paging devices, beepers,
and mobile telephones; peripheral input/output devices such as
keyboards, printers, scanners, plotters, monitors, and drives
intended for removable media; related communications devices such
as modems, cables, and connections; storage media such as hard
disk drives, floppy disks, compact disks, magnetic tapes used to
store digital data (excluding analog tapes such as VHS), and
memory chips; and security devices.

90. Based on my knowledge, training, and experience, as
well as information related to me by agents and others involved
in the forensic examination of digital devices, I know that data
in digital form can be stored on a variety of digital devices and

1  that during the search of the premises it is not always possible
2  to search digital devices for digital data for a number of
3  reasons, including the following:

4          a.    Searching digital devices can be a highly
5  technical process that requires specific expertise and
6  specialized equipment.  There are so many types of digital
7  devices and software in use today that it is impossible to bring
8  to the search site all of the necessary technical manuals and
9  specialized equipment necessary to conduct a thorough search.  In
10 addition, it may also be necessary to consult with specially
11 trained personnel who have specific expertise in the type of
12 digital device, software application or operating system that is
13 being searched.

14         b.    Digital data is particularly vulnerable to
15 inadvertent or intentional modification or destruction.
16 Searching digital devices can require the use of precise,
17 scientific procedures that are designed to maintain the integrity
18 of digital data and to recover "hidden," erased, compressed,
19 encrypted or password-protected data.  As a result, a controlled
20 environment, such as a law enforcement laboratory or similar
21 facility, is essential to conducting a complete and accurate
22 analysis of data stored on digital devices.

23         c.    The volume of data stored on many digital devices
24 will typically be so large that it will be highly impractical to
25 search for data during the execution of the physical search of
26 the premises.  A single megabyte of storage space is the
27 equivalent of 500 double-spaced pages of text.  A single gigabyte
28 of storage space, or 1,000 megabytes, is the equivalent of

90

1  500,000 double-spaced pages of text.  Storage devices capable of
2  storing 500 gigabytes (GB) of data are now commonplace in desktop
3  computers.  Consequently, each non-networked, desktop computer
4  found during a search can easily contain the equivalent of 240
5  million pages of data, that, if printed out, would completely
6  fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500
7  GB drive could contain as many as approximately 450 full run
8  movies or 450,000 songs.

9         d.    Electronic files or remnants of such files can be
10  recovered months or even years after they have been downloaded
11  onto a hard drive, deleted or viewed via the Internet.
12  Electronic files saved to a hard drive can be stored for years
13  with little or no cost.  Even when such files have been deleted,
14  they can be recovered months or years later using readily-
15  available forensics tools.  Normally, when a person deletes a
16  file on a computer, the data contained in the file does not
17  actually disappear; rather, that data remains on the hard drive
18  until it is overwritten by new data.  Therefore, deleted files,
19  or remnants of deleted files, may reside in free space or slack
20  space, i.e., space on the hard drive that is not allocated to an
21  active file or that is unused after a file has been allocated to
22  a set block of storage space for long periods of time before they
23  are overwritten.  In addition, a computer's operating system may
24  also keep a record of deleted data in a swap or recovery file.
25  Similarly, files that have been viewed via the Internet are
26  automatically downloaded into a temporary Internet directory or
27  cache.  The browser typically maintains a fixed amount of hard
28  drive space devoted to these files, and the files are only

91

1  overwritten as they are replaced with more recently viewed
2  Internet pages.  Thus, the ability to retrieve residue of an
3  electronic file from a hard drive depends less on when the file
4  was downloaded or viewed than on a particular user's operating
5  system, storage capacity, and computer habits.  Recovery of
6  residue of electronic files from a hard drive requires
7  specialized tools and a controlled laboratory environment.

8           e.   Although some of the records called for by this
9  warrant might be found in the form of user-generated documents
10  (such as word processor, picture, and movie files), digital
11  devices can contain other forms of electronic evidence as well.
12  In particular, records of how a digital device has been used,
13  what it has been used for, who has used it, and who has been
14  responsible for creating or maintaining records, documents,
15  programs, applications and materials contained on the digital
16  devices are, as described further in the attachments, called for
17  by this warrant.  Those records will not always be found in
18  digital data that is neatly segregable from the hard drive image
19  as a whole.  Digital data on the hard drive not currently
20  associated with any file can provide evidence of a file that was
21  once on the hard drive but has since been deleted or edited, or
22  of a deleted portion of a file (such as a paragraph that has been
23  deleted from a word processing file). Virtual memory paging
24  systems can leave digital data on the hard drive that show what
25  tasks and processes on the computer were recently used.  Web
26  browsers, e-mail programs, and chat programs store configuration
27  data on the hard drive that can reveal information such as online
28  nicknames and passwords.  Operating systems can record additional

92

1 | data, such as the attachment of peripherals, the attachment of
2 | USB flash storage devices, and the times the computer was in use.
3 | Computer file systems can record data about the dates files were
4 | created and the sequence in which they were created. This data
5 | can be evidence of a crime, indicate the identity of the user of
6 | the digital device, or point toward the existence of evidence in
7 | other locations. Recovery of this data requires specialized
8 | tools and a controlled laboratory environment.

9 |        f.    Further, evidence of how a digital device has been
10 | used, what it has been used for, and who has used it, may be the
11 | absence of particular data on a digital device. For example, to
12 | rebut a claim that the owner of a digital device was not
13 | responsible for a particular use because the device was being
14 | controlled remotely by malicious software, it may be necessary to
15 | show that malicious software that allows someone else to control
16 | the digital device remotely is not present on the digital device.
17 | Evidence of the absence of particular data on a digital device is
18 | not segregable from the digital device. Analysis of the digital
19 | device as a whole to demonstrate the absence of particular data
20 | requires specialized tools and a controlled laboratory
21 | environment.

22 |        g.    The United States has not attempted to obtain this
23 | data by other means.

24 | **R.    Request for Sealing of Affidavit**

25 |        91.   The criminal investigation regarding HOFFMAN and his
26 | coconspirators is ongoing. A number of additional interviews,
27 | subpoenas, and possible grand jury testimony and search warrants,
28 | are contemplated in the very near future. Based upon my training

1  and experience, I know that criminals actively search for
2  criminal affidavits and search warrants via the internet, and
3  disseminate them to other criminals as they deem appropriate,
4  i.e., post them publicly online.  Disclosure of the contents of
5  this affidavit at this time would seriously impede the continuing
6  investigation and prosecution by disclosing the details of the
7  United States' investigation, which potentially would cause
8  target(s)/subject(s) of the investigation to flee, destroy
9  evidence, or intimidate and attempt to corruptly influence
10 potential witnesses in the case.  Such activity would seriously
11 impede the investigation and prosecution.  Accordingly, I
12 respectfully request that this Court issue an order sealing this
13 Search Warrant Application and Affidavit until further order this
14 Court.

15                              _____
                                Lisa Ulrikson
16                              Special Agent, IRS-CI

17

18
   Subscribed and sworn to before me
19 this _____ day of September _21_, 2011.
20          VICTOR B. KENTON
   _____
21 United States Magistrate Judge

22

23

24

25

26

27

28

                              94